J. Henk Taylor – State Bar No. 016321
**WARNER ANGLE HALLAM**
  **JACKSON & FORMANEK PLC**
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
E-mail:  htaylor@warnerangle.com

*Proposed Counsel for the Debtor*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **In Re:** | **Case No. 2:23-bk-02832-DPC** |
| **LEGACY CARES, INC.,** | **Chapter 11** |
| **Debtor.** | |

### DECLARATION OF KEITH B. BIERMAN, CPA IN SUPPORT OF THE DEBTOR'S MOTION TO APPROVE USE OF CASH COLLATERAL AND BORROWING UNDER SECTION 364

I, Keith Bierman, declare as follows:

1.      I am over the age of 18 and am mentally competent. I make this declaration (the " Bierman Declaration") in support of the *Motion for Orders (I) Authorizing Debtor to Obtain Postpetition Financing on Priming, Superpriority and Secured Basis; (II) Permitting Use of Cash Collateral; (III) Granting Interim and Additional Relief; and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(c)* (the "DIP Motion") filed by Legacy Cares, Inc. ("Debtor" or "Cares") in the above- captioned case (the "Chapter 11 Case").

2. The facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of Debtor, Debtor's management firm, or my opinion based upon experience, knowledge, and information concerning the operations of Debtor, its business operations and the industry as a whole. If called upon to testify, I would testify competently to the facts set forth herein.

**A. <u>Background and Qualifications.</u>**

3. I am a Senior Managing Director at MCA Financial Group, Ltd. ("<u>MCA</u>") in Phoenix, Arizona. MCA is a leading restructuring consulting firm providing advisory services to emerging growth and mid-size corporations on significant mergers, acquisitions, divestitures, restructurings and other strategic corporate transactions. I am a Certified Public Accountant in the state of Arizona. I have been a member of MCA since 2001, prior to which I was Corporate Controller and Vice President of Finance at a software development firm from 1998 to 2000, and prior to that I was a member of the Assurance and Advisory Group at KPMG, LLP from 1996 to 1998. As a consultant focused on restructuring, bankruptcy, receivership, turnarounds and other special situations since 2001, I regularly advise companies and various creditor constituencies in financial restructurings, both in Chapter 11 proceedings as well as in out-of-court transactions, and also regularly advise and assist companies in stressed or distressed situations.

4. I have led hundreds of corporate turnaround engagements in my twenty plus years at MCA. Such engagements include out of court restructurings, CRO engagements,

- 2 -

Warner Angle Hallam Jackson & Formanek PLC

Warner Angle Hallam Jackson & Formanek PLC

bankruptcy reorganizations, receiverships, liquidating agent, responsible party and other similar roles. MCA also assists its clients to obtain various forms of financing including, but not limited to: secured financing, mezzanine financing, subordinated debt, unsecured financing, and DIP loans. As such, I am familiar with lending markets, customary lending terms, market rates of interest, collateral valuation, security interests and other debt lending terms and conditions.

5. MCA has rendered financial advisory services to Debtor in connection with its restructuring efforts since January 2023 when MCA was retained by Debtor as its Chief Restructuring Officer ("CRO") pursuant to a consulting agreement. I lead the MCA engagement team in our capacity as CRO. As the CRO for Debtor, I am integrally involved in all aspects of Debtor's operations and finances, and I work closely with Debtor's board of directors, management and legal counsel. Among other duties and responsibilities, I have, among other things, (a) analyzed Debtor's historical financial statements, its historical cash flows, its current liquidity and its projected cash flows; (b) assisted Debtor in evaluating its restructuring options and other strategic alternatives; (c) interfaced directly with Debtor's various management firms regarding operations and finances of Debtor's day to day activities, (d) prepared numerous budgets and cash flow analysis necessary to obtain pre-petition funding from Debtor's pre-petition secured lender necessary to continue the operations of Debtor, (e) routinely communicated with Debtor's creditors including its pre-petition secured lender and its legal and business advisors regarding a host of business

- 3 -

issues facing Debtor, (f) as part of preparing Debtor for its Chapter 11 filing, I conducted an analysis of and assisted Debtor in securing debtor-in-possession financing ("DIP Financing") on the most competitive terms and conditions believed to be available to Debtor under the circumstances.

### B. Debtor's Operations.

6.     Debtor owns Legacy Park, a 320-acre multi-sport facility located in Mesa, Arizona that caters primarily to amateur athletes and their families who travel locally and from across the country to play in athletic tournaments and to use the facilities for practice and entertainment (the "Park"). The Park has 8 baseball and softball fields, 19 basketball courts, 35 soccer, football and lacrosse fields, 57 indoor volleyball courts, 12 beach volleyball courts and 1,500-seat stadium, 85 arcade games, 41 pickleball courts and a 2,000-seat stadium, and 22 futsal courts (a small-sided soccer game), among others. The Park also contains a full-service restaurant, food and beverage concessions, a physical therapy clinic, state of the art sports performance training facilities, game arcade, convention areas, golf simulators, festival grounds, entertainment venues, among other amenities. The Park is considered the largest sports and entertainment facility in North America. The Park's facilities and operations are capital intensive. The sheer size of the Park necessitates continuous and oftentimes expensive maintenance of its playing surfaces, amenities and common areas in order to attract as many participants and guests as possible. There are significant fixed costs associated with the Park's infrastructure that must be

- 4 -

Warner Angle Hallam Jackson & Formanek PLC

maintained at a high level. Nearly all of Debtor's assets are leased or financed necessitating regular lease and debt service payments in order to continue to use the assets Debtor and its guests rely upon.

7. The Park's day-to-day operations are managed by a third party sports and facilities management firm, Elite Sports Group, LLC ("ESG"), pursuant to a Qualified Management Agreement ("QMA"). The QMA provides, in part, that Debtor is responsible for paying for, or reimbursing, the direct costs associated with the activities of the Park. Cost categories such as payroll, activities expenses (balls, nets, equipment, etc.) must all be reimbursed or paid for directly by Debtor. Debtor is also responsible for all non-direct fixed and variable costs of the Park, including rent, utilities, janitorial, ground maintenance, leases, advertising, and other costs necessary to operate and maintain the facilities. Failure to pay such expenses will result in decreased athletic participation rates, reduced utilization of the Park by guests, and deterioration of the Park's facilities.

8. The Park opened in February 2022. Since its opening, the Park has operated at a loss. As a result, Debtor has been exploring options to restructure its debt and/or operations since the fall of 2022.

**C. The Trustee.**

9. Debtor financed the construction of the Park through loans funded by the proceeds of revenue bonds issued by the Industrial Development Authority in 2020 and 2021. UMB Bank, N.A., serves as the trustee ("UMB") for the holders of these bonds. As

- 5 -

Case 2:23-bk-02832-DPC    Doc 10    Filed 05/01/23    Entered 05/01/23 12:19:26    Desc
Main Document    Page 5 of 14

Warner Angle Hallam Jackson & Formanek PLC

of the Petition Date in this case, Debtor owes the Trustee approximately $301,000,000 under various loan and security documents described more particularly in the Moss Declaration. UMB is Debtor's primary secured creditor.

10. Debtor does not own the real estate on which the Park sits. Rather, Debtor occupies the Park premises under the terms of a 40-year ground lease (the "Ground Lease") with the lessor, Pacific Proving, LLC.

11. The Debtor's leasehold estate under the Ground Lease—and the structures, improvements and fixtures of the Park—comprise the bulk of Debtor's assets and the most of the collateral for the debt owed to UMB.

### D. **Effort to Recapitalize.**

12. Given the Park's consistent operational shortfall, in the summer of 2022, Debtor's former third-party sports manager, Legacy Sports, USA, LLC ("Sports") retained Loop Capital ("Loop") a full-service investment bank, brokerage and advisory firm, so seek alternative financing sources and/or a restructuring of Debtor's existing bonds. I had numerous meetings and calls with Loop personnel regarding their efforts to obtain new financing alternatives/structures in order to improve Debtor's financial liquidity. However, Loop was ultimately not able to procure the additional financing under a timeline sufficient to allow the Park to continue to operate without material disruption to its operations.

Warner Angle Hallam Jackson & Formanek
PLC

- 6 -

**E. Need for Cash Collateral and Post-Petition Financing.**

13. Post-petition financing of the Debtor's operations is necessary given the Debtor's liquidity situation, which is described further in the Moss Declaration. The Debtor needs both access to credit and use of cash collateral in order to pay amounts due under the QMA, employees, vendors, customers and suppliers, make necessary capital expenditures to maintain and replace equipment, give all stakeholders the confidence that Debtor will remain a viable going-concern business, and to effectuate a successful restructuring, including the payment of professional fees and other administrative costs.

14. Debtor requires immediate access to cash in order to avoid a loss of going-concern value and ensure a smooth transition into the Chapter 11 Case and to maintain the Park in good condition so that it will be attractive to potential buyers. Debtor requires the immediate use of cash to pay operating expenses, including employees, vendors, rent, insurance, utilities among other expenses. To assess immediate funding needs, Debtor and MCA, with input from Debtor's third-party Park operations manager ESG, developed a nine-month cash flow forecast taking into account cash receipts and disbursements anticipated over the budget period. MCA analyzed the impact of a bankruptcy filing on changes in working capital, anticipating that there would be a potential contraction of sources of cash receipts and in trade credit, which will limit available working capital. MCA also projected material cash disbursements such as capital expenditures, rent,

Warner Angle Hallam Jackson & Formanek PLC

- 7 -

accounts payable, insurance payments, payments to utilities, payroll and other material disbursements.

15. Based on information provided by Debtor, I believe the 7-month summary of projected cash flows attached hereto as Exhibit "A" is a reasonably accurate representation of Debtor's working capital needs from the Petition Date through October 2023 and analysis of Debtor's liquidity during that period (the "Initial Budget"). The Initial Budget was developed by members of MCA, including myself, with assistance from Debtor's President, Debtor's Chief Financial Officer, and Debtor's third-party Park operations manager.

16. To assess Debtor's funding needs, MCA worked with the Debtor to develop cash flow forecasts taking into account historical cash receipts and disbursements, contractual commitments, projected needs of the Park as well as other factors. Together with Debtor, we analyzed the impact of a bankruptcy filing on changes in working capital and other material cash disbursements, determined potential cash outlays that would impact the amount of cash necessary to maintain operations throughout the Chapter 11 Case, including required vendor payments, capital expenditures, and other material disbursements. MCA also analyzed Debtor's projected financial performance over the anticipated length of the Chapter 11 Case and analyzed the cash needs required to maintain operations during the Chapter 11 Case and work to reorganize within the required time frame. These projections were used to determine the total funding required under the

proposed DIP credit facility and will be submitted prior to the final hearing on the DIP Motion. Together with the use of cash collateral, the funding requested in the DIP Motion on a final basis is anticipated to be adequate to meet these needs.

17. Absent access to cash collateral and the working capital that will be available to Debtor under the DIP credit facility, as set forth in the Initial Budget, I believe Debtor will be unable to maintain its business operations resulting in a diminution of the value of Debtor's assets and the estate. In all likelihood, without the availability of funding provided by the DIP credit facility, the Park will need to be closed to further use. The result would likely be the liquidation of Debtor's business and the attendant loss of going-concern value. Further, the lack of funding available to Debtor in the Chapter 11 Case will result in deterioration of Debtor's physical facilities as many of the playing surfaces and amenities require constant upkeep in order to maintain the quality of experience for the athletes and patrons of the Park. Debtor's estate will suffer immediate and irreparable harm if Debtor's use of cash collateral and the DIP credit facility is not approved on an interim basis. As such, I believe Debtor's use of cash collateral and the DIP credit facility are in the best interests of Debtor's estate and creditors.

Warner Angle Hallam Jackson & Formanek PLC

- 9 -

## F. The DIP Credit Facility Terms.

18.     As noted, Debtor has a significant amount of debt owed to UMB as of the Petition Date secured by a first lien on substantially all of the assets of Debtor. The amount of Debtor's secured debt effectively leaves little or no significant collateral available for a new lender.  Debtor has not generated a profit since its inception; and does not have cash flow sufficient to service any new debt, let alone the existing secured debt owed to the current bondholders.  As a result, in my opinion, obtaining new debt without the consent of the bondholders and UMB, as trustee, is not feasible.  Debtor is not able to offer UMB adequate protection of its pre-petition liens.

19.     Debtor and its advisors conducted arm's-length negotiations with UMB regarding the terms of the proposed "Priming Superpriority Debtor-in-Possession Credit Agreement" (the "DIP Credit Agreement") attached as Exhibit A to the DIP Motion.  The terms of the DIP Credit Agreement reflect the most favorable terms on which the UMB was willing to offer financing and authorize use of cash collateral.  MCA and Debtor's analysis of UMB's proposal for debtor-in-possession financing and use of cash collateral resulted in MCA and Debtor concluding that the terms of the DIP Credit Agreement were very favorable under the circumstances.  The interest rate of the DIP Credit Agreement provided by UMB, the term of the DIP Credit Agreement and the lack of covenants requiring Debtor to take quick and rash actions, provides Debtor time to continue to benefit

- 10 -

Warner Angle Hallam Jackson & Formanek PLC

from the ongoing operations of the Park in anticipation of a going concern sale to a third party buyer.

20. I believe the DIP Credit Agreement negotiated with UMB provides significant benefits to Debtor. First, it provides Debtor with a substantial amount of time and liquidity in a Chapter 11 Case. Second, while the commencement of the Chapter 11 Case is likely to have an adverse impact on Debtor's operations, the proposed DIP financing should assure athletes, patrons, sponsors and visitors that a bankruptcy would not impact services. Third, the DIP financing provides Debtor time to continue its efforts to market and sell the Park to the highest and best bidder.

21. Under the DIP Credit Agreement, UMB has agreed to the terms of a DIP credit facility for Debtor to obtain post-petition financing up to an aggregate principal amount not to exceed $9,000,000.

22. Debtor has an immediate need to use the DIP financing and UMB's cash collateral to continue operating the Park and resolve this case. Debtor needs the DIP financing to permit the orderly continued operation of the Park, to pay vendors and employees, and to market the Park and resolve this case. Because Debtor's existing cash on hand and projected operating revenues will not be sufficient for Debtor to accomplish these things, or to pay other operating expenses and administrative expenses pending the completion of the restructuring process, it is imperative that Debtor obtains post-petition financing at the outset of this case. Having an assured cash flow will encourage employees,

- 11 -

Warner Angle Hallam Jackson & Formanek PLC

customers, and vendors to deal with Debtor on an ongoing basis. If Debtor is unable to secure post-petition financing, Debtor will be forced to terminate Park operations immediately, to the substantial detriment of Debtor's estate and all creditors.

23. The access to liquid assets through the DIP financing and use of cash collateral is therefore vital to the preservation and maintenance of the going concern value of the Park and maximizing its value for the benefit of all creditors. Debtor's proposed Initial Budget identifies anticipated sources and uses of cash on a weekly and monthly basis.

24. Debtor's assets are severely underwater. Debtor's primary assets—the leasehold under the Ground Lease and the structures, improvements and fixtures at the Park—are subject to UMB's perfected lien. While Debtor has not appraised these assets, both Debtor and UMB recognize that the debt owed to UMB on its pre-petition loans is several multiples of the combined value of these assets. Moreover, the Park losses total approximately $1 million a month in its operations; and this cash burn will only increase as we approach the summer season, which is the slowest part of the year for the Park's business. Given the continued operating losses, and the immediate need to stabilize the Park's continued operation through a sale, Debtor cannot realistically secure post-petition financing from a source other than UMB.

25. Debtor therefore determined, in the exercise of its sound business judgment, that the proposal for DIP financing and use of cash collateral as set forth in the DIP Credit

- 12 -

Warner Angle Hallam Jackson & Formanek PLC

Agreement provided by UMB is the most favorable under the circumstances and addresses Debtor's needs. Debtor does not believe it could obtain proposals for post-petition financing on terms and conditions more favorable to Debtor's estate than those offered by UMB.

26. A rapid plan process is warranted here because Debtor lacks the financial ability to operate in bankruptcy for months on end where its operations are cash flow negative. Debtor's asset values do not support ongoing administrative expenses and a substantial amount of DIP financing. A plan to sell the Park must be implemented immediately to avoid wasteful expenditures. Without prompt but realistic plan deadlines, UMB is not willing to fund the DIP facility and approve use of its cash collateral; and without the DIP facility and access to cash, Debtor would not be able to maximize its value. These deadlines may not be set in stone, as UMB has the ability to extend the deadlines at its discretion. Further, these deadlines will ensure that the process will proceed as quickly as possible, while also providing sufficient time for Debtor to comply with all necessary rules and applicable law.

- 13 -

Warner Angle Hallam Jackson & Formanek PLC

27. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 28 day of April, 2023.

_____

Keith B. Bierman, CPA

Warner Angle Hallam Jackson & Formanek PLC

- 14 -