# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>LEGACY CARES, INC.,<br><br>                Debtor. | Case No. 2:23-bk-02832-DPC<br><br>Chapter 11<br><br>**ORDER (I) AUTHORIZING THE RETENTION OF MCA FINANCIAL GROUP, LTD. AS FINANCIAL ADVISOR, EFFECTIVE AS OF THE PETITION DATE, AND (II) GRANTING RELATED RELIEF** |

Upon consideration of the *Debtor's Application for Entry of an Order (I) Authorizing the Retention and Employment of MCA Financial Group, Ltd. as Financial Advisor, Effective as of the Petition Date, and (II) Granting Related Relief* (the "Application")[1], filed by the above-captioned debtor (the "Debtor"); the Court having reviewed the Application, the Bierman Declaration; the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application

proceeding pursuant to 28 U.S.C. § 157(b), (iv) the terms and conditions of MCA's employment, including, but not limited to, the Fee and Expense Structure set forth in the Engagement Letter and summarized in the Application, are reasonable; (v) MCA is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code; and (vi) notice of the Application was sufficient under the circumstances; after due deliberation the Court having determined that the relief requested in the Application is necessary and essential for the Debtor's reorganization and such relief is in the best interests of the Debtor, its estate, its creditors, and all parties in interest; and good and sufficient cause having been shown,

**IT IS HEREBY ORDERED THAT:**

1. The Application is GRANTED as set forth herein.

2. The Debtor is authorized, pursuant to sections 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, to employ and retain MCA as its financial advisor in accordance with the terms and conditions set forth in the Engagement Letter and to pay fees and reimburse expenses to MCA on the terms and at the times specified in the Engagement Letter, as may be modified by this Order.

3. The terms of the Engagement Letter attached hereto as **Exhibit 1** are approved in all respects except as limited or modified herein.

4. The following language in paragraph 9 of the Engagement Letter is hereby deleted: "Further, in no event shall the total aggregate liability of MCA relating to the services provided hereunder or otherwise arising under this Agreement to Client and its

- 2 -
Case 2:23-bk-02832-DPC    Doc 142    Filed 05/25/23    Entered 05/25/23 17:56:27    Desc
Main Document    Page 2 of 12

successors and assigns exceed the total amount of fees received and retained by MCA hereunder."

5. MCA's compensation, as set forth in the Engagement Letter, including, without limitation, the Fee and Expense Structure, will be subject to Court review and approval pursuant to sections 330 and 331 of the Bankruptcy Code. MCA shall be compensated and reimbursed upon submission and approval of fee applications according to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable orders of this Court.

6. The Debtor shall be bound by the indemnification, contribution, reimbursement, exculpation and other provisions of the Engagement Letter and will indemnify and hold harmless MCA and the other Indemnified Parties, pursuant to the Engagement Letter, subject, during the pendency of this Chapter 11 Case, to the following modifications:

    a. No Indemnified Person shall be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Letter for services unless such services and the indemnification, contribution, or reimbursement therefor are approved by the Court;

    b. The Debtor shall have no obligation to indemnify any Indemnified Person, or provide contribution or reimbursement to any Indemnified Person for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from such Indemnified Person's bad faith, gross negligence, willful misconduct, fraud, breach of fiduciary duty, if any, or self-dealing; (ii) for a contractual dispute in which the Debtor alleges the breach of MCA's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to applicable law ; or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing, to be a claim or expense

- 3 -
Case 2:23-bk-02832-DPC   Doc 142   Filed 05/25/23   Entered 05/25/23 17:56:27   Desc
Main Document    Page 3 of 12

for which such Indemnified Person should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter as modified by this Order; and

    c. If, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in this Chapter 11 Case (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing this Chapter 11 Case, any Indemnified Person believes that it is entitled to the payment of any amounts by the Debtor on account of the Debtor's indemnification, contribution and reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, MCA must file an application therefor in this Court, and the Debtor may not pay any such amounts to MCA before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by MCA and the other Indemnified Persons for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtor's obligation to indemnify the Indemnified Persons. All parties in interest shall retain the right to object to any demand by any Indemnified Person for indemnification, contribution or reimbursement.

7. The Debtor and MCA are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062 or 9014.

9. The relief granted herein shall be binding upon any Chapter 11 trustee appointed in this Chapter 11 Case, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of this Chapter 11 Case to case under chapter 7.

10. To the extent that this Order is inconsistent with the Engagement Letter, the terms of this Order shall govern.

11. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

**DATED AND SIGNED ABOVE.**

# EXHIBIT 1

## CONSULTING AGREEMENT

*AGREEMENT* (the "Agreement") is effective this 26th day of April 2023, by and between Legacy Cares, Inc., an Arizona non-profit corporation (herein referred to as the "Client" or the "Company") and MCA Financial Group, Ltd., ("MCA"). The Company is the owner of Bell Bank Sports Park, a 320-acre multi use athletic facility located in Mesa, Arizona (the "Park").

### RECITALS:

*A.* Client desires to obtain MCA's services in connection with certain financial and operational matters germane to the filing of a Chapter 11 Bankruptcy Petition by the Company (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"); and

*B.* MCA desires to provide such services to Client directly for a fee that will compensate it for time spent for services rendered and costs advanced by MCA as contemplated hereunder.

*NOW, THEREFORE,* in consideration of the foregoing and of the mutual promises and conditions hereinafter set forth, the Parties agree as follows:

1. *Retention and Termination of MCA.* Client hereby engages and retains MCA and MCA hereby agrees to use its best efforts to render to Client the consulting services from the date hereof until terminated by the Parties. Client may terminate this Agreement by providing notice that the Agreement will terminate in ten (10) days.

2. *MCA's Services.* MCA's services hereunder are set forth below and in further detail in <u>Exhibit A</u> to this Agreement.

    i) MCA will serve as the financial advisor to the Company in the Bankruptcy and will report directly to the Company's Board of Directors (the "Board") and will have the responsibilities as set forth herein. Notwithstanding the authorities and responsibilities of the MCA, the Board will retain the ultimate decision-making authority for the Company.

    ii) MCA is authorized to communicate directly with members of the Board, Company employees, creditors, contractors, partners, sponsors, vendors and other constituencies and their respective legal and other advisors regarding all functions of the Company including, but not limited to: sales, operations, personnel, finance and accounting, monitoring accounts payable and accounts receivable, monitoring management fees and advances, financial reporting, sale efforts, capital formation, reorganization efforts and alternatives including revising or amending the current management structure and management agreements, and other activities as may be relevant from time to time in the best interests of Company;

    iii) MCA shall be permitted to communicate directly with legal counsel for the Company. Such communications shall be considered attorney-client

1

privileged communications and MCA shall not waive the attorney-client privilege without consent of Company, and

iv) Assist Client with other matters as requested from time to time.

3. ***Payment for Services.*** Client shall pay MCA the sum of $550 per hour for Senior Managing Directors, $450 per hour for Managing Directors, $395 per hour for Directors, $295 for Associates, and $125 per hour for administrative and research personnel for the services to be rendered hereunder, which fee shall be payable upon billing. MCA shall be reimbursed for all direct expenses incurred in performing such services. Client shall pay $75 per hour for non-billable out of town travel time of professionals (outside of the Phoenix metro area). Requests for reimbursement shall be tendered by MCA and shall be paid by Client upon receipt of billing.

MCA shall receive a retainer in the amount of $204,210.43 which shall be held by MCA and applied to the final billings pursuant to an appropriate order from the Bankruptcy Court. Any unused retainer shall be returned to Client upon termination of this Agreement.

Upon the filing of a Bankruptcy Case, the Company will promptly seek authority to retain MCA in the Bankruptcy Case as financial advisor to the Company as debtor in possession. MCA acknowledges that its continued engagement as a financial advisor to the Company once the Company has commenced a Bankruptcy Case is contingent upon the Bankruptcy Court approving MCA's employment in the Bankruptcy Case pursuant to 11 U.S.C. § 327(a). MCA further acknowledges right to payment for services rendered by MCA after the commencement of a Bankruptcy Case is contingent upon: (a) MCA filing appropriate interim and final fee applications for its services in the Bankruptcy Case as required by 11 U.S.C. §§ 330 and 331 and Bankruptcy Rule 2016; and (b) the Bankruptcy Court approving such fee applications in the Bankruptcy Case.

4. ***MCA's Time Commitment.*** MCA shall devote such time as reasonably requested by Client for consultation, advice and assistance on matters described herein and provide the same in such form as Client requests; however, MCA anticipates that it will spend considerable time to perform the services required hereunder.

5. ***Independent Contractor.*** The relationship created hereunder is that of a consultant acting as an independent contractor through the MCA's firm. The parties acknowledge and agree that MCA shall have no authority to, and shall not, bind Client to any agreement or obligation with any third party. The parties also acknowledge that MCA is not providing legal services or acting as a broker/dealer and such services must be obtained by Client from other parties. Client agrees that MCA shall not be prevented or barred from rendering services similar or dissimilar in nature for and on behalf of any person, firm or corporation other than Client in any matter unrelated to the Projects.

6. ***Nondisclosure of Confidential Information.*** MCA acknowledges that it is the policy of Client to maintain as secret and confidential all valuable information heretofore or hereafter acquired, developed or used by Client relating to its business, operations, employees and customers which may give Client a competitive advantage in its industry (all such information is hereinafter referred to as "Confidential Information"). The Parties recognize that, by reason of MCA's duties hereunder, MCA may acquire Confidential Information. MCA

recognizes that all such Confidential Information is the property of Client. In consideration of Client entering into this Agreement, MCA agrees that:

> i) It shall not, directly or indirectly, use, publish, disseminate or otherwise disclose any Confidential Information obtained during its engagement by Client except as required by the MCA to perform his duties described herein, it is understood that this subparagraph shall survive the termination of this Agreement; and
>
> ii) During the term of its engagement by Client, it shall exercise all due and diligent precautions to protect the integrity of any or all of Client's documents containing Confidential Information.

7. ***Communications with MCA.*** MCA will not independently conduct a due diligence review of Client and will, to a great extent, be relying upon information provided by Client.

8. ***Exculpation of Liability and Indemnification.*** All decisions with respect to consultations or services rendered by MCA for transactions negotiated for and presented to Client by MCA shall be those of Client, and MCA shall have no liability with respect to such decisions made by Client. In connection therewith, Client agrees to indemnify and hold MCA harmless against any and all losses, claims, damages and liabilities and the expense, joint and several, to which MCA may become subject and will reimburse MCA for any legal and other expenses, including attorney's fees and disbursements incurred by MCA in connection with investigating, preparing or defending any actions commenced or threatened or claim whatsoever, whether or not resulting in the liability, unless such claims, damages, or liabilities arise from the gross negligence or intentional misconduct of MCA.

The foregoing indemnification shall not, however, apply to any damage, claim, loss or expense which arises from MCA's gross negligence or willful misconduct.

9. ***Limitation on Damages.*** As to the services that Client has requested and MCA has agreed to provide as set forth in this Agreement, the total aggregate liability of MCA under this Agreement to Client and its successors and assigns, shall be limited to the actual damages incurred by Client or its successors or assigns. In no event will MCA or any of its affiliates be liable to Client or its successors or assigns for consequential, special or punitive damages, including loss of profit, data, business or goodwill.

Further, in no event shall the total aggregate liability of MCA relating to the services provided hereunder or otherwise arising under this Agreement to Client and its successors and assigns exceed the total amount of fees received and retained by MCA hereunder.

10. ***Entire Agreement.*** This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter contained herein. There are no representations or warranties other than as shall be set forth herein.

11. ***Waiver.*** No waiver or modification of this Agreement shall be valid unless in writing and signed by the parties hereto.

3

12. ***Notices.*** All notices, consents, requests, demands and offers required or permitted to be given under this Agreement will be in writing and will be considered properly given or made when personally delivered to the party entitled thereto, or when mailed by certified United States mail, postage prepaid, return receipt requested, addressed to the addresses appearing in this Agreement. A party may change its address by giving notice to the other party hereto.

13. ***Counterparts.*** This Agreement may be signed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall constitute one agreement. It shall not be required that any single counterpart hereof be signed by the Parties, so long as each Party signs any counterpart hereof.

14. ***Applicable Law.*** This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

15. ***Attorneys' Fees.*** In case of any action or proceeding to compel compliance with, or for a breach of, any of the terms and conditions of this Agreement, the prevailing Party shall be entitled to recover from the losing Party all costs of such action or proceeding, including, but not limited to, reasonable attorneys' fees.

***IN WITNESS WHEREOF,*** the undersigned have executed this Agreement to be effective as of the day and year first above written.

MCA Financial Group, Ltd.  
An Arizona Corporation

By: /s/ Keith Bierman  
Its: Senior Managing Director

Legacy Cares, Inc.  
An Arizona non-profit corporation

By: /s/ Douglas Moss  
Its: President

4

<u>Exhibit A</u>

<u>Summary of Services to be Provided by MCA</u>

<u>Financial and Cash Management</u>

1. Oversee cash and liquidity management of the Company including conducting an ongoing review and management of the Company's:
   a. Current cash forecasting tools, data sources, assumptions and drivers and any consolidation processes.
   b. Current liquidity management and working capital reporting roll-forwards, processes, and systems.
2. Prepare, analyze and evaluate the Company's budgets and cash projections necessary to manage its cash flow and obtain borrowings pursuant to any approved Debtor in Possession Borrowing Facility (the "DIP Budget").
   a. Interface with the required personnel in order to prepare the Company's DIP Budget and related cash needs.
   b. Maintain and update the DIP Budget as necessary to provide the Court and creditors with updated financial information and borrowing requirements of the Company.
   c. Provide answers to questions concerning the assumptions and inputs used to prepare the DIP Budget.
3. Oversee and/or assist with any Company treasury functions including disbursement of expenditures for operating expenses.

<u>Operational Matters</u>

4. Review, monitor and make recommendations to the Board concerning operations, organizational structure, roles and responsibilities of the personnel at the Company.
5. Interface directly with and manage the relationship with any management companies providing services to the Company.
   a. If necessary, propose changes to key management contracts to the Board for review and approval, subject to Court approval.
6. Provide organization and operational strategy alternatives with an objective of optimizing the Company's operations, and financial performance.
7. Execute on organizational and operational improvement opportunities identified by the MCA and approved by the Board, subject to Court approval, as needed.

<u>Creditor Management and Communications</u>

8. Interface with third party creditors of the Company and communicate with creditors concerning the ongoing provision of goods and services by creditors to the Company.
9. Communicate with the Trustee, UMB Bank, and its advisors concerning matters related to the Bankruptcy proceedings, borrowings pursuant to any credit facilities, financial reporting, among others.

5

Case 2:23-bk-02832-DPC   Doc 142   Filed 05/25/23   Entered 05/25/23 17:56:27   Desc
Main Document    Page 11 of 12

10. Prepare summaries of creditor claims as requested by legal counsel for the Company.

Support the Company's Sale Efforts

11. Interface with and support the efforts of any investment banker(s) retained by the Company pursuant to an engagement to sell the Company's assets during the Bankruptcy proceedings.
    a. Provide information to the investment banker for the preparation of materials to market and sell the assets of the Company.
    b. Provide due diligence information to the investment banker for review by prospective purchasers.
    c. Facilitate tours of the Park by prospective purchasers.
    d. Review and evaluate proposals to purchase the Company and provide advice to the Company concerning strengths and weaknesses of each proposal.
    e. Review and evaluate any sale documents including purchase agreements, motions to sell, etc.
12. Prepare, if necessary financial projections and operating plans for the purpose of effectuating a potential sale of the Company.

Assist the Company's Legal Counsel and the Company During the Bankruptcy

13. Prepare analysis requested by the Company's legal counsel in connection with the Bankruptcy.
14. Assist legal counsel in the preparation of any Plan of Reorganization and related documents and support, if necessary.
15. Provide testimony, both written and in person, concerning matters before the Bankruptcy Court for consideration.
16. Advise the Company's Board concerning matters that arise during the pendency of the Bankruptcy.
17. Participate in any meetings including, the Initial Debtor Interview, Initial Meeting of Creditors, and other required meetings pursuant to the Bankruptcy.

Accounting System and Financial Reporting

18. Assist the Company to maintain its financial accounting and reporting functions to ensure current, updated financial information is available to the Court and creditors.
19. Assist the Company to prepare Monthly Operating Reports and other required financial reports as necessary during the Bankruptcy.

General Duties

20. Communicate with trade creditors, vendors and suppliers concerning issues as may occur from time to time including the extension of credit necessary to continue the Company's operations without interruption.
    a. Coordinate legal responses, if necessary, with the Company's legal counsel.
21. Assist management of the Company and the Board, where appropriate, to achieve the successful execution of the Company's objectives.