# EXHIBIT 25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

```
_____
In re:                                  )
                                        )
LEGACY CARES, INC.        CH: 11        )     2-23-02832
                                        )
TRANSCRIPT OF SECTION 341 HEARING       )
                                        )
MEETING OF CREDITORS                    )
_____)
```

U.S. Bankruptcy Court
230 N. First Avenue, Suite 101
Phoenix, AZ 85003-1706

June 6, 2023
9:00 a.m.

BEFORE TRUSTEE JENNIFER GIAIMO, Hearing Officer

VIDEO/TELEPHONIC HEARING

<u>APPEARANCES:</u>

| | |
|---|---|
| For the Debtor: | J. Henk Taylor<br>WARNER ANGLE HALLAM JACKSON<br>& FORMANEK, PLC<br>2555 E. Camelback Rd., Ste. 800<br>Phoenix, AZ 85016 |
| For UMB Bank: | Peter Riggs<br>SPENCER FANE LLP<br>2415 E. Camelback Rd., #600<br>Phoenix, AZ 85016 |
| For Unsecured Creditors<br>Committee: | Jordan Kroop<br>PACHULSKI, STANG, ZIEHL & JONES<br>10100 Santa Monica Blvd.<br>13th Floor<br>Los Angeles, CA 90067-4003 |
| For Two Entities: | D. Lamar Hawkins<br>GUIDANT LAW FIRM<br>402 E. Southern Avenue<br>Tempe, AZ 85282 |



APPEARANCES: (Continued)

For RKS Plumbing:                James Reed
                                 UDALL SHUMWAY
                                 1138 N. Alma School Rd., #101
                                 Mesa, AZ 85201

For Haydon Companies, Inc.:      Robert Warnicke
                                 WARNICKE LAW PLC
                                 1 E. Washington Street, #400
                                 Phoenix, AZ 85004

For Kearney Electric, Inc.:      Philip J. Giles
                                 ALLEN, JONES, AND GILES PLC
                                 1850 N. Central Avenue, #1150
                                 Phoenix, AZ 85004

For Insight Investments, LLC:    Kathleen M. Allare
                                 2901 N. Central Avenue, #20
                                 Phoenix, AZ 85012

For Wholesale Floors:            Bradley D. Pack
                                 ENGELMAN BERGER PC
                                 2800 N. Central Ave., Ste. 1200
                                 Phoenix, AZ 85004

 Also Present:                   Douglas Moss
                                 President of Legacy Cares

                                 Keith Bierman
                                 Senior Managing Director of MCA

Proceedings recorded by electronic sound recording; transcript
produced by eScribers, LLC.

eScribers
www.escribers.net | 800-257-0885

```
                          INDEX

WITNESS:                       PAGE

Douglas Moss
   (By the Hearing Officer)    7, 51, 71, 98, 112, 114
   (By Mr. Hawkins)            85
   (By Mr. Reed)               86
   (By Mr. Warnicke)           90
   (By Mr. Pack)               92

Keith Bierman
   (By the Hearing Officer)    39, 67, 98, 111, 113
   (By Mr. Pack)               92
```

eScribers

www.escribers.net | 800-257-0885

1          HEARING OFFICER:  Okay.  Good morning.  We are

2    officially on the record.  My name is Jennifer Giaimo.  I am an

3    attorney for the United States Trustee, which is a component of

4    the United States Department of Justice.  I will be presiding

5    over this meeting on behalf of the United States Trustee, or

6    UST.

7          We are here telephonically to conduct the meeting of

8    creditors pursuant to Bankruptcy Code Section 341(a) in the

9    matter of Legacy Cares, Inc., case number 23-2832, currently

10   pending in the U.S. Bankruptcy Court for the District of

11   Arizona.

12         It is June 6th, 2023, and the time is approximately 9

13   a.m.  I'd like to ask all participants to please mute your

14   phone while you are not speaking.  In light of the large number

15   of creditors on this call, I will initially take appearances

16   from the debtor, UMB Bank, and the Unsecured Creditors

17   Committee.

18         When I complete my questioning, I will go through the

19   list of creditors who notified the UST that they intended to

20   ask questions and I will give each creditor an opportunity to

21   ask questions.  And before we conclude, I will give any other

22   creditor participating on the call an opportunity to ask

23   questions.  Will the attorney for the debtor please make his

24   appearance?

25         MR. TAYLOR:  Good morning.  This is Henk Taylor for

1 the debtor, Legacy Cares, Inc.

2         HEARING OFFICER: Thank you. I understand that we

3 have two individuals who will be testifying on behalf of the

4 debtor, Mr. Doug Moss and Mr. Keith Bierman. Is that correct,

5 Mr. Taylor?

6         MR. TAYLOR: Yes.

7         HEARING OFFICER: Mr. Doug Moss, can you please state

8 your name and affiliation to the Debtor, for the record?

9         MR. MOSS: Yes. Good morning. Douglas Moss,

10 President of Legacy Cares, Inc.

11         HEARING OFFICER: Thank you. And if you wouldn't

12 mind just trying to speak up a little. Sorry to be a pain, but

13 we just need to make sure that this is all on the record, so

14 I'm going to ask that both you and Mr. Birman really try to

15 speak up.

16         Mr. Birman, can you please state your name and

17 affiliation to the debtor for the record?

18         MR. BIRMAN: Yes. Keith Birman, senior managing

19 director at MCA Financial Group, Ltd. I'm the financial

20 advisor to the Debtor, Legacy Cares, Inc.

21         HEARING OFFICER: Okay. And we -- I think there's a

22 little bit of -- and I really don't want to be a pain, but I

23 really need for you to both really speak up a little bit more

24 because on my end it's sounding a little garbled. Okay?

25         MR. BIERMAN: Okay. We'll do our best.

1      HEARING OFFICER:  Okay.  Will the attorney for UMB

2  Bank please make their appearance if they are on the line?

3      MR. RIGGS:  Good morning.  This is Peter Riggs from

4  the law firm of Spencer Fane, on behalf of UMB Bank.

5      HEARING OFFICER:  Thank you.  And will the attorney

6  for the Unsecured Creditors Committee please make their

7  appearance, if they are on the line?

8      MR. KROOP:  Good morning, everybody.  This is Jordan

9  Kroop, Pachulski, Stang, Ziehl & Jones, on behalf of the

10  Unsecured Creditors Committee.

11      HEARING OFFICER:  Thank you.  I'll start with

12  Mr. Moss.  Do you understand that your testimony here will be

13  under oath and you will be subject to the penalties of perjury

14  if you knowingly give false testimony?

15      MR. MOSS:  Yes.

16      HEARING OFFICER:  Okay.

17      Mr. Bierman, do you understand that your testimony

18  here will be under oath and you will be subject to the

19  penalties of perjury if you knowingly give false testimony?

20      MR. BIERMAN:  Yes.

21      HEARING OFFICER:  So first I will ask Mr. Moss, on

22  your end, please raise your right hand as I administer the

23  oath.

24          DOUGLAS MOSS, DEBTOR'S WITNESS, SWORN

25      HEARING OFFICER:  Next, Mr. Bierman?  Can you please

1  raise your right hand?

2           KEITH BIERMAN, DEBTOR'S WITNESS, SWORN

3           HEARING OFFICER:  Okay.  Mr. Moss, are you aware of

4  any reason why you would not be able to fully understand my

5  questions presented to you, today?

6           WITNESS/MR. MOSS:  No.

7           HEARING OFFICER:  Mr. Bierman, the same question to

8  you?

9           WITNESS/MR. BIERMAN:  No.

10          HEARING OFFICER:  Okay.  Mr. Moss, you were the

11  individual who signed the petition, schedule of assets and

12  liabilities, and the statement of financial affairs on behalf

13  of Legacy Cares in this case, correct?

14          WITNESS/MR. MOSS:  That is correct.

15          HEARING OFFICER:  Before you signed those documents,

16  did you read and understand what you were required to disclose

17  in response to the questions in those documents?

18          WITNESS/MR. MOSS:  Yes, I did.

19          HEARING OFFICER:  Did you provide answers to the

20  questions to Debtors' bankruptcy counsel to input into the

21  forms?

22          WITNESS/MR. MOSS:  Yes, I did.

23          HEARING OFFICER:  Okay.  And did you -- after the

24  information was input into the form, did you double-check that

25  all of the information was complete and truthful?

1          WITNESS/MR. MOSS:  Yes, I did.

2          HEARING OFFICER:  And were you aware that when you

3   signed the petition schedules and statements, that you were

4   attesting under oath to the truth of what was disclosed in

5   those documents?

6          WITNESS/MR. MOSS:  Yes, I was.

7          HEARING OFFICER:  Okay.  Today, are you aware of any

8   inaccuracies in the petition schedules or statements that you

9   signed in this case?

10         WITNESS/MR. MOSS:  No, I am not.

11         HEARING OFFICER:  Okay.  Before I begin the

12  questioning, please note that I will initially state the name

13  of the person to whom the question is being directed, and then

14  the succeeding question should be answered by that same person

15  until I address the second testifying witness.  So I'm going to

16  direct these series of questions to you, Mr. Moss.

17         When did you first become president of Legacy Cares?

18         WITNESS/MR. MOSS:  I believe it was February of 2020.

19         HEARING OFFICER:  Okay.  And in February 2020 when

20  you became president, Randy Miller and Chad Miller had stepped

21  down as directors of Legacy Cares; correct?

22         WITNESS/MR. MOSS:  That is correct.

23         HEARING OFFICER:  When did Larry White first become a

24  director of Legacy Cares?

25         WITNESS/MR. MOSS:  I believe -- I believe it was the

1    same day.

2          HEARING OFFICER:  Okay.  The same day that you became

3    president?

4          WITNESS/MR. MOSS:  That is correct.

5          HEARING OFFICER:  Okay.  And did Larry White serve as

6    chief financial officer of Legacy Cares at any point during

7    2021 and 2022?

8          WITNESS/MR. MOSS:  Yes.

9          HEARING OFFICER:  And do you know when that was?

10          WITNESS/MR. MOSS:  It was -- it was the entire -- it

11    was the entire time.

12          HEARING OFFICER:  Okay.  So from at least August 2020

13    through the bankruptcy filing, Larry White was serving as the

14    chief financial officer of Legacy Cares?

15          WITNESS/MR. MOSS:  Yes.  Yes, that's correct.

16          HEARING OFFICER:  Okay.  So on the statement of

17    financial affairs, page 135, it states that the current board

18    members, as of the petition date, are Dan O'Brien and Natalie

19    Alvarez; correct?

20          WITNESS/MR. MOSS:  Yes, that's correct.

21          HEARING OFFICER:  Okay.  Current --

22          WITNESS/MR. MOSS:  In addition to Larry White and

23    myself.

24          HEARING OFFICER:  Oh.  Okay.  So that's not clear

25    from the disclosure.  So and let me clarify.  You just said in

1 addition to Larry White and myself.  Are you on the Board of

2 Directors?

3             WITNESS/MR. MOSS:  Yes, I am.

4             HEARING OFFICER:  Okay.  And when did you first

5 become on the Board of Directors?

6             WITNESS/MR. MOSS:  The same -- the same day I was

7 named president.

8             HEARING OFFICER:  Okay.  Well, the Arizona

9 Corporation Commission records reflect that you were only the

10 president of Legacy Cares.  It does not reflect that you were a

11 director.  Is that a mistake?

12             WITNESS/MR. MOSS:  I believe it is.

13             HEARING OFFICER:  Okay.

14             WITNESS/MR. MOSS:  Checking -- checking the paperwork

15 right now.

16             HEARING OFFICER:  I'm sorry, you're checking -- can

17 you speak up, please?

18             WITNESS/MR. MOSS:  Yeah.  We're checking --

19 checking -- looking at the paperwork right now.

20             HEARING OFFICER:  Okay.  Well, I'm just telling you

21 what the Arizona Corporation Commission records show, which is

22 public documents.  So for clarification, in February 2020, when

23 you became president, you also became a director of the entity

24 Legacy Cares?

25             WITNESS/MR. MOSS:  Yes.

1        HEARING OFFICER:  Okay.  And when did Dan O'Brien and

2  Natalie Alvarez first become board members?

3        WITNESS/MR. MOSS:  Dan -- Dan O'Brien, I believe, is

4  the same time as Larry White.  And Natalie Alvarez was -- I

5  don't remember the exact name, but it was approximately a year

6  ago.  Maybe nine months ago.  I'd have to look.  I'm not sure

7  offhand.

8        HEARING OFFICER:  Okay.  And again, I'll just let you

9  know that the Arizona Corporation Commission records reflect

10  that -- I believe in 2020, Dan O'Brien was a director, but for

11  2021, 2022, and 2023, Dan O'Brien is not reflected as being on

12  the Board of Directors at Legacy Cares.  So again, is that a

13  mistake on the records on the Arizona Corporation Commission

14  website?

15        WITNESS/MR. MOSS:  Yes, it is.

16        HEARING OFFICER:  Okay.  So I think after the

17  conclusion of the 341 meeting, I'll get with your attorney so

18  we can sort out the paperwork on that, and figure out who was a

19  director and when.

20        WITNESS/MR. MOSS:  Thank you.

21        HEARING OFFICER:  Okay.  And I do think that, for

22  clarification, that the statement of financial affairs of

23  Legacy Cares, in this case, should be amended to reflect that

24  both you and Larry White are board members, in addition to Dan

25  O'Brien and Natalie Alvarez.  Okay?

1  make it -- we needed to make a change on a number of fronts.

2          HEARING OFFICER:  Okay.  Can you --

3          MR. TAYLOR:  And Jennifer, just to clarify, when he

4  refers to QMA, that means qualified management agreement.

5          HEARING OFFICER:  Yes.  Thank you very much, Henk,

6  for putting that on the record.  Thank you.

7          Okay.  So for -- you mentioned performance.  Can you

8  just give me a little bit more specific information about what

9  type of performance problems you were having with Legacy Sports

10 that led to the termination of the contract?

11         WITNESS/MR. MOSS:  Well, the -- the revenues were

12 dramatically under the projection, and we -- we were in the

13 financial position -- position that we found ourselves in where

14 we were unable to pay our bills, make payments to the bond

15 holders, so things needed to change.

16         HEARING OFFICER:  Okay.

17         WITNESS/MR. MOSS:  And needed to change in

18 leadership.

19         HEARING OFFICER:  Okay.  So is it fair to say that

20 part of the reason that Legacy Cares was compelled to file a

21 bankruptcy was as a result of mismanagement by Legacy Sports?

22         WITNESS/MR. MOSS:  A lack of performance of Legacy

23 Sports, as compared to the budget and the expectation.

24         HEARING OFFICER:  Okay.  And would you classify that

25 as mismanagement?

1    WITNESS/MR. MOSS:  I -- I haven't been able to spend

2  the time to really delve into that.  The performance was just

3  not there.  The financial performance wasn't there.  So that's

4  the overriding decision.

5          HEARING OFFICER:  Okay.

6          WITNESS/MR. MOSS:  The causes -- well --

7          HEARING OFFICER:  All right.  So you said you needed

8  new leadership?

9          WITNESS/MR. MOSS:  Yes.

10          HEARING OFFICER:  And then in March of 2023, Legacy

11  Cares replaced Legacy Sports with Elite Sports Group, LLC as

12  the manager of the park; correct?

13          WITNESS/MR. MOSS:  That is correct.

14          HEARING OFFICER:  Okay.  And so who made the decision

15  to contract with Elite Sports?

16          WITNESS/MR. MOSS:  I did.

17          HEARING OFFICER:  And the purported managing member

18  of Elite Sports is Randy Miller's son, Brett Miller; correct?

19          WITNESS/MR. MOSS:  That is correct.

20          HEARING OFFICER:  Okay.  Well, since you -- you

21  wanted to get -- have new leadership, can you tell me why you

22  chose to replace Legacy Sports with an entity run by a family

23  member of the Legacy Sports principals?

24          WITNESS/MR. MOSS:  Yeah.  Because it was Brett

25  Miller, and it wasn't the members of the -- the rest of the

eScribers

www.escribers.net · 800-257-0885

Case 2:23-bk-02832-DPC   Doc 246-2   Filed 06/28/23   Entered 06/28/23 12:17:34
Desc Exhibit 25 - 341 Transcript   Page 13 of 27

1        HEARING OFFICER:  Well, as I said it's -- the term is

2   used throughout the load agreement.

3        MR. TAYLOR:  Well, the word "independent" is a pretty

4   typical word that's used throughout legal documents.  So --

5        HEARING OFFICER:  Right.  So then I would assume that

6   Mr. Moss, as the signatory to this loan agreement, would have

7   understood what that term meant.

8        MR. TAYLOR:  Again.  Without pointing to a specific

9   provision in the agreement, Ms. Giaimo, I don't know that you

10  can ask him about the meaning of the word -- the word

11  "independent".

12       HEARING OFFICER:  Well, I'm not asking.  And let me

13  see if I could put it this way.  In your experience, Mr. Moss,

14  as a businessman, and in your experience as the president of

15  Legacy Cares, would you agree that King Dog was not an

16  independent company from Legacy Cares, in light of the fact

17  that you were both president of Legacy Cares and owner of King

18  Dog, at the time that there was a contract between Legacy Cares

19  and King Dog?

20       WITNESS/MR. MOSS:  I don't know if I would agree with

21  that.

22       HEARING OFFICER:  Okay.  So in your opinion, you

23  think that even though you were the president of Legacy Cares,

24  and Legacy Cares was entering into a contract with your wholly-

25  owned entity, King Dog, King Dog could have been considered an

1    independent company, independent from Legacy Cares?

2              WITNESS/MR. MOSS:  Yeah.  It wasn't a subsidiary of

3    Legacy Cares.  It was -- you know, it's -- it's yeah.

4              HEARING OFFICER:  Okay.

5              WITNESS/MR. MOSS:  I don't know.  It might -- I

6    looked at it --

7              HEARING OFFICER:  All right.  Well, let me ask you

8    this.  So Legacy Cares had paid King Dog, your company, $35,000

9    per month in connection with the project; correct?

10             WITNESS/MR. MOSS:  That's correct.

11             HEARING OFFICER:  And over what period of time were

12   those payments made?

13             WITNESS/MR. MOSS:  I believe it was from September of

14   2020 to -- I'm going to say December of 2022 or January of

15   2023.  Yeah, I think that -- 2020 -- I'm sorry.  September of

16   2020 to either December 2021 or January 2022.

17             HEARING OFFICER:  Okay.  And what was the fee being

18   paid for?

19             WITNESS/MR. MOSS:  That was to me to be -- as --

20   as -- as president.  I had a -- a -- as president of Legacy

21   Cares, and that was the mechanism by which there were no

22   employees at that time.  There was no employee of Legacy Cares.

23   Legacy Sports, we were looking to save the money and not have

24   to pay the -- Legacy Cares or Legacy Sports, the senior

25   executives, were not doing -- being paid directly.  They were

1 my position, as the president of Legacy Cares, through the

2 mechanism by which the bond proceeds paid Legacy Sports to pay

3 my salary. That's it. That is the only payments I received

4 other than expense reimbursements. But there's no second

5 payment.

6          HEARING OFFICER: Okay. But there was a disclosure,

7 to the bondholders, that there was an agreement between Legacy

8 Cares and King Dog to provide technology advisory services,

9 correct?

10          WITNESS/MR. MOSS: Yes. I -- there's a -- there's a

11 deferral -- there's a deferral agreement.

12          HEARING OFFICER: Okay. So that's separate and apart

13 from the payments that --

14          WITNESS/MR. MOSS: That was separate and apart --

15          HEARING OFFICER: Okay.

16          WITNESS/MR. MOSS: -- and no fee was every paid, no

17 money exchanged hands. It was -- it was supposed to be a fee

18 paid at closing, which was deferred based on the instructions

19 from Ziegler, saying that the bondholders wanted to defer it.

20 I signed a deferral agreement and agreed to those terms, and

21 nothing has ever been transacted because those terms were never

22 met.

23          HEARING OFFICER: And when you start talking about

24 this deferred fee, are you talking about the deferred

25 technology advisory fee in the amount of $912,500 to King Dog?

1          WITNESS/MR. MOSS:  That is correct.

2          HEARING OFFICER:  And you're saying that -- so you're

3   saying that was never paid?

4          WITNESS/MR. MOSS:  Never paid.  Not any -- not that

5   or any portion of that was ever paid.

6          HEARING OFFICER:  Okay.  Okay.  And is that a claim

7   that you are asserting against Legacy Cares in this case?  Are

8   you trying to -- are you going to try to recover that fee as a

9   creditor of Legacy Cares in this case?

10         WITNESS/MR. MOSS:  No.

11         HEARING OFFICER:  So is it fair to say that the

12  $912,500 deferred fee is an amount that you no longer deem due

13  in owing from Legacy Cares?

14         WITNESS/MR. MOSS:  That is correct.

15         HEARING OFFICER:  Okay.  Okay.  So in April of 2021,

16  Mr. Moss, you attested on an annual compliance certificate that

17  Legacy Cares had fulfilled all of its obligations under the

18  loan agreement with the Arizona Industrial Development

19  Authority; correct?

20         WITNESS/MR. MOSS:  I believe so.

21         HEARING OFFICER:  And you made a similar attestation

22  on the 2022 annual compliance certificate; correct?

23         WITNESS/MR. MOSS:  I believe so.

24         HEARING OFFICER:  So at the time that you made the

25  April 2021 certification, were you aware that Legacy cares had

1          Is that something that was just a mistake?

2          MR. TAYLOR:  Where do you say the form schedules

3   require exactly, Ms. Giaimo?

4          HEARING OFFICER:  Well, if you go to the website of

5   the bankruptcy court for the District of Arizona, they have

6   forms, and you can easily pull up the form --

7          MR. TAYLOR:  Okay.  I'm asking the question about

8   typically what are you saying is the account agent, we have to

9   give in the schedule exactly?

10         HEARING OFFICER:  There -- you see that item 11

11  requests the disclosure of the amount of accounts receivable,

12  due to Legacy Cares, that are 90 days or less.  And there's an

13  amount there.  The form requires that beneath that, you should

14  say accounts receivable that are older than 90 days.  But

15  that's not on the form that you --

16         MR. TAYLOR:  I guess --

17         HEARING OFFICER:  -- was filed.

18         MR. TAYLOR:  I guess the form that we used didn't

19  have it, so when you say older than 90 days, is there any

20  outward-bound period on that?

21         HEARING OFFICER:  I'm not saying anything --

22         MR. TAYLOR:  90 days from what?

23         HEARING OFFICER:  Well, let me just ask you this,

24  Mr. Moss.  Are -- at the time of the bankruptcy filing, were

25  there accounts receivable due to be paid to Legacy Cares that

1  were older than 90 days overdue?

2          WITNESS/MR. MOSS:  We disclosed what we thought was

3  accurate.

4          HEARING OFFICER:  That's not my question.  Let me see

5  if I can -- let me say it again.  At the time of the bankruptcy

6  filing, were there accounts receivable due to be paid to Legacy

7  Cares that were more than 90 day old?

8          WITNESS/MR. MOSS:  You know, the -- there -- there

9  were some that were in dispute, and we were having our

10  attorneys look at it, and it wasn't really determined whether

11  that was accurate or not.

12          HEARING OFFICER:  Well, you did not disclose them in

13  any event on the schedules; correct?

14          WITNESS/MR. MOSS:  I -- I didn't see where in the

15  form that we have -- I don't -- I don't see where it shows

16  that.

17          HEARING OFFICER:  Okay.  Well, I'm --

18          WITNESS/BIERMAN:  Ms. Giaimo, this is Keith.  We'd be

19  happy to follow up with you --

20          HEARING OFFICER:  Yes.

21          WITNESS/BIERMAN:  -- and review the detail of what's

22  in that accounts receivable number on item 11 on the schedule

23  so that you -- it may -- I don't want to speculate, but it may

24  very well be that there are receivables or that that's the

25  total receivable number and that there are actual individual

1  accounts older than 90 days that are within that balance and

2  may just have been input incorrectly.

3          HEARING OFFICER:  Okay.

4          WITNESS/BIERMAN:  But we -- that's an easy follow-up

5  with --

6          HEARING OFFICER:  Okay.  And it's not just a

7  follow-up.  I think what you need to do is follow the form so

8  we can hash this out after the meeting, but I am going to

9  request that this be amended so that the form that is filed

10  complies with the form that is provided on the court's website

11  which requires -- that has a line item for accounts receivable

12  that are older than 90 days.  And if they're zero, then you

13  need to put that.  Okay?

14          WITNESS/BIERMAN:  Okay.

15          HEARING OFFICER:  Okay.  Well, let me go back to the

16  accounts receivable that were reflected on the Legacy Cares

17  balance sheet for the first quarter of 2022.  So there were

18  $1.3 million of receivables from Legacy Sports.  Was that $1.3

19  million paid?  Was it ever paid?

20          WITNESS/BIERMAN:  That's what's in dispute.  Legacy

21  Sports says that it has been paid and we disagree and our --

22  we've been discussing that, and it has not come to that

23  conclusion yet.

24          HEARING OFFICER:  Okay.  So that should be disclosed

25  then as a potential account receivable, at least on the

1 schedule of assets for Legacy Cares. Okay?

2 　　　　　WITNESS/BIERMAN: We can make that adjustment.

3 　　　　　HEARING OFFICER: Okay.

4 　　　　　WITNESS/BIERMAN: We can make that adjustment.

5 　　　　　HEARING OFFICER: Okay. So I want to ask you. The

6 $1.3 million reflected on the first quarter of 2022 balance

7 sheet is broken down. There's $1.2 million receivable labeled

8 as "LSUSA Operating Activity XFR." Can you tell me what that

9 refers to, Mr. Moss?

10 　　　　　WITNESS/MR. MOSS: I -- I don't recall.

11 　　　　　HEARING OFFICER: You don't have any idea what the

12 $1.2 million receivable on the 2022 balance sheet refers to?

13 　　　　　WITNESS/BIERMAN: When you say 2022, Ms. Giaimo, what

14 month specifically? Are you talking 12/31/2022?

15 　　　　　HEARING OFFICER: I'm talking about the first quarter

16 of 2022, so obviously it would be January, February --

17 　　　　　WITNESS/BIERMAN: Okay.

18 　　　　　HEARING OFFICER: -- or March.

19 　　　　　WITNESS/BIERMAN: So March 31st, 2022? Okay. We

20 don't have that in front of us so we -- I'll see if I can pull

21 it up here. I wasn't aware you were going to ask about March

22 of 2022 so I didn't have that in front of me.

23 　　　　　HEARING OFFICER: Yeah. If you could do that, that

24 would be helpful, because my next question -- there's also a

25 receivable in the amount of about $63,000 for a loan. It says

1          WITNESS/MR. MOSS:  -- what I'm not seeing.

2          HEARING OFFICER:  Okay.  Hold on.  I'm not asking you

3    about looking at a document, right now.  Do you recall, as the

4    president of Legacy Cares, that Legacy Cares made a loan to

5    Legacy Sports LLC in the amount of about $63,000 in the first

6    quarter of 2022?  Do you recall that occurring?

7          WITNESS/MR. MOSS:  I'm not aware -- I do not recall

8    that.  It could have been an intercompany transfer of some

9    sort.  I don't know.

10          HEARING OFFICER:  Okay.  So would you have any reason

11   to dispute a balance sheet that stated that there was loan

12   principal due to Legacy Cares from Legacy Sports LLC in the

13   amount of about $63,000 for the first quarter of 2022?  Do you

14   have any reason to dispute that?

15          MR. TAYLOR:  Ms. Giaimo, you're referring to a

16   balance sheet.  I think Mr. Bierman is trying to open it up on

17   his computer to understand what you're referencing here.  So

18   you'll need to give us a few minutes to get what we think is

19   the document that you're asking about in front of us.

20          HEARING OFFICER:  Okay.  That's fine.  All right.

21   While that's happening, let me see if I can ask -- let me just

22   ask a couple of quick questions while they're pulling up that

23   document.  To your knowledge --

24          MR. TAYLOR:  Ms. Giaimo, you're going to have to

25   wait.  We're trying to get this document that you're asking

1       HEARING OFFICER:  Okay.  Well let me ask you this.

2  As the president of Legacy Cares, was it your responsibility to

3  approve any loans being made on behalf of the company?

4       WITNESS/MR. MOSS:  I believe the bond documents

5  prohibit us from doing loans so I won't -- I don't know, again.

6  This is where I'm out of my lane here.  I would -- I would not

7  necessarily categorize these as a loan.  Maybe Larry would.  I

8  don't know.  But I mean, there would -- I don't believe these

9  were loans.

10      To the best of my knowledge, they could have been

11  internal, they could have been transfers, but I -- I don't

12  know.  I don't know.  That's why I'm really just speculating

13  here and I'm uncomfortable speculating because we can get the

14  person to you that can give you the exact information.

15      HEARING OFFICER:  Okay.  But my question is whether

16  or you in your capacity as president were the person that would

17  need to authorize any loans being made on behalf of Legacy

18  Cares?

19      MR. TAYLOR:  Ms. Giaimo, this is Henk here.  I'm

20  going to make a statement for the record at this point.  We

21  have been in this 341 meeting for almost an hour and 45

22  minutes, and it's clear that you're conducting a deposition of

23  Mr. Moss, and I object to that.  If you want to have a

24  deposition of Mr. Moss, you can do that through a 2004

25  examination, which is proper.

1          WITNESS/MR. MOSS:  Yes.

2          HEARING OFFICER:  Who's the entity that holds that

3  liquor license?

4          WITNESS/MR. MOSS:  I don't recall the -- I don't

5  recall the name of the entity offhand.

6          HEARING OFFICER:  So let me ask you this.  Is the

7  liquor license, as far as you're concerned, going to be part of

8  the assets that are being -- that are proposed to be sold in

9  this case?

10          WITNESS/MR. MOSS:  Potentially, yes.

11          HEARING OFFICER:  And how would you go about getting

12  that liquor license, getting the rights to sell that liquor

13  license if it's in someone else's name?

14          WITNESS/MR. MOSS:  I -- I -- I don't know.  You'd

15  have to ask an attorney.

16          HEARING OFFICER:  Okay.  The balance sheet also

17  reflects that there is an amount due to Legacy Cares from --

18  well, it says for Waltz Construction settlement, and the amount

19  due is about $1.1 million.  Can you tell me what that's for?

20          WITNESS/MR. MOSS:  That was -- that was payment

21  that's been in dispute between Legacy Sports and Legacy Cares.

22          HEARING OFFICER:  Okay.  Can you tell me a little bit

23  more about what the amount is refers to?  Was there a

24  settlement between anybody at J.S. Waltz Construction Company?

25          WITNESS/MR. MOSS:  Yeah.  It was a settlement

1  agreement between Legacy Cares or among Legacy Cares and Waltz

2  Construction.  Part of that agreement also included Legacy

3  Sports.  There was money to satisfy and be able to conclude

4  this agreement, the settlement agreement.  Legacy Cares paid

5  settlement for Legacy Sports, and said that was to be

6  reimbursed and that's the money that's showing there.  And that

7  Legacy Sports says that it has been repaid.  And that is in

8  dispute.

9          HEARING OFFICER:  Okay.  So that is -- is that then

10  considered a current asset of the estate?

11          WITNESS/MR. MOSS:  Yeah.  Potentially, it is.  Yeah.

12          HEARING OFFICER:  Right.  This claim.  So Legacy

13  Cares has a claim against Legacy Sports in the amount of about

14  $1.1 million for this Waltz Construction settlement payment.

15  Is that correct?

16          WITNESS/MR. MOSS:  That's correct.

17          HEARING OFFICER:  Okay.  And let me ask you.  Do you

18  know what caused there to be a dispute?  Or what was the

19  dispute that led to this settlement?

20          WITNESS/MR. MOSS:  Legacy Cares terminated Waltz as

21  the -- the construction company building the park.

22          HEARING OFFICER:  Okay.  And had Waltz Construction

23  ever performed any services or given any labor or materials

24  before the settlement?

25          WITNESS/MR. MOSS:  Yes.  And that's why that was part

1  of the settlement.

2          HEARING OFFICER:  Okay.  And who was the person that

3  signed the contract with Waltz on behalf of Legacy Cares?

4          WITNESS/MR. MOSS:  I believe it was myself.

5          HEARING OFFICER:  Okay.  And can you tell me why you

6  terminated the Waltz Construction contract?

7          WITNESS/MR. MOSS:  There was a lack of progress on

8  the project and there were also concerns about the ability of

9  Waltz to complete the project on time and on budget.

10          HEARING OFFICER:  Okay.  Okay so Mr. Moss, your

11  declaration states that in the summer of 2022, Legacy Sports

12  retained Loop Capital to obtain alternate financing for Legacy

13  Cares.  Is that correct?

14          WITNESS/MR. MOSS:  That's correct.

15          HEARING OFFICER:  Did you authorize Legacy Sports to

16  undertake those refinancing efforts on behalf of Legacy Cares?

17          WITNESS/MR. MOSS:  No.

18          HEARING OFFICER:  Who authorized that?

19          WITNESS/MR. MOSS:  Legacy Sports.

20          HEARING OFFICER:  Legacy Sports authorized itself to

21  obtain financing on behalf of Legacy Cares?

22          WITNESS/MR. MOSS:  Let me put it to you this way,

23  they took it up on themselves to reach out to Loop Capital to

24  begin refinancing -- a refinancing process.

25          HEARING OFFICER:  Well, can you tell me why Legacy

1          WITNESS/MR. MOSS:  But I don't want -- I don't want

2     to speculate -- I don't want to speculate on what those options

3     and alternatives would be.

4          HEARING OFFICER:  Right.  But I was just trying to

5     get an idea if you've considered what alternate options there

6     are for reorganization in the event that a sale falls through,

7     and you're saying you have not.  Is that right?

8          WITNESS/MR. MOSS:  We have not focused in on that.

9     We focused -- we were focusing in on the current process at

10    hand.

11         HEARING OFFICER:  Okay.  All right.  Well, I have no

12    further questions.  I'm going to open up and again ask if

13    anyone on the line has any follow-up questions they'd like to

14    ask.  Anyone?

15         Okay.  All right.  Then that will conclude this

16    matter.  Thank you all for attending.  And we will go off the

17    record, now.  Thank you.

18        (Proceedings Concluded)

19

20     I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22

23    Dated: June 9, 2023                    _Saira Khan_____

24                                           eScribers, LLC
                                            7 227 N. 16th Street
                                            Suite #207
25                                           Phoenix, AZ 85020