**PAPETTI SAMUELS WEISS MCKIRGAN LLP**
16430 North Scottsdale Road
Suite 290
Scottsdale, AZ 85254

**Robert McKirgan** (State Bar No. 011636)
Direct Dial: 480.800.3533
Email: rmckirgan@PSWMlaw.com

**Randy Papetti** (State Bar No. 014586)
Direct Dial: 480.800.3525
Email: rpapetti@PSWMlaw.com

**Jared Sutton** (State Bar No. 028887)
Direct Dial: 480.800.3527
Email: jsutton@PSWMlaw.com

*Attorneys for Debtor*

J. Henk Taylor – State Bar No. 016321
**WARNER ANGLE HALLAM**
 **JACKSON & FORMANEK PLC**
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
E-mail:  htaylor@warnerangle.com

*Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>**LEGACY CARES, INC.,**<br><br>Debtor. | **Case No. 2:23-bk-02832-DPC**<br><br>**Chapter 11**<br><br>**DEBTOR'S RESPONSE AND OBJECTION TO UNITED STATES TRUSTEE'S MOTION TO APPOINT CHAPTER 11 TRUSTEE OR, ALTERNATIVELY, TO DISMISS CASE**<br><br>**Hearing Date:  July 27, 2023**<br>**Hearing Time:  10:00 am**<br>**Location:      Phoenix, Ct. Rm. 603** |

## I.   **INTRODUCTION**

The UST's Motion to appoint a Chapter 11 Trustee reflects a disappointing lack of objectivity. The Motion presents itself as the product of a careful and almost forensic investigation. But that is a misleading façade. The Motion is filled with inaccuracies, slants, and mischaracterizations. To tell the story it apparently wants to tell, the Motion improperly conflates Legacy Cares (the actual Debtor) with Legacy Sports (which the Debtor terminated as the Park's Manager). And while it spends pages crafting a

misleading impression of Debtor's historical conduct, the Motion is conspicuously almost silent on anything Debtor has done since or even in the months before the filing that indicates it will be an unreliable steward of its role in this process.

The UST's Motion has been objected to by UMB Bank, N.A., as Trustee for the bondholders (DE 298) and the Unsecured Creditors' Committee (DE 299). Indeed, it is not clear that it is supported by any creditor. That is telling in and of itself.

For the following reasons, the Motion should be denied.

## II.   BACKGROUND.

### A.   Cares' Role with the Park.

What became Legacy Park was the vision of Randy Miller. He and his son, Chad, were its initial promoters. Legacy Cares was initially an Arizona limited liability company that the Millers owned and controlled. (MD ¶ 9)[1]. None of Debtor's current directors or officers were involved in Cares at the time it was an Arizona LLC. (*Id*.)

The Millers' dream of building the Park became a reality with the issuance of bonds through the Arizona Industrial Development Authority. (*Id*. ¶ 5). For the anticipated bonds to qualify as tax exempt, however, Cares had to convert to a 501(c)(3) corporation, which it did in November 2019. (*Id*. ¶ 10). In February 2020 the Millers resigned their positions with Cares. (*Id*.). They thereafter did not serve on Cares' Board and they were not employed by Cares. (*Id*.). The Millers guided the financing efforts through their for-profit entity, Legacy Sports USA, LLC ("Sports"). (*Id*.).

Upon converting to not-for-profit status, Cares initially had no staff or employees and functioned solely through its board of directors. (*Id*. ¶ 12). Pursuant to the Qualified Management Agreement discussed below (the "QMA"), Sports, as Manager for Cares,

---

[1] Citations to "MD ¶--" reference the "Declaration of Douglas Moss in Support of the Debtor's Response and Objection to the United States Trustee's Motion to Appoint Chapter 11 Trustee or, Alternatively, to Dismiss Case" and exhibits thereto filed concurrently with this Response.

took the lead on the bond offering, closing the bond offering, construction of the Park, and then management of the Park's operations. (*Id*. ¶¶ 12 and 17, and ex. 3).

## B. Sports, Not Cares, was in Charge of Development and Operations—and All Involved Knew That.

Per the QMA, which was fully disclosed in the Offering Memoranda used in the two bond offerings, Sports was to provide pre-opening services for the Park including all aspects of the Park's development and construction. (*Id*. ¶ 17). Then, upon opening of the Park, Sports was to manage and operate the Park. (*Id*.). Under the QMA, all employees of the Park were to be Sports employees. (*Id*. ¶ 18). At the time the QMA was signed, Cares employed only one officer (Doug Moss); a college intern paid on a part-time basis (Andrew Madden); and had a part-time CFO that it paid under a contract (Larry White). (*Id*.). Thus, although Cares had certain approval and other rights under the QMA, it was not intended that Cares would have sufficient resources to play a major role in the Park's development, construction and operation.

To reiterate, this structure—in particular, the reliance on Sports to build and operate the Park—was fully disclosed in the Offering Memorandum and otherwise publicly available.[2]

## C. Construction of the Park.

### 1. The Independent Monitor.

To assist Cares and provide protection to the bondholders in overseeing construction, Cares retained Emmet Holdings ("EH") as an independent construction monitor. (*Id*. ¶ 24). Although the UST now questions the Monitor's independence, the UST has no legitimate basis in doing so. Cares hired EH at the recommendation of the

---

[2] MD ex. 1, pp. 3, 7-8, 18- 20 and Appendix A, p. 74 ("Legacy Cares, Inc. has contracted with LS-USA to serve as the Developer, Operating Company, and Manager of Legacy Sports Park, which included management and oversight of Project Development, Facilities Operation, and Maintenance").

Warner Angle Hallam Jackson & Formanek PLC

underwriter of the bonds, Ziegler Financial. (*Id*.). The Construction Monitor's role was to monitor the construction process, including review and approval of pay applications and requisitions. (*Id*.).

Mr. Moss signed the monitoring agreement with EH on behalf of Cares in August 2020. (*Id*., ex. 4). Prior to hiring EH as a construction monitor, Mr. Moss had no dealings with EH or its principal, Jim Neal. (*Id*. ¶ 26). EH and Mr. Neal, in Debtor's view, performed their obligations competently and diligently, as reflected in the monthly reports the Monitor produced each month and that Cares then posted on the publicly available EMMA website. (*Id*.).

The UST appears to question EH's integrity and independence by alleging that EH in 2019—prior to the AZIDA structure becoming a reality—made some effort to help Sports find financing for what became the Park. (Mot. at 13). That did not disqualify EH from later being retained by Cares to provide Construction Monitor services for the Park once separate financing was found, especially given that the contract was with Cares. Moreover, Mr. Moss was not involved in the prior unsuccessful efforts to find financing and had no knowledge at the time of any prior role that Mr. Neal may have played in trying to locate funding for the Park. (MD ¶ 26).

Other than trying to cast aspersion, it is unclear what the UST's point is regarding the Construction Monitor that would in any way support the UST's Motion. There is no contention that EH and Mr. Neal were not qualified for the role, or that they did so incompetently. Nor is there anything nefarious about the process that the Monitor oversaw. During the construction phase, contractors' pay applications were reviewed and approved by both Sports and the Construction Monitor. (*Id*. ¶ 25). Following those approvals, Mr. Moss then reviewed and approved the pay applications, and submitted requisitions to UMB Bank in its role as Trustee under the bond offerings for it to approve and pay the contractors. (*Id*.).

Warner Angle Hallam Jackson & Formanek PLC

In any event, Mr. Moss never approved an application, or submitted a requisition for payment of an application, where the pay application had not been previously reviewed and approved by both Sports and EH. (*Id*.).

### 2. Waltz Construction.

Sports negotiated the first construction contract with a general contractor, JS Waltz Construction LLC ("Waltz"). (*Id*. ¶ 23). In addition to agreeing to build the Park, Waltz apparently also made a $1 million equity investment in Sports. (*Id*. ¶ 55).

A few months into the construction phase, it became clear that Waltz was unable to perform within budget and that there would be other problems with Waltz. (*Id*. ¶ 54). With the agreement of UMB and Sports, Cares in October 2020 terminated the contracts with Waltz. (*Id*.). Waltz responded by asserting claims against Cares and Sports. (*Id*.). Cares could not afford the expense, delay, and distraction of what would be potentially massive litigation. (*Id*.). Cares needed to retain a new general contractor and make sure construction got on track given that Sports was already booking events at the Park based on the assumption that it would open in early 2022. (*Id*.). Thus Cares focused on reaching a settlement with Waltz. (*Id*.).

Cares concluded that Waltz was legitimately owed approximately $1.7 million for work performed. (*Id*. ¶ 55). In addition, Waltz insisted on being repaid its $1 million investment. (*Id*.). Cares and Sports had no better choice but to agree to a settlement that included both the termination damages ($1.7 million) and a refund of Waltz's equity investment in Sports ($1 million). (*Id*.). A settlement was reached and an agreement entered into effective May 21, 2021. (*Id*.).

Sports advised Mr. Moss that Sports did not have the $1 million to repay Waltz's investment, but Sports would repay the $1 million to Cares. (*Id*. ¶ 56). Counsel advised Mr. Moss that the settlement could be paid from the Project Fund (the portion of the Bond proceeds earmarked for construction of the Park). (*Id*.). Accordingly, Cares made a

Warner Angle Hallam Jackson & Formanek PLC

Warner Angle Hallam Jackson & Formanek
PLC

requisition to UMB for payment of the full settlement amount ($2.7 million), and UMB paid the requisition. (*Id.*). Cares then booked a receivable due from Sports for the approximately $1 million portion of the settlement that should have been paid by Sports. (*Id.*). This is the $1,120,000 "loan" for "Waltz Construction Settlement" reflected on Cares' 2022 financial statements. (WD ¶ 14).[3]

When Cares later followed up on repayment, Randy Miller responded that he had already repaid this loan by making the payment to Sports, which, in turn, used the monies to fund Park operations without demanding reimbursement from Cares. (MD ¶ 58). When Cares demanded documentation of this repayment and use of the funds, Sports failed to provide it. (*Id.*). There was subsequent correspondence and dialogue about the situation, but given that the issue was not resolved to Cares' satisfaction, Cares has continued to show this as a loan receivable due from Sports, including disclosing this on its original Schedule A/B in this case. (*Id.*; WD ¶ 14; DE 1, Sch. A/B, item 71).

### 3. The Mechanic's Liens.

As of the petition date in this case, there were approximately $37 million in mechanic's liens recorded against the Park. (DE 9 ¶ 50). Eliminating duplication, the face amount of these claims is approximately $29.5 million. Debtor continues to investigate both the amount and validity of these claims as well as what assets are encumbered by the liens.

The Construction Monitor endeavored to ensure the Project was done on time and on budget—and, notwithstanding the Mechanic's Liens, he will testify that it essentially was. However, Sports, apparently anticipating that it would be able to raise additional funds for the Park, initiated construction of additional improvements and schedule accelerations that were outside the construction budget contemplated by the offering

---

[3] Citations to "WD ¶--" reference the "Declaration of Lawrence K. White" and exhibits thereto filed concurrently with this Response.

Warner Angle Hallam Jackson & Formanek PLC

materials for the 2020 and 2021 bonds, approved by Cares, and monitored by the Construction Monitor. Sports also requested and received draws from the bond proceeds for operating expenses that were beyond the amounts that Sports was entitled to receive and that, consequently, served to deplete funds available for construction. These additional improvements, schedule adjustments, and excessive draws directly or indirectly account for a significant portion of the existing liens. The Monitor warned Sports that it would be responsible for many of these expenses and to reimburse the draws, but that never occurred.

Many of these decisions by Sports outside the approved construction budget did not result in mechanic's liens until at or after the time the Park opened in 2022. The UST references a mechanic's lien recorded on October 29, 2021 by CPR Construction Cleaning, LLC ("CPR"). (Mot. at 11). But CPR released the lien two weeks later. (MD ¶ 61). It appears the first lien that remained unreleased as of the petition date was recorded on May 27, 2022—months after the Park opened.[4]

### D. Alleged Pre-Petition Loans.

In addition to the Waltz settlement receivable, the UST claims Cares made certain "loans and advances" to Sports in 2021. These purported "loans and advances" are summarized in a chart on page 8 of the Motion. The chart is misleading. Except for the Waltz construction settlement, none of these are "loans and advances" that Cares made or authorized:

- "Accounts Receivable-LS USA" ($1,790,685.27): The Motion refers to this line item on Cares' balance sheet. (Mot., ex. 7, p. 12). The March 2023 balance for this line item is $1,790,685.27. This amount is, in fact, ***accounts receivable due from customers of the Park***. This amount is not, in any way, a "loan" from Cares to Sports. Instead, the receivables due from Park customers were initially recorded on the books of Sports. Because those customer receivables were

---

[4] "Notice and Claim of Mechanics' and Materialmen's Lien" recorded by R.H. Dupper Landscaping, Inc. at Instrument No. 20220460107.

ultimately assets of Cares, this line item is shown as an asset on Cares' balance sheet as part of the consolidation of the books of the two entities. (WD ¶ 11).

- "LS USA Operating Activity Xfr" ($1,257,871.05): The Motion cites this line item on Cares' balance sheet. (Mot., ex. 7, p. 12). This line item is, in fact, an intercompany account; it does not represent a loan made by Cares to Sports. Cash was transferred back and forth between the two entities. This account was one of two accounts initially used to track transfers between the entities, the other account being the "Due to/from Legacy Sports USA" shown in the current liabilities section of the balance sheet. (*Id.*, p. 16). The receivable shown on the March 2023 balance sheet indicates cash due from Sports to Cares. The Due to/from account in the liability section of the balance sheet was cash due from Cares to Sports. After the first quarter of March 2022, the line item in the asset portion of the balance sheet was eliminated and all transfers were accounted for in the "Due to/from Legacy Sports USA" account. For example, the September 30 balance sheet in the "Due to/from" account shows a negative liability of $1,066,162.16, meaning funds were due from Sports in that amount. *Id.* Conversely, in the following quarter, the liability was $1,149,561.71, meaning that Cares owed Sports that amount as of that date. *Id.* The balance in that account fluctuated depending on the timing of the sweeps from the Revenue account and the requisitions made by Sports. This line item does not reflect a loan from Cares to Sports. (WD ¶ 12).

- "Legacy Sports Loan Principal" ($63,208.82): The current assets section of Cares' balance sheet reflects a line item for a "loan" due from Legacy Sports LLC. Legacy Sports LLC is an entity distinct from Sports (Legacy Sports USA, LLC). Legacy Sports LLC is Randy Miller's personal business entity. Due to his work for Randy Miller, Larry White discovered that monies in the Sports' operating account had been used for non-Park Pre-Opening purposes—specifically, the money was used to benefit Randy Miller's company, Legacy Sports LLC, and other entities. Mr. White insisted that Randy Miller, Chad Miller and Mike Baggett repay these monies to Sports. The Millers and Mr. Baggett agreed and "loan" receivables were booked to the Sports balance sheet to reflect these monies due Sports that were to be utilized for Start-Up and Pre-Opening Operational Requirements as outlined in the Bond Indenture. These accounts appeared on Cares' balance sheet after consolidation of the two entities' books. This was not a situation in which Cares voluntarily lent money to the Millers and Mr. Baggett; rather, it was an example of Cares' exercising oversight over Sports. The March 30, 2022 balances cited in the Motion reflect significant payments made prior to March 30, 2022. The remaining balance due were repaid by September 9, 2022, as reflected on the Q3 ending September 30, 2022 balance sheet, showing that these accounts had been brought to zero. (WD ¶ 13). At no

Warner Angle Hallam Jackson & Formanek PLC

point did Cares authorize the use of any project funds for use by the Millers, Mr. Baggett or their other entities. (MD ¶ 53).

- "Legacy Sports TN LLC Loan Principal" ($20,330.99). Legacy Sports TN LLC was an entity formed by Sports' principals to develop a sports complex in Tennessee. This line item reflects the improper use of funds by Sports' principals to benefit that entity. As with the funds reflected in the "loan" to Legacy Sports, LLC, Cares insisted Sports' principals repay these monies and booked this as a "loan". (WD ¶ 13). Again, Cares never authorized this use of these funds. (MD ¶ 53).

- "Legacy Sports TX LLC Loan Principal" ($6,413.62). Legacy Sports TX LLC was an entity formed by Sports' principals to develop a sports complex in Texas. As with the Tennessee project, Sports' principals—without Cares' authorization—utilized project funds to support this out-of-state venture. Again, once Cares discovered this, it insisted these monies be repaid and booked this as a "loan". (WD ¶ 13; MD ¶ 53).

Finally, the UST references a "Loan to Legacy Sports" of $3,234,076.00 referenced on Cares' 2021 tax return. (Mot. at 8). This was not a separate "loan." Rather, that item reflects the sum of the December 31, 2021 balances for the following items *already included in the UST's table*: (i) the Waltz settlement payment; (ii) "LS USA Operating Activity Xfr"; (iii) "Legacy Sports Loan Principal"; (iv) "Legacy Sports TN LLC Loan Principal"; and (v) "Legacy Sports TX LLC Loan Principal". (WD ¶ 15). Thus this line item in the UST's table is duplicative.

### E.    Cares Engages Outside Professionals.

By October 2022, Cares faced mounting pressure. The financial reports from Sports indicated the Park was operating at a significant loss. (MD ¶¶ 28-30). Then, in short succession, UMB issued its notice of default (October 4) and the first mechanic's lien foreclosure action was filed in Superior Court (October 10). (*Id*. ¶ 32).

In response, that same month, Cares retained counsel (Papetti Samuels Weiss McKirgan LLP) to assist Cares in dealing with the many financial and legal challenges

facing the Park. (*Id*.). In December, Cares retained Keith Bierman and MCA Financial Group, Ltd. to function as Cares' Chief Restructuring Officer. (*Id*.). Shortly thereafter, Cares engaged restructuring counsel (Warner Angle Hallam Jackson & Formanek, PLC). (DE 35 at 1).

### F.  **The Lack of Audited Financials.**

As the UST notes, the Loan Agreement required Cares to obtain audited financial statements beginning in 2021. The Park, however, was under construction throughout 2021. (MD ¶ 28). The Park began operations in February 2022 and was fully operational as of May 2022. (*Id*.) Cares' management understood (incorrectly) that it only needed to provide audited financial statements once the Park opened for business. (*Id*. ¶ 37). Notably, UMB did not raise the issue of a lack of a 2021 audit until October 4, 2022— when UMB noticed a default under the bond financing documents citing, among other things, the lack of audited financial statements for 2021. (*Id*. ¶ 60).

Regardless, well before receiving this default notice, Cares had begun the process for obtaining audited financial statements for 2022. (*Id*. ¶ 38). In May 2022, Cares' board authorized the retention of an accounting firm to audit Cares' financial statements. (*Id*.). Cares' board selected CBIZ as its auditor on July 8, 2022. (*Id*. ¶ 39).

CBIZ, however, subsequently notified Cares that it needed to have a separate firm perform a forensic audit before CBIZ could issue an opinion on Cares' financial statements. (*Id*.) Accordingly, in July 2022, Cares' board discussed a forensic audit. (*Id*. ¶ 40). To that end, in August 2022, the board considered proposals from multiple firms to conduct a forensic audit. (*Id*.). In September 2022, Cares' board selected Fenix to conduct the forensic audit. (*Id*.).

Before Fenix was formally engaged, UMB sent its October 4 notice of default. (*Id*. ¶¶ 32 and 41). Shortly thereafter, UMB informed Cares that it wanted a forensic audit conducted by UMB's financial advisor. (*Id*. ¶ 41). Cares supported this effort. (*Id*.). For

Warner Angle Hallam Jackson & Formanek
PLC

example, on October 27, 2022 Cares' counsel sent Sports a letter instructing Sports to cooperate with the forensic audit and UMB's requests for information. (*Id*.).

### G. Loop Capital.

Ultimately, UMB and its advisor never performed the audit. Here is what happened. In the summer of 2022, Sports retained Loop Capital, an investment bank, brokerage and advisory firm, to seek alternative financing sources for the Park and/or assist with restructuring the existing the bond debt. (*Id*. ¶ 33). After Cares' October 27, 2022 instruction to Sports, Loop Capital communicated to UMB that a forensic audit would delay and interfere with its supposedly progressing efforts to restructure and/or refinance the bonds. (*Id*. ¶ 42). In deference to the restructuring efforts, UMB and Debtor stopped pursuing the forensic audit. (*Id*.).

That Sports (and not Cares) engaged Loop Capital is not surprising. Sports, as manager and architect of the original bond financing, was in the best position, at that point in time, to head up the effort to restructure the Park's debt financing. (*Id*. ¶ 34). In addition, as the developer of the Park and a party to many of the construction contracts giving rise to the mechanic's liens, Sports faced its own liability for the unpaid claims of contractors and materialmen.[5] Thus Sports had its own interest in obtaining a refinancing. Nevertheless, Cares repeatedly made it clear to Sports that Cares needed to participate in the process with Loop Capital and would have to approve any refinancing or restructuring. (MD ¶ 34). Cares' counsel sent letters to Sports in October and December 2022 reiterating this point, seeking information as to status, demanding that Sports

---

[5] This is evident in the pleadings filed by contractors in the lien foreclosure litigation currently pending in this Court (Adv. Pro. No. 2:23-ap-00089-DPC). For example, the claims pleadings filed by Kearney Electric ("Kearney Electric, Inc.'s Answer, Crossclaim, and Third Party Complaint" dated January 18, 2023) and JFK Electrical ("Defendant JFK Electrical Contracting Enterprises, Inc.'s Counterclaim/Crossclaim & Third-Party Complaint" dated December 8, 2022) assert breach of contract claims against Sports.

Warner Angle Hallam Jackson & Formanek PLC

comply with its obligations under the QMA, and clarifying the limited scope of Sports' agency with respect to any refinancing. (*Id*.).

Ultimately, though the process went on for many months, Loop Capital was unable to deliver any financing. As a result, in February 2023, UMB informed Cares that the bondholders were pulling out of the process. (*Id*. ¶ 35). Cares then disclosed that status to the public in an EMMA filing on February 27, 2023. (*Id*.).

### H.    Cares Terminates Sports.

Following the failed efforts by Loop Capital, Debtor began exploring its options. (MD ¶ 43). Cares' Board soon concluded that, under nearly all scenarios, Cares needed to change the Park's management, free itself from the unrealistic terms of the existing QMA, and end its relationship with Sports. (*Id*. ¶ 44). Cares began formally negotiating with Sports and, on March 28, 2023, entered into an agreement to terminate the QMA. (*Id*., ex. 14). Pursuant to that agreement, Sports waived the significant Termination Fee otherwise due under the QMA. (*Id*.). Cares, however, did not waive any claims or causes of action it may have against Sports or its principals. (*Id*.).

### I.    Cares Engages Elite.

When negotiating the termination of the Sports QMA, Cares began looking for a new manager. (*Id*. ¶ 45). Given the Park's grave financial situation, the complexity of running the Park, and the growing likelihood that the Park would be sold, it was going to be extremely difficult for Cares to find a third party willing to step in and manage the Park on an interim basis. (*Id*.; BD ¶ 20).[6] The only viable alternatives were some new iteration of Sports or OVG Facilities ("OVG"). (MD ¶ 45; BD ¶¶ 20-23).

---

[6] Citations to "BD ¶--" reference the "Declaration of Keith Bierman, CPA in Support of the Debtor's Response and Objection to the United States Trustee's Motion to Appoint Chapter 11 Trustee or, Alternatively, to Dismiss the Case" filed concurrently with this Response.

Warner Angle Hallam Jackson & Formanek PLC

As discussed in the Offering Memorandum, while Cares' QMA was with Sports, Sports, in turn, contracted with OVG from the outset to oversee certain operations at the Park. (MD ¶ 45). Cares discussed the prospect of OVG taking over the full management of the Park upon Sports' termination, but OVG refused to consider doing so unless Cares paid OVG millions of dollars OVG claimed it was owed by Sports. (*Id*.). Cares did not have the ability or willingness to pay OVG these amounts as a condition to negotiating a new QMA with OVG. (*Id*.).

Cares made clear to representatives of Sports that Cares was not interested in a QMA with an entity owned or controlled by Randy or Chad Miller. (*Id*. ¶ 46). Instead, Cares negotiated with Brett Miller and a newly formed entity, Elite Sports Group, LLC ("Elite"), that is owned 100% by Brett Miller. (*Id*.). Brett had the experience and knowledge of the Park necessary to step in immediately, as he had been involved with Sports' management of the Park. (*Id*.).

On April 14, 2023, after substantial negotiation, Cares and Elite entered into a new QMA (the "Elite QMA"). (*Id*. ¶ 47, ex.16). The Elite QMA is significantly different than the QMA with Sports, to Debtor's benefit. (*Id*.). Under the Elite QMA, Cares "has complete and full authority and decision-making power as it relates to all operations, activities and events held at or related to the Park." (*Id*., ex. 16 at ¶ 2.1(b)). Among other things, Cares has the right to review and approve all contracts and major contracts that require Cares' co-signature. (*Id*., ex. 16 at ¶ 2.1(c)). Elite is responsible to pay its own executive compensation and Cares is not obligated to reimburse for those expenses; Cares must approve all employee bonuses to be funded by Cares; and Cares has the right to approve the appointment of executives. (*Id*., ex. 16 at ¶ 2.5(a)-(b)). Elite is entitled to only one fee—a Management Fee calculated as 6% of Sports Revenue and 4% of Non-Sports Revenue. (*Id*., ex. 16 at ¶ 10.1). The Elite QMA is for a term of one-year with extension rights in favor of Cares (as compared to the 30-year term of the Legacy Sports

QMA) and, importantly, Cares can terminate the Elite QMA upon a sale of the Park. (*Id*., ex. 16 at ¶ 3.1).

Elite offered critical operational advantages as well. Retention of Elite allowed for continuity of personnel at the Park without interruption to operations. (BD ¶ 21). Elite managed to retain hundreds of Sports and OVG employees, thus avoiding potential chaos at the Park. (*Id*.). The Park was able to continue uninterrupted operations during one of the busiest times of season. (*Id*.). In contrast, a new manager would have been required to staff up with hundreds of employees, rebuild relationships with sports and event promoters, install administrative and back-office management, re-book cancelled events and commitments, among other tasks. (*Id*. ¶ 22).

### J.    Park Performance Has Improved.

Since revising the QMA and engaging Elite, the Park's financial performance has markedly improved:

- Park operations in May and June 2022 yielded a combined net loss of $3.05 million. Park operations for the same two months in 2023 yielded a combined net loss of only $2.13 million, a year over year improvement of more than $921,000.

- Park headcount has been streamlined as part of these 2023 efforts. Overall payroll costs in May and June 2022 were a total of $3.01 million. Overall payroll costs for the same two months in 2023 were reduced to a total of $1.95 million, a year over year savings of $1.1 million.

- The Park's food and beverage division ("F&B") which contains all concessions and the onsite full-service restaurant, has been almost completely turned around and is expected to generate consistent operating profits beginning in the fall. The overall results for F&B in May and June of 2022 were a combined net operating *loss* of $256,000. The same timeframe in 2023 yielded a combined net operating *profit* of $25,500, a year over year improvement of over $281,000.

(BD ¶ 28).

Warner Angle Hallam Jackson & Formanek PLC

Warner Angle Hallam Jackson & Formanek PLC

### III. __ARGUMENT.__

"[T]he standard for a § 1104 appointment is very high . . . ." *In re Smart World Technologies, LLC*, 423 F.3d 166, 176 (2d Cir. 2005). That is because there is a "strong presumption against appointing an outside trustee." *In re Marvel Enter. Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998). The reason for this presumption is two-fold. First, there is often no need for appointment of a trustee because a debtor-in-possession is, by statute, a fiduciary of the creditors and thus obligated to act in their best interests. *Id*. Second, the debtor's "familiarity with the business it had already been managing at the time of the bankruptcy filing . . . often mak[es] it the best party to conduct operations during the reorganization." *Id*.

Given this "strong presumption," the UST bears the burden of proving grounds for appointment of a trustee under Section 1104(a) by clear and convincing evidence. *See, e.g.*, *In re Bayou Group*, 564 F.3d 541, 546 (2d Cir. 2009); *In re G-I Holdings*, 385 F.3d 313, 317-18 (3d Cir. 2004).[7] The UST has not, and cannot, carry that burden here.

In its Motion, the UST cites Section 1104(a), but does not specify whether it is seeking appointment under subsection (a)(1) or (a)(2) or both. The bulk of the UST's Motion addresses the "cause" grounds of subsection (a)(1): "for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C., § 1101(a)(1). While this is the thrust of the UST's Motion, the UST also, in passing, claims that appointing a trustee would be "in the best interest of creditors and the estate." (Mot. at 10). So it appears the UST is arguing subsection (a)(2) as well.

---

[7] While neither the Ninth Circuit nor the Ninth Circuit BAP have addressed the burden of proof under Section 1104(a), bankruptcy courts in this Circuit have applied the "clear and convincing" evidence standard. *See, e.g.*, *In re Minesen Co.*, 2022 WL 5223909, *1 (Bankr. D. Haw., Oct. 3, 2022); *In re Briarwood Capital, LLC*, 2010 WL 2884949, *3 (Bankr. S.D. Cal., July 19, 2010); *In re Sonicblue Inc.*, 2007 WL 926871, *12 (Bankr. N.D. Cal., Mar. 26, 2007).

Warner Angle Hallam Jackson & Formanek PLC

1

### A.    <u>Appointment of a Trustee Is Not in Anyone's Best Interest</u>.

2      It is hardly surprising the UST gives short shrift to its (a)(2) argument. The Motion

3 comes nowhere close to establishing that appointing a trustee would be in the best

4 interests of creditors and the estate. Indeed, a glaring omission from the Motion is any

5 acknowledgment—let alone discussion—of the current posture of this Chapter 11 case or

6 the potentially catastrophic loss that appointing a trustee could cause.

7      As Debtor in this case has stated from the first day, it intends to sell the Park and

8 distribute the proceeds of that sale to creditors. That must happen quickly because the

9 DIP lender, UMB, is only providing the funds necessary to keep the Park open and fund

10 the case through the end of October—a schedule built around the anticipated prompt sale

11 of the Park. If all goes according to plan, the Park will be sold, a new owner will take

12 over, and Debtor will be out of the picture before Fall. This is not a case where the

13 debtor's management is seeking to control the debtor's business indefinitely. This sale

14 process is in the best interests of creditors; Debtor is working diligently to further the

15 process; and, consequently, the Court should deny the Motion. *See, e.g.*, *In re RMS*

16 *Titanic, Inc.*, 2018 WL 11205929, *3 (Bankr. M.D. Fla., June 29, 2018) (denying motion

17 to appoint a trustee in light of "the efforts currently in progress to liquidate the [debtor's]

18 assets for the benefit of the estate").

19      Notably, the UST has never questioned Debtor's plan to sell the Park or the

20 Debtor's commitment to do so. Appointing a trustee would delay any sale for months. At

21 a minimum, as an estate fiduciary, no trustee is going to sign off on a sale here without

22 first (a) engaging counsel and likely a financial advisor, (b) allowing these professionals

23 time to review and understand the assets and liabilities of this estate and the Park's

24 operations; and (c) understanding the differing claims and parties-in-interest in this case.

25 Given the size of the Park and its complex history, that educational process will not

26 happen in weeks. Meanwhile, whatever momentum has been built up by Miller Buckfire

27 through its sale efforts will likely be lost as potential buyers move on.

28

Even if buyers were willing to tolerate the delay caused by appointing a trustee, the asset they are looking at today (an open, going concern business) could easily tarnish. That is because the Park will likely go dark if a trustee is appointed. The Park loses $1 million a month and cannot stay open without the lending provided by UMB under the DIP loan. But the appointment of a Chapter 11 trustee is an event of default under the DIP Credit Agreement. (DE 3, Exh. A, § 8.1(e)). UMB would have the right to pull its financing if the UST wins its Motion. If that happens, the Park shuts down.

The Court has already heard testimony that if the Park shuts down, that will cost the estate millions of dollars in value on a sale. And, to make it worse, a trustee would be unable to fund the necessary costs of simply holding on to the property—the $319,000 per month due under the Ground Lease, as well as the costs for electrical and water needed just to preserve the Park buildings and fields. Appointment of a trustee thus could be catastrophic.

The UST's Motion ignores these potential consequences—and even all the lesser, but still destructive scenarios that could play out if a trustee is imposed. Instead, the UST offers up just one supposed benefit of a trustee: the trustee allegedly can better investigate and pursue estate causes of action. (Mot. at 20 and 22). Even here, the UST ignores the practical realities of this case. Debtor and its current management were never going to be in charge of pursuing estate causes of action. This is, and always has been, a liquidating case. Any estate causes of action will be transferred under a plan to a liquidating trust with a trustee most likely selected by the Creditors Committee. That liquidating trustee—not Debtor's current management—will investigate and pursue estate claims.

For now, it is enough that Debtor preserves all estate causes of action. It has done so. Debtor listed claims against third parties in its schedules. (DE 1, at 22). When it comes time to prepare a plan and disclosure statement, Debtor will work with the Creditors Committee to make sure potential claims and the targets of those claims are disclosed and preserved. The UST has not pointed to any evidence that Debtor and its

- 17 -

professionals will shirk their fiduciary duties to make sure estate claims are preserved for the benefit of creditors.

In short, the Motion doesn't make the case for a trustee under subsection (a)(2). It doesn't even come close. Far from benefitting creditors, appointment of a trustee could harm them greatly. Not only does this negate any grounds for appointing a trustee under subsection (a)(2), as explained below, it also undermines the UST's claim for a trustee under the "cause" standard of subsection (a)(1).

## B. The UST Has Not Demonstrated "Cause" Exists.

While Section 1104(a)(1) is stated in mandatory terms ("the court shall order the appointment of a trustee"), the mere existence of one or more of the enumerated factors ("fraud, dishonesty, incompetence, or gross mismanagement") is not enough to justify appointment of a trustee. Rather, in assessing whether "cause" exists, the Court should consider the materiality of the alleged misconduct and the consequences to the reorganization effort of appointing a trustee. *See Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 241-2 (4th Cir. 1987). "While under § 1104(a)(1) the court is not directly called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore competing benefit ***and harm*** that such an appointment may place upon the estate." *In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (emphasis original); *accord In re Shotwell Landfill, Inc.*, 2014 WL 4377721, at *3 (Bankr. E.D.N.C., Sept. 4, 2014).

As just explained, the Motion fails to address the certain delay to and potential derailing of the sale process, as well as the danger of UMB pulling its funding. The Motion also ignores the importance of timing in assessing the "cause" factors. While Section 1104(a)(1) calls for an examination of both pre-petition and post-petition conduct of the debtor's management, "the focus is on the debtor's current activities, not past misconduct." *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001); *accord In re Bergeron*, 2013 WL 5874571, at *7 (Bankr. E.D.N.C., Oct. 31, 2013). Even putting aside the UST's improper conflation of Cares with Sports, much of the alleged misconduct the

- 18 -

UST relies on, if it occurred at all, happened pre-petition before Cares (i) engaged its own counsel and financial advisor who have since worked with Cares on an almost daily basis, (ii) was placed under a microscope by the bondholders and their professionals, and (iii) terminated Sports and the QMA. And since Debtor filed this case, its conduct is scrutinized by UMB, the Creditors Committee, the UST, and the Court. Courts have noted that the disclosure required in Chapter 11, as well as the scrutiny of the court and creditors, typically undercuts the need for a trustee. *In re Waterworks, Inc.*, 538 B.R. 445, 465 (Bankr. N.D. Ill. 2015); *Bergeron*, 2013 WL 5874571, at *9; *In re Daily*, 2009 WL 3415204, at *3 (Bankr. M.D. Tenn., Oct. 19, 2009). Yet, the UST's Motion says nearly nothing of substance about any ***post-petition*** misconduct.

### 1. <u>Pre-Petition</u>.

In reviewing alleged pre-petition sins, the UST proceeds as if Cares was charged with developing and operating the Park. That is incorrect. From the outset, the development and operation of the Park was primarily in the hands of Sports—not Cares. That was by design and was fully disclosed. As required by the tax-exempt nature of the bond financing, Cares was set up as a non-profit entity to hold title to the Park's assets. For much of the relevant time period, Cares had only one full-time employee (Doug Moss). No one ever intended Cares to hands-on manage the development, construction, and operation of the Park. That was Sports' job.

Everyone understood this. The QMA between Cares and Sports gave Sports the discretion to manage the Park's construction and, upon completion, to operate the Park. The QMA did not, as either a practical or legal matter, permit Cares to monitor, in real time, Sports' use of funds. The QMA was attached to the Limited Offering Memorandum for both bond financings. The Motion ignores this context.

The Motion also displays a stunning failure by the UST to investigate before filing the Motion. A number of the alleged pre-petition bad acts either never happened, were not Cares' fault, or are easily explained when context is supplied.

- 19 -

### a) Cares Did Not Make Improper Loans.

Nowhere is this lack of due diligence by the UST more evident than in its claim that Cares authorized almost $7.5 million in "loans" to Sports. (Mot. at 5-9). As explained above, most of the transactions the Trustee assumes are skeevy "loans" from Cares to Sports were nothing of the sort. Approximately $3 million of this figure represents money actually owed to the Park from customers and an intercompany account that reflects funds legitimately exchanged by Sports and Cares.[8] And the alleged $3.2 million loan indicated in the 2021 tax return, in fact, merely duplicates the other alleged "loans" in the UST's table.

It is true that principals of Sports took money out of Sports (not Cares) for seemingly improper purposes. But Cares never authorized Sports' principals to use project funds to pay for personal expenses or other business ventures. To the contrary, when Cares discovered these monies had been taken, Cares' management insisted Sports repay these monies, had Sports' principals execute promissory notes, and documented the situation by disclosing these as "loans" on Cares' financial statement. Sports then repaid the monies. (WD ¶ 13). That hardly amounts to a misuse of funds by **_Cares_**.

The only "loan" that can be said to have been authorized by Cares was the use of $1,120,000 in project funds to settle with Waltz. That was clearly Sports' obligation.

But, as explained, Cares had no real choice except to settle the matter. As explained above, Cares was under pressure to resolve Waltz's claim resulting from Cares' termination of the general contract with Waltz to construct the Park. That was a bona fide claim of approximately $1.7 million and was properly paid for out of project funds. Waltz, however, would not settle its termination claim without also recovering what apparently was its equity investment in Sports. Cares was forced to accept that linkage. Faced with the cost and distraction of having to arbitrate Waltz's termination

---

[8] "Accounts Receivable—LS USA" ($1,790,685.27) and "LS USA Operating Activity Xfr" ($1,257,871.05).

Warner Angle Hallam Jackson & Formanek PLC

Warner Angle Hallam Jackson & Formanek PLC

claim at a sensitive time in the Park's construction, Cares decided to pay the full $2.7 million settlement out of project funds.

But Cares did not give this money away to Sports. Rather, as the UST acknowledges, Cares deemed this a loan to Sports and disclosed it as such on its financial statements. When Cares was told that Sports had paid these funds back by satisfying Park operational expenses, Cares demanded proof.

There is no evidence that Mr. Moss or anyone else in Cares' management benefited personally from Cares paying this settlement to Waltz. Rather, this payment was made to satisfy Cares' obligations under its settlement with Waltz and thereby further Cares' interest in moving on from Waltz. This is not a case where the debtor's pre-petition management diverted corporate assets for their individual benefit. Accordingly, this case is easily distinguished from caselaw (such as that cited by the UST) that justifies appointment of a trustee based on the debtor's management enriching themselves. *See*, *e.g.*, *In re PRS Ins. Group, Inc.*, 274 B.R. 381 (Bankr. D. Del. 2001) (appointing trustee based on debtor's president and sole shareholder diverting corporate assets for his personal benefit).

### b) Mr. Moss Did Not "Falsely" Certify Compliance.

Another example of the UST's lack of diligence is its claim that Mr. Moss filed a false compliance certificate in April 2022. The UST claims the compliance certificate was false because Mr. Moss "knew or should have known" that there were mechanic's liens against the Park, pointing to lien by CPR that was recorded on October 29, 2021.

The UST, however, apparently failed to investigate what happened to CPR's lien. If it had, it would have found that CPR released this lien of record on November 12, 2021. Mr. Moss did not "wrongly attest" that there were no liens against the Park when he executed the compliance certificate on April 28, 2022.

As for conducting audits, as Mr. Moss has testified, he mistakenly understood that audits were not required until after the Park opened for business as it would have no revenue until then. That the fine print in the Loan Agreement in fact required an audit

sooner does not negate that when Moss signed the compliance certificate in April 2022 he did not think the lack of an audit was a breach of the Loan Agreement given that the Park was not yet operating. Indeed, the compliance certificate contains this important disclosure that the UST conveniently fails to mention:

> The project is in the construction stage and the Borrower has not generated any operating data or financial information relative to operations thus such information is unavailable.

(Mot., ex. 13). Mr. Moss may have been mistaken in his understanding of when an audit was required, but his understanding was disclosed.

### c) After the Park Opened, Cares Prepared for an Audit.

As with its claim that Cares made "loans" that never existed, the UST's allegation that Cares "failed to take even preliminary steps" necessary to conduct an audit is itself a false statement. After the Park opened in May 2022, Cares began the process of engaging an audit firm and progressed with CBIZ. Not surprisingly, however, it became clear that due to the issues relating to Sports already disclosed in the 2021 tax return and financial statements, neither CBIZ nor another audit firm would sign off on audited financials without a forensic audit. Cares then took steps to arrange a forensic audit. Ultimately, it was the bond trustee (UMB)—the ostensible primary beneficiary of any audit—who held off conducting an audit in deference to the Loop Capital process.

More generally, it is hard to fathom how Cares' failure to conduct an audit has any bearing on a motion under Section 1104(a)(1). The UST has not alleged anything Cares did pre-petition amounts to fraud. And while not conducting an audit for 2021 was a technical breach of the Loan Agreement, this cannot reasonably be described as evidence of "dishonesty, incompetence or gross mismanagement of the affairs of the debtor."

### d) Mr. Moss Did Not Mislead the Bondholders.

The UST next takes Mr. Moss to task for his understanding of the word "independent" as used in a list of contracts in an appendix to the Offering Memorandum. From that, the UST spins a story that this allegedly misleading use of the word

Warner Angle Hallam Jackson & Formanek PLC

"independent" to describe Mr. Moss' company KingDog Enterprises, LLC was material to the decision of "potential purchasers of $250 million worth of bonds." (Mot. at 12).

As the UST acknowledges, the Offering Memorandum fully disclosed the material point: Mr. Moss was expecting to be paid a fee of $912,500 at closing. As Mr. Moss testifies, that fee is the subject of the agreement with KingDog Enterprises listed in the appendix. (MD ¶--). Regardless of how the "potential purchasers of $250 million worth of bonds" may have understood the word "independent," Mr. Moss' personal interest in the closing of the bond financing was fully disclosed. Perhaps just as material for present purposes, Mr. Moss ultimately received nothing out of the closing. The fee due KingDog was never paid.[9]

### e) The Construction Monitor Was, In Fact, Independent.

The UST's complaint about Cares retaining Jim Neal's firm EH as the independent construction monitor is just another unjustified aspersion. Initially, it is not obvious where and when the UST believes "disclosure" about EH needed to be made. As the Loan Agreement makes clear, the hiring of a construction monitor was a post-closing item. (DE 9-2 at § 8.05(c)). There was no representation or expectation that Cares or anyone else would disclose the identity of the construction monitor prior to closing.

Even if this disclosure was necessary, for a "failure" to disclose Mr. Neal's prior involvement in the Park to be meaningful, there would have had to have been knowledge by Mr. Moss of Mr. Neal's prior efforts to help the Park locate funding sources. Before retaining EH to serve as the Park's Construction Monitor in 2020, Mr. Moss had no knowledge of Mr. Neal's efforts in 2019 to help seek funding for the Park. (MD ¶ 26). Notably, Mr. Moss was NOT a party to any of the emails the UST touts on this point.

---

[9] The UST's claim that Mr. Moss' fee was unnecessary in light of another company, Anthony James Partners, being retained to provide technology related services ignores the timing of Mr. Moss' services. Mr. Moss' services were rendered prior to the closing of the bond financing. His fee was due at closing. Constructing the Park required an actual technology plan. Anthony James Partners was retained to provide those construction-related services.

But all of this is ultimately beside the point. The UST's premise—that Mr. Neal's 2019 efforts to help the Park obtain financing should have disqualified him from serving as a construction monitor for the project—is wrongheaded. The term "Independent" is defined in the Loan Agreement as "a Person who is not a member of the governing body of the Borrower [Cares] or its Affiliates or an officer or employee of the Borrower or its Affiliates." (DE 9-2 at 8; DE 9-1 at 8). Jim Neal was never a member of Cares' board or an officer of Cares and had no conflict of interest affecting his ability to perform his role. (MD ¶ 26). Given Cares hired an "Independent" monitor as required by the Loan Agreement, it is nonsensical to claim, as the UST does, that Cares had to "disclose" a prior relationship between Jim Neal and Sports—even if Mr. Moss had been aware of it. And there is no indication that Mr. Neal or his firm did anything other than a very professional job in their role.

### f) The UST Offers No Evidence or Argument to Question Cares' Decision to Retain Elite.

When it tries to make something nefarious out of Cares' decisions to terminate Sports and retain Elite, the Motion is reduced to nitpicking.

The UST sees value in pointing out an obvious drafting error in a signature line. Respectfully, that is immaterial.

Elite's failure to promptly register to do business in Arizona is marginally more serious. But the UST does not dispute that Elite was a properly formed Delaware entity. When the UST pointed out the lack of registration in Arizona, the Debtor told Elite to rectify this promptly, which it did.

What is notably absent from the UST's Motion is any claim that Elite is doing a poor job managing the Park. Nor does the UST provide any argument or evidence that Elite is misappropriating funds. That is the kind of evidence the UST should be prepared to offer it if is going to claim that hiring Elite was "incompetent" or amounted to "gross mismanagement."

Warner Angle Hallam Jackson & Formanek PLC

The UST does offer some rank speculation. The UST harps on the family relationship between the Millers and current employees of Elite. But the UST has not pointed to a single instance where Brett Miller, Jennifer Miller, Layne Baggett or Ashley Simmons has done anything wrong in their work for Elite or vis-à-vis the Park. The UST offers no evidence that these Elite employees are not providing valuable services to Elite and the Park and earning their paycheck.

The UST's effort to cast shade on Debtor's decision to retain Elite comes off poorly in light of the Park's actual performance. In just over two months under the new QMA, Debtor and Elite have significantly (a) reduced the cash burn, (b) streamlined and reduced the Park's payroll, and (c) turned a huge loss in the Park's F&B to a modest gain. That hardly demonstrates that Debtor is "incompetent" or "grossly mismanaging" the Park.

### g) Standards of Governance.

The Motion points to the fact that Cares had not adopted a formal conflict-of-interest policy. As the Motion concedes, the IRS recommends, but does not require such a policy. And given that for most of its short history Cares has been an overwhelmed not-for-profit corporation with a minimal number of employees and a daily crisis to confront, such a policy was not deemed a high priority. Regardless, Cares did adopt a conflict-of-interest policy in ***May 2022***. (MD ¶ 68).

Nor is there anything "troubling" about Sports having issued checks to Cares board members in 2021. Dan O'Brien was paid by Sports because at the time he was a Sports employee providing services at the Park—a fact that was disclosed in the Offering Memorandum. (*Id*. ¶ 69). Likewise, Larry White was performing accounting services for Legacy Sports in 2021 before coming onboard with Cares. So, again, it is not surprising that he was paid by that entity in 2021. (*Id*. ¶ 69; WD ¶¶ 1-2). Meanwhile, in 2021, Cares lacked a payroll system to allow payment of Mr. Moss' salary. So his salary, which was requisitioned by Cares from the bond fund, was simply funneled through Sports' payroll processor. His only loyalties were to Cares, not Sports. (MD ¶ 69).

Warner Angle Hallam Jackson & Formanek PLC

Nor was it inappropriate for Sports to initiate the effort with Loop Capital to refinance the Park's debt. Cares was careful to warn Sports not to commit Cares to any arrangement with Loop or anyone else, but Cares understood that Sports had its own interest in finding funds to pay off the mechanic's lien creditors and Sports at the time had the most institutional knowledge about the Park and its finances. Finally, Cares made it clear to both Sports and Loop throughout the process that (i) Cares' personnel needed to be involved in the discussions, and (ii) Cares would ultimately need to approve any deal. (MD ¶ 34). Cares did not shirk any responsibility.

### h) Cares Did Not Pay $7.1 Million In Salaries in 2022.

The UST throws out a big number--$7.1 million in salaries in 2022—to imply Cares' management was enriching itself rather than paying contractors. But only $460,000 in salary, plus $245,000 in contracted-for compensation, was paid to actual employees of Cares. (MD ¶ 70). The figure motion proceeds from includes the salaries paid to all the Park employees, nearly all of whom were Sports (not Cares) employees. (*Id.*)

It is unfair of the UST to suggest that Cares chose to pay "$7.1 million of non-hourly salaries" while stiffing the contractors. First, Sports—not Cares—set those salaries for Sports employees. The Sports QMA did not give Cares the ability to hire or fire Sports employees or set their compensation. (MD ¶ 70 and ex. 3). And Sports' conduct in this respect is one of the reasons Cares terminated Sports. (*Id*. ¶ 70). Second, most of those salaries were in place long before the issue arose with unpaid contractors.

### 2. Post-petition.

The UST's evidence of material post-petition misconduct is threadbare. Even where there are isolated instances of pre-petition misconduct, "courts have been reluctant to appoint a trustee absent signs of ***post-petition*** mismanagement or misconduct because 'speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a chapter 11

- 26 -

case or justify the additional costs of a trustee.'" *Bergeron*, at *7 (quoting *Sletteland*, 260 B.R. at 672) (emphasis added). The UST cannot point to any post-petition mismanagement or misconduct by Cares.

### a) Cares Has Disclosed its Receivables.

The UST dings Cares for not disclosing the company's accounts receivable that are over 90 days' old. Cares agrees this information should be available and so it has amended its Schedule A/B. (DE 295). Other than insinuating the omission may been "by design," the UST offers no reason why Cares and its professionals would want to conceal its old A/R. The insinuation does not even make sense: Cares' receivables have been routinely disclosed in its financial statements posted in EMMA filings. We do not even understand the UST's logic on this one.

### b) Elite.

The UST gets a lot wrong about Elite and its management fee. First, there is no "ambiguity" regarding the calculation of Elite's fee. The calculation of that fee is set forth in Section 10.1 and Exhibit A to the Elite QMA. As required by IRS guidance, this fee is calculated based on a percentage of the gross revenues of the Park. Debtor has provided a copy of the Elite QMA to anyone who has asked for it in the case, including to the UST. A copy of this QMA is an exhibit to Mr. Moss' declaration supporting this response.

Debtor has not "committed" to paying Elite a fee of $708,714 from May 1 through October 31, 2023. This figure comes from Debtor's DIP budget. It reflects the ***projected*** total fee that will be paid to Elite over the budget period. The actual fee depends upon actual revenues. (BD ¶ 24).

Nor does Elite's management fee represent "pure profit" to Elite. There are significant overhead expenses of Elite that are not reimbursed through the QMA. (*Id*. ¶ 25). Most notably, Elite's executive compensation is not reimbursed by Debtor. (*Id*. ¶ 26). Likewise, the premium on Elite's D&O insurance (which runs about $300,000 a

1   year) is not covered, nor are fees Elite must pay to its lawyers and other professionals.

2   (*Id*. ¶ 25).

3       The UST next claims "the Debtor should have provided proof" that Elite's

4   management fees and the reimbursements due under the QMA are "reasonable and

5   necessary." That comment begs the question: where and to whom should this disclosure

6   have been made? Nothing in the form Schedules or Statement of Financial Affairs

7   required this disclosure. Nothing in the Bankruptcy Code or Bankruptcy Rules requires a

8   debtor to, as a matter of course, provide "proof" that a contract with a property manager

9   is "reasonable and necessary." This alleged "lack of disclosure" is just another baseless

10  aspersion.

11      Perhaps recognizing this, the UST suggests Debtor should have filed a formal

12  motion to employ Elite as the Park manager. But why? Again, nothing in the Bankruptcy

13  Code or rules requires that a property manager be formally employed in a Chapter 11

14  case. The Bankruptcy Code does require court approval of the employment of "attorneys,

15  accountants, appraisers, auctioneers, or other professional persons." 11 U.S.C.§ 327(a).

16  Elite is clearly not an "attorney", "accountant", "appraiser" or "auctioneer." While the

17  term "other professional" is not defined in the Code, the Delaware Bankruptcy Court has

18  formulated the following test to determine when someone is a "professional" within the

19  meaning of Section 327(a):

20          [A] "professional" is limited to those occupations which control, purchase
21          or sell assets that are important to reorganization, is negotiating the terms of
22          a plan of reorganization, and has discretion to exercise his or her own
            personal judgment.

23  *In re Brookstone Holdings Corp.*, 592 B.R. 27, 28-9 (Bankr. D. Del. 2018) (citations and

24  quotations omitted). Elite is not within that definition.

25      While operating the Park is a much larger and more complicated task than

26  operating an apartment complex or office building, Elite's role in this case is like that of a

27  manager hired by the owner (debtor) of the complex or building. Not surprisingly, courts

28

- 28 -

have rejected the argument that property managers are "professionals" that need to be employed under Section 327. *In re Livore*, 473 B.R. 864, 870 (Bankr. D.N.J. 2012) (to be a "professional person," "he or she must play an integral role in the administration of the bankruptcy case"); *In re Park Ave. Partners Ltd. Partnership*, 95 B.R. 605, 616-17 (Bankr. E.D. Wisc. 1988) (even though manager had "unfettered discretion in how the property was managed", manager was not a professional within the meaning of Section 327(a)).

The UST's authority is inapposite. See *In re Marion Carefree Ltd. Partnership*, 171 B.R. 584 (Bankr. N.D. Ohio 1994). In *Marion*, the debtor sought to hire a "manager" to provide "marketing, personnel management and financial and accounting services" for the debtor. *Id*. at 586. Specifically, the manager's proposed duties included "general accounting, payroll accounting, cash management and supervisory services for such accounting tasks" for the debtor in that case. *Id*. at 588. Not surprisingly, the court had no difficulty finding the manager was acting as an "accountant" under Section 327. *Id*.

Of course, if challenged in good faith, Debtor must be able to prove that its QMA with Elite is reasonable and necessary. So far, only the UST has questioned this—in its ill-advised Motion. Throughout this case, Debtor has readily responded to the UST's informal requests for information and explanation. And in responding to this Motion, Debtor has provided even more evidence of both the necessity and reasonableness of Elite's employment. (MD ¶ 45; BD ¶¶ 17-23).

At this point, it is incumbent on the UST to provide evidence that Debtor's employment of Elite, under all the circumstances, is not "reasonable and necessary." The UST has not even tried to meet that basic burden. The UST has not, for example, provided any evidence that the management fee (4% on non-sports revenue, 6% on sports revenue) is unreasonable or out of market. By contrast, Debtor has provided that evidence. (BD ¶ 17 to 19). Nor has the UST shown that Debtor could have hired another entity to operate the Park. Debtor has provided evidence that it had no other option but Elite. (MD ¶ 45; BD ¶¶ 20-23).

- 29 -

Warner Angle Hallam Jackson & Formanek
PLC

1    The UST has thus failed to establish cause for a trustee under Section 1104(a)(1)

2  and the Motion should be denied.

3              **C.    There Is No Cause to Dismiss the Case.**

4         As an afterthought, and apparently without giving any thought to how it would

5  affect many of the stakeholders, the UST asks for dismissal of the case as alternative

6  relief. The request is utterly without merit.

7         By its nature, a motion to dismiss or convert under Section 1112(b)(1) focuses on

8  the debtor's conduct after the filing of the petition. *See* 11 U.S.C. § 1112(b)(4) (listing

9  grounds for "cause"). As just explained, the Motion offers almost nothing to support a

10  contention that the Debtor has engaged in material post-petition misconduct. The UST

11  says that it has established "gross mismanagement of the estate." 11 U.S.C. §

12  1112(b)(4)(a). In fact, the UST has offered *zero* evidence of ***post-petition***

13  mismanagement. Pre-petition misconduct, even if it exists, is immaterial here. *In re*

14  *Rosenblum*, 608 B.R. 529, 541-2 (Bankr. D. Nevada 2019) (noting the "bankruptcy estate

15  did not exist during the pre-petition period."); *In re Sunnyland Farms, Inc.*, 517 B.R. 263,

16  267 (Bankr. D.N.M. 2014) ("The alleged gross mismanagement must occur post-

17  petition."). The only concrete failure the UST can point to is not promptly amending

18  Schedule A/B's disclosure on old receivables. That has now been cured; and even if it

19  was not, that single omission hardly amounts to cause.

20         Nor does the UST offer any argument, let alone proof, that dismissal of this case

21  would be in the best interests of creditors and the estate. The Court, however, must

22  consider that factor—even if cause were to exist here. *In re Sullivan*, 522 B.R. 604, 612

23  (9th Cir. BAP 2014) (bankruptcy court abused its discretion in ordering dismissal of

24  Chapter 11 case without considering the best interests of creditors and the estate).[10]

25

26

27       [10] In the event the Court determines there is "cause" to dismiss this case under Section

28  1112(b)(1), Debtor asserts (and requests the opportunity to prove) that "unusual circumstances"
exist here to not dismiss the case.  11 U.S.C. § 1112(b)(2).

- 30 -

IV. **CONCLUSION**.

The UST's Motion should not have been filed. It should be denied.

RESPECTFULLY SUBMITTED this 20th day of July, 2023.

WARNER ANGLE HALLAM JACKSON & FORMANEK, P.L.C.

By */s/ Henk Taylor  (016321)*
       Henk Taylor

PAPETTI SAMUELS WEISS McKIRGAN LLP
       Robert McKirgan
       Randy Papetti
       Jared Sutton

*Counsel to the Debtor*

*eFiled* this 20th day of July, 2023 via the Court's CM/ECF filing system and a copy of the foregoing mailed/emailed this same date to:

Jennifer A. Giaimo
Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003
Jennifer.A.Giaimo@usdoj.gov

*U.S. Trustee's Office*

By */s/ Lasya Androsiuk*

Warner Angle Hallam Jackson & Formanek PLC