J. Henk Taylor – State Bar No. 016321
**WARNER ANGLE HALLAM**
   **JACKSON & FORMANEK PLC**
2555 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 264-7101
Facsimile: (602) 234-0419
E-mail:  htaylor@warnerangle.com

*Counsel for the Debtor*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| **In Re:**<br><br>**LEGACY CARES, INC.,**<br><br>       **Debtor.** | **Case No. 2:23-bk-02832-DPC**<br><br>**Chapter 11** |

**DECLARATION OF KEITH B. BIERMAN, CPA IN
SUPPORT OF THE DEBTOR'S RESPONSE AND OBJECTION TO THE
UNITED STATES TRUSTEE'S MOTION TO APPOINT CHAPTER 11
TRUSTEE OR, ALTERNATIVELY, TO DISMISS THE CASE**

I, Keith Bierman, declare as follows:

1.  I am over the age of 18 and am mentally competent. I make this declaration (the "Bierman Declaration") in support of Debtor's Response and Objection to United States Trustee's Motion to Appoint Chapter 11 Trustee or, Alternatively, to Dismiss Case (the "Response") filed by Legacy Cares, Inc. ("Debtor" or "Cares") in the above-captioned case (the "Chapter 11 Case").

2. The facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of Debtor, Debtor's current and former management firms, or my opinion based upon experience, knowledge, and information concerning the operations of Debtor, its finances and the industry as a whole. If called upon to testify, I would testify competently to the facts set forth herein.

**A. Background and Qualifications.**

3. I am a Senior Managing Director at MCA Financial Group, Ltd. ("MCA") in Phoenix, Arizona. MCA is a leading restructuring consulting firm providing advisory services to emerging growth and mid-size corporations on significant mergers, acquisitions, divestitures, restructurings and other strategic corporate transactions. I am a Certified Public Accountant in the state of Arizona. I have been a member of MCA since 2001, prior to which I was Corporate Controller and Vice President of Finance at a software development firm from 1998 to 2000, and prior to that I was a member of the Assurance and Advisory Group at KPMG, LLP from 1996 to 1998. As a consultant focused on restructuring, bankruptcy, receivership, turnarounds and other special situations since 2001, I regularly advise companies and various creditor constituencies in financial restructurings, both in Chapter 11 proceedings as well as in out-of-court transactions, and also regularly advise and assist companies in stressed or distressed situations.

4. I have led hundreds of corporate turnaround engagements in my twenty plus years at MCA. Such engagements include out of court restructurings, CRO engagements, bankruptcy reorganizations, receiverships, liquidating agent appointments, responsible party appointments and other similar roles.

5. MCA has rendered financial advisory services to Debtor in connection with its restructuring efforts since late December 2022 when MCA was retained by Debtor as its Chief Restructuring Officer ("CRO") prior to the Chapter 11 Case pursuant to a consulting agreement. MCA currently serves as Financial Advisor to the Debtor in the Chapter 11 Case. I led the MCA engagement team in our capacity as CRO and I currently lead the MCA engagement team in our role as Financial Advisor to the Debtor. As the former CRO and current Financial Advisor for the Debtor, I am integrally involved in all aspects of Debtor's operations and finances, and I work closely with Debtor's board of directors, management and legal counsel. I have, among other duties and responsibilities, (a) analyzed Debtor's historical financial statements, its historical cash flows, its current liquidity and its projected cash flows; (b) assisted Debtor in evaluating its restructuring options and other strategic alternatives; (c) interfaced directly with Debtor's various management firms regarding operations and finances of Debtor's day to day activities; (d) prepared numerous budgets and cash flow analyses necessary to obtain pre-petition funding from Debtor's pre-petition secured lender necessary to continue the operations of Debtor; (e) routinely communicated with Debtor's creditors including its pre-petition secured

- 3 -

lender and its legal and business advisors regarding a host of business issues facing Debtor; (f) as part of preparing Debtor for its Chapter 11 filing, I conducted an analysis of and assisted Debtor in securing debtor-in-possession financing on the most competitive terms and conditions believed to be available to Debtor under the circumstances; and (g) was heavily involved in the negotiations concerning the management agreements with the Debtor's current management firm.

### B. The Separate Roles of Elite Sports Group and the Debtor

6. Debtor owns Legacy Park, a 320-acre multi-sport facility located in Mesa, Arizona that caters primarily to amateur athletes and their families who travel locally and from across the country to play in athletic tournaments and to use the facilities for practice and entertainment (the "Park"). The Park has 8 baseball and softball fields, 19 basketball courts, 35 soccer, football and lacrosse fields, 57 indoor volleyball courts, 12 beach volleyball courts and 1,500-seat stadium, 85 arcade games, 41 pickleball courts and a 2,000-seat stadium, and 22 futsal courts (a small-sided soccer game), among others. The Park also contains a full-service restaurant, food and beverage concessions, a physical therapy clinic, state of the art sports performance training facilities, game arcade, convention areas, golf simulators, festival grounds, entertainment venues, among other amenities. The Park is considered the largest sports and entertainment facility in North America.

- 4 -

7. The Park's day-to-day operations are managed by a third-party sports and facilities management firm, Elite Sports Group, LLC ("Elite"), pursuant to a Qualified Management Agreement ("QMA"). The QMA provides, in part, that Debtor is responsible for paying for, or reimbursing, the direct costs associated with the activities of the Park. Direct cost categories such as payroll, activities expenses (balls, nets, equipment, etc.), food costs, etc., must all be reimbursed or paid for directly by Debtor. Debtor is also responsible for all fixed and indirect costs of the Park not specifically related to the activities at the Park, including rent, utilities, janitorial, ground maintenance, leases, advertising, and other costs necessary to operate and maintain the facilities. Failure to pay such expenses will result in decreased participation rates by clubs, members, and their families, reduced utilization of the Park by guests, poor financial performance and deterioration of the Park's facilities.

8. Elite and the Debtor play two distinct and intentionally separate roles in the management and ownership, respectively, of the Park. Elite provides the day-to-day management of all of the Park's activities and is responsible for providing the industry expertise, personnel, and business relationships including both customer and vendor relationships. The Debtor is the owner of the Park and its role and responsibilities are limited to that of an owner of any asset, namely, preserving and enhancing the value of the Park, controlling its finances including borrowing money and providing high-level oversight of the Park in connection with the fulfillment of the mission and goals of Cares.

9.      As is common in any industry where an owner outsources the management of an operating real estate asset, for example, an apartment complex, office building, sports arena or a resort hotel, the owner does not generally have the personnel, business relationships, specialized skill and knowledge about how to properly run and manage the asset once it is complete and operational. Further, the owner doesn't have access to, like in Elite's case, hundreds of full-time and seasonal employees and industry specific vendors necessary to operate a large sports facility of the scale of the Park.  The owner also does not have industry relationships with revenue sources such as advertising sponsors, athletic clubs, national sports governing organizations, tournament organizers, performance coaches and similar industry specific relationships, many of which have been cultivated by the manager over years of operating in the industry.  Accordingly, the facility owner retains a management company to provide these services for a management fee on top of the actual direct operating costs of the facility. The direct costs and expenses associated with running the property (on-site employees, rent, utilities, maintenance, supplies, etc.) are paid for, or reimbursed to the management firm directly, by the owner as these obligations are the owner's obligations. The manager does not make any profit from the payment of the direct expenses by the owner as these expenses are reimbursed by the owner to the manager on a dollar-for-dollar basis depending on actual cost of those expenses, without markup.  The costs of owning and operating the facility, in this case the Park, are a pass through to the management firm.  This arrangement is common in, for instance, the ownership and

Case 2:23-bk-02832-DPC   Doc 301   Filed 07/20/23   Entered 07/20/23 18:11:22   Desc
Main Document    Page 6 of 17

management of large professional sports arenas. For example, Oak View Group LLC ("OVG"), previously a pre-petition manager of the Park, manages the Footprint Center where the Phoenix Suns play, among many other facilities throughout the country.

### C. Expenses Paid by the Manager and the Owner and Calculation of the Management Fee.

10. The manager is responsible for paying certain overhead expenses of the manager, using the management fee earned and received from the owner. Examples of these manager specific expenses paid directly by the manager, without direct reimbursement from the owner, include, but are not limited to; directors and officer's insurance for its executives, organizational costs, outside consulting fees, legal fees for its counsel, and non-facility specific unreimbursed overhead expenses of the manager's entity. The remaining management fee, net of the manager-specific costs they are responsible for paying directly, represents a profit to the manager. Management firms are entitled to make a profit for the services they provide. Otherwise, why would management firms be in the business of venue or asset management?

11. Commonly, the management fee is performance-based and is directly tied to the performance of the underlying asset the manager is managing. The management fee is commonly calculated as an agreed-to percentage of revenue collected by the facility being managed as this fee is straight forward and easily calculated. Further, this fee structure incentivizes the manager to run the facility in a way that maximizes revenue, which is good

- 7 -

for the owner. An incentive-based management fee structure also provides protection to the owner (the Debtor in this case) because if the manager underperforms, the owner owes a proportionately lower management fee. As the Park was originally conceived, structured and financed, this same management fee arrangement as a percentage of revenue was agreed to by the bondholders.

12. The owner/manager structure has been in place for decades in the amateur and professional recreational sports facilities industry throughout the United States. Specific to the amateur and recreational sports facilities, managers perform services including, but not limited to:

- Day to day facility operations, maintenance and capital repairs;
- Staffing of full time and part time personnel including directors, coaches, referees, umpires and trainers;
- Grow and develop multi-sport leagues, teams, tournaments and trainings;
- Plan and schedule special events such as concerts, farmers' markets, charity events and other non-sports events;
- Manage food and beverage operations including concessions and on-site restaurants or food trucks; and
- Sell and manage national, regional and local sponsorship opportunities, naming rights, revenue shares and similar revenue generating activities.

13. The Debtor is a 501(c)3 non-profit entity with only two employees and a board of directors. The Debtor does not have the requisite skillset, staffing, and national and local sporting relationships necessary to effectively manage the Park and, as a non-profit with important tax ramifications, Cares was never intended to operate the Park itself,

- 8 -

for risk of disqualifying its tax-exempt status as well as the tax-exempt nature of the bonds issued in connection with the Park's development.

14. Consistent with other facilities of its kind, Cares originally retained a management company, Legacy Sports USA, LLC ("Sports"), under a QMA to manage the Park. Sports retained a separate management entity, OVG Facilities, LLC ("OVG") to manage the food and beverage, facilities and certain sponsorship aspects of the Park. Sports, and OVG, were terminated as managers of the Park prior to the Chapter 11 Case.

15. For the reasons outlined in the May 1, 2023 Omnibus Declaration of Douglas Moss in Support of First Day Motions, Legacy Park and it's then manager, Sports, failed to generate positive cash flow, which rendered Cares unable to make its required debt service payments and caused other problems.

16. As part of its pre-bankruptcy turnaround and cost-saving efforts, Cares terminated Sports (and OVG through its contractual affiliation with Sports) as the Park's manager, and on April 14, 2023, Cares replaced Sports and OVG with a new manager Elite under a completely new QMA with terms more favorable to the Debtor.

### D. The Retention of Elite to Replace Sports.

17. The retention of Elite was a heavily negotiated, arms-length process between Elite and Cares and its respective advisors and legal counsel. Retention of Elite allowed Cares to eliminate or reduce many of the fees previously provided for in the QMA with Sports. Cares was also able to eliminate certain onerous terms and conditions as provided

- 9 -

in the original QMA with Sports. A table summarizing just a few of the economic improvements Cares was able to secure with Elite as compared to the Sports QMA follows:

| QMA Term | Sports QMA | Elite QMA |
|---|---|---|
| Basic Management Fee (% of revenue) | 7% of total revenues | 4% of non-sports revenues and 6% of sports revenues |
| Accounting Fee (fixed fee per month) | $5,000 per month | None |
| Incentive Management Fee (% of operating profits) | 5% of gross operating profit | None |
| Termination Fee | Cares must pay the historical average of Basic, Accounting and Incentive Fees for remainder of <u>30-year term of the QMA</u> | Cares to pay 0 to 6 months of Basic Management Fee only depending on the circumstances of the termination |

18. Although OVG was contracted directly with Sports, under the original QMA, Cares was required to pay all fees charged by OVG as those fees were passed through to Cares as a reimbursable operating cost. Retention of Elite allowed Cares to eliminate the fees charged by OVG and passed through to Cares, by including such fees in Elite's management fee and doing so at a much lower cost to Cares. A table summarizing just a few of the economic improvements Cares was able to secure with Elite as compared to OVG follows:

- 10 -

| QMA Term | OVG QMA | Elite QMA |
|---|---|---|
| Operating Fee | $250,000 per year | None |
| Food and Beverage Fee (% of food and beverage revenue) | 5% of gross food and beverage revenues | 4% of gross food and beverage revenues |
| Other Event Revenue Fee (% of net event revenue) | 15% of net event revenues | 4% of gross event revenues |
| Termination Fee | Cares must pay historical average of Basic, Accounting and Incentive Fees for remainder of 30-year term | Cares to pay 0 to 6 months of Basic Management Fee only depending on circumstances of termination |

19. Prior to executing a QMA with Elite, Cares identified other publicly available management firm agreements whereby a manager was performing management services on behalf of a facility owner. Although the publicly available comparables were not similar in size, complexity and type of facility as that owned by Cares, Cares found that the management fee agreed to with Elite was not commercially unreasonable when compared with these public examples. Additionally, the rate charged by third-party manager OVG, a nationally recognized arena and sports facility management company representing a true market comparable, significantly exceeded that which Cares was able to obtain with Elite.

20. While considering its options for management alternatives to replace Sports, Cares also faced a difficult situation whereby its poor financial situation was public

- 11 -

knowledge. This is because Cares, as a public reporting entity, was required to disclose its financial condition similar to a public company. Additionally, there were numerous derogatory articles about the Park in the press. The financial condition of Cares was well known in the industry. Cares also believed it may be filing for Chapter 11 protection and/or selling the Park, a fact that would need to be disclosed to any new management firm candidates prior to their potential engagement. Few, if any, managers would have been willing to take over as long-term management of the troubled Park, knowing that Cares was losing a million dollars per month, before debt service obligations, may be headed for Chapter 11 bankruptcy and that the Park may be sold, potentially eliminating any new manager from the opportunity to manage the Park.

21. The Park is at its busiest with activity between September and May. Retention of Elite allowed for continuity of personnel at the Park without interruption to operations. Elite was able to hire hundreds of employees of Sports and OVG, thus avoiding cancellation of hundreds of planned events and activities at the Park. This allowed Legacy Park to continue uninterrupted operations during one of the busiest times of its year. The rationale behind the retention of Elite was to preserve the value of the Park for the creditors so it could be sold in four to six months in the Chapter 11 Case, at maximum value as a going concern. To shut the Park down, which would have happened, but for the retention of Elite, on the eve of a sale process would have been disastrous for the Debtor's creditors.

- 12 -

22. Given the extremely short timeline the Debtor was working with, had the Debtor entered into a new management agreement with a management firm with no previous connections to the Park, the disruptive operational and financial impact to Cares and the Park would have been significant. A new manager would have been required to "staff up" with hundreds of employees, rebuild relationships with sports and event promoters, install administrative and back-office management, re-book cancelled events and commitments, among other tasks. This process would have taken place at the height of the Park's busiest time of year while preparing for a Chapter 11 filing and an expedited sale process.

23. Maintaining continuity of the workforce and employees with institutional knowledge of the Park was critical to maintaining already scheduled revenue-generating events and yields the highest and best value and ultimate return to creditors upon a sale. A wholesale change in management would have created operational chaos, uncertainty and large-scale cancellations of previously committed events which would have taken months to rebook. Further, reputational damage to the Park upon a cessation of operations would have had far-reaching implications. Events are often booked many months (sometimes up to a year) in advance. Families participating at the Park have paid fees and dues, and booked travel plans, all of which would be lost if the Park were to shut down. The "sales cycle" of the Park is long and the loss of the ability to book events in the summer of 2023

- 13 -

would have detrimental cascading consequences for the high season in the fall of 2023 and winter/spring of 2024 resulting in less revenue and further losses for the Park.

### E. The UST's Concerns About the Management Fee Payable to Elite

24. In its motion, the United States Trustee ("UST") states, "Debtor has committed to paying Elite a management fee totaling $708,714 over a 26-week period." This is inaccurate. As noted previously, Cares has retained Elite to perform management services for the Park. In exchange, Cares pays to Elite 4% - 6% of revenues earned, depending on the category of revenue generated. The $708,714 Management Fee is based on budgeted revenue. If revenue earned is less than that budgeted, so too will be the management fee paid. If Elite meets the revenue targets, the Park will perform according to the approved DIP Budget.

25. The UST also states, "As indicated by the various pleadings in this case, the cost of all overhead arising from the operation of the Park is being paid by the Debtor, either directly by Debtor or through reimbursements to Elite, and Debtor is fully subsidizing Elite's payroll. Consequently, the entire $708,714 payment represents pure profit to Elite." This is also inaccurate. Under the QMA with Elite, Cares reimburses Elite for expenses incurred directly to operate the Park. Certain overhead costs and other administrative costs of Elite are explicitly precluded from reimbursement under the QMA. Elite must pay for these expenses using the management fee earned therefore reducing Elite's "profit." For example, legal fees and certain insurance costs of Elite are not

- 14 -

reimbursed by the Debtor. Cares is aware that premiums for certain Elite insurance policies which are not reimbursable by Cares, cost more than $300,000 per year alone, the equivalent of approximately three months of management fees, should they be earned by Elite. Such costs are to be paid by Elite from its management fee earned.

26. In addition, under the QMA with Elite, Elite is responsible to pay its own Executive Compensation and Cares has no obligation to refund Elite for these expenses.

27. The UST is also critical of the amount of funds paid to Elite for compensation costs, namely employees of Elite. The UST states, "Almost 30% of the Debtor's post-petition operating disbursements are being paid for [by] Elite's employees and management fee." However, like all managers for operations of the size and scale of the Park, the number of employees required to run a facility of this type is significant. It is expensive and requires significant personnel to manage the multitude of activities occurring at the Park at any given time. Appropriately, one of the largest expenses is employee-related costs. Elite employs approximately 61 salaried employees and approximately 341 hourly employees, some of which are part time. The nature and types of jobs performed by Elite employees include sports directors, coaches, referees, trainers, concession stand workers, cooks, restaurant servers, performance training professionals, janitors, facilities personnel, security, grounds crews, and others. The average salaried employee of Elite earns $76,138 per year. Hourly employees of Elite are compensated at an average of $17 per hour. Such amounts are not unreasonable for the services provided

- 15 -

to the Park. The Debtor closely monitors the budgeted staffing of Elite, as any owner would, on a weekly basis, to ensure staffing levels are appropriate for the needs of the Park.

### F. The Financial Performance of the Park has Improved under the Debtor's Leadership and Elite's Management

28. The UST's concerns also ignore the relevant fact that the financial performance of the Park has markedly improved under the Debtor's leadership and Elite's Management. After terminating Sports (and OVG), retaining Elite, implementing wholesale changes to Park operations and personnel, and providing hands-on oversight, the financial performance of the Park has markedly improved. Because most of these changes were implemented between April and early May 2023, one can look to the Park financial results for May and June 2023 as compared to May and June 2022, a year prior, as concrete data points that illustrate the improvements. Representative examples follow:

- Park operations in May and June 2022 yielded a combined net loss of $3.05M. Park operations for the same two months in 2023 yielded a combined net loss of only $2.13M, a year over year improvement of more than $921k.

- Park headcount has been streamlined as part of these 2023 efforts. Overall payroll costs in May and June 2022 were a total of $3.01M. Overall payroll costs for the same two months in 2023 were reduced to a total of $1.95M, a year over year savings of $1.1M.

- The Park's food and beverage division ("F&B") which contains all concessions and the onsite full-service restaurant, has been almost completely turned around and is expected to generate consistent operating profits beginning in the fall. The overall results for F&B in May and June of 2022 were a combined net operating *loss* of

Case 2:23-bk-02832-DPC   Doc 301   Filed 07/20/23   Entered 07/20/23 18:11:22   Desc
Main Document    Page 16 of 17

$256K. The same timeframe in 2023 yielded a combined net operating *profit* of $25.5K, a year over year improvement of over $281K.

The changes implemented by the Debtor and its Park manager have yielded positive financial changes for the Debtor.

I declare the foregoing to be true under penalty of perjury.

Submitted this 20th day of July, 2023.

_____
Keith B. Bierman, CPA