**WARNER ANGLE HALLAM
JACKSON & FORMANEK PLC**
J. Henk Taylor (AZ Bar No. 016321)
2555 E. Camelback Rd., Suite 800
Phoenix, AZ 85016
Tel: 602-264-7101
htaylor@warnerangle.com
*Counsel for Debtor*

**SPENCER FANE LLP**
Peter L. Riggs (AZ Bar No. 023423)
Zachary R.G. Fairlie (*pro hac vice*)
Jessica A. Gale (AZ Bar No. 030583)
2415 E. Camelback Rd., Suite 600
Phoenix, AZ 85016
Tel: 602-333-5430
jgale@spencerfane.com
priggs@spencerfane.com
zfairlie@spencerfane.com
*Counsel for UMB Bank, N.A.
as bond trustee*

**PACHULSKI STANG ZIEHL & JONES LLP**
Jordan A. Kroop (AZ Bar No. 018825)
Bradford Sandler (*pro hac vice*)
Cia Mackle (*pro hac vice*)
4530 E Shea Blvd., Suite 140
Phoenix, AZ 85028
Tel: 212-561-7734
jkroop@pszjlaw.com
bsandler@pszjlaw.com
cmackle@pszjlaw.com
*Counsel for Official Committee
of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| LEGACY CARES, INC., | Case No. 2:23-bk-02832-DPC |
| Debtor. | **AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION** |

# Article 1 — Introduction

Legacy Cares, Inc. ("**Debtor**"), the Official Committee of Unsecured Creditors ("**Committee**"), and UMB Bank, N.A. in its capacity as indenture trustee ("**UMB**" and, collectively with the Debtor and the Committee, "**Proponents**") jointly propose this Amended Combined Disclosure Statement and Plan of Liquidation ("**Plan**") under Chapter 11 of the Bankruptcy Code, proposing to pay creditors from one source: recovery of avoidable transfers and other claims the Estate[1] may have against third parties.

This Plan contains certain statutory provisions, describes certain events in this Chapter 11 Case, and incorporates certain attached related documents. Although the

---

[1] Capitalized terms used but not defined in Article 1, Article 2, or Article 3 are defined in Article 4 below.

Proponents believe that this information is fair and accurate, this information is qualified in its entirety in that it does not set forth the entire text of those documents or statutory provisions or every detail of those events. This information is provided only as of the date of this Plan. There can be no assurances that the statements contained in this Plan will be correct at any subsequent time.

This Plan was prepared in accordance with Bankruptcy Code §§ 1123 and 1125 (with specific reliance on Bankruptcy Code § 1125(f)) and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Plan has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed on the accuracy or adequacy of the statements contained in this Plan. No other governmental or other regulatory agency approvals have been or will be obtained.

The Proponents submit this Plan, as it may be amended from time to time, under Bankruptcy Code § 1125 and Bankruptcy Rule 3016, to all the Debtor's known holders of Claims entitled to vote to accept or reject the Plan (to "**Vote**"). The purpose of this Plan is to provide adequate information to enable all holders of Claims entitled to Vote to arrive at a reasonably informed decision in exercising their right to Vote.

**Because this Plan may affect your rights, you should consult with your own counsel and contact the Debtor's counsel with any questions regarding any Plan provision or any disclosure made in this Plan.**

In preparing this Plan, the Proponents relied on financial data derived from the Debtor's books and records and based on various assumptions regarding the Debtor's business. Although the Proponents believe this information fairly reflects the financial condition of the Debtor as of today and that the assumptions regarding future events reflect reasonable business judgments, the Proponents do not represent or warrant the accuracy of the financial information contained in this Plan or assumptions regarding future results and operations. The financial information contained in this Plan and in its exhibits has not been audited or prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction. The Proponents expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or for any other reason.

Confirmation and effectiveness of the Plan are subject to certain material conditions described in Article 12. There is no assurance that the Plan will be confirmed or, if confirmed, that these material conditions will be satisfied or waived. **You should read this Plan in its entirety before Voting.**

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, all holders of Claims (including holders of Claims not entitled to Vote) will be bound by the Plan's terms and any transactions the Plan contemplates.

The contents of this Plan should not be construed as legal, business, or tax advice. Holders of Claims should consult their own legal counsel and tax advisors as to legal, tax, and other matters concerning their Claim. This Plan may not be relied on for any purpose other than to determine how to Vote or object to Confirmation. All holders of Claims should refer to Article 6 of this Plan for information regarding the precise treatment of their Claim. Under the Bankruptcy Court's order allowing the filing of a combined disclosure statement and plan, this Plan seeks to provide adequate information to creditors under Code § 1125 so that no separate disclosure statement is required. Article 2 and Article 3 contain information typically found in disclosure statements including:

- Information about the Debtor and events leading to and occurring during the Chapter 11 Case;

- Who can Vote on, or object to Confirmation of, the Plan and applicable procedures and deadlines;

- What legal and factual criteria the Bankruptcy Court will consider when deciding whether to confirm the Plan;

- Why the Proponents believe the Plan is feasible, and how the treatment of your Claim under the Plan compares with what you would receive on your Claim in a hypothetical liquidation under Chapter 7; and

- The effects of Confirmation of the Plan.

### A. Solicitation and Voting

The Bankruptcy Court has not yet confirmed the Plan. That cannot occur until those holders of Claims entitled to Vote have Voted. This Plan describes the terms of the Debtor's liquidation and provides additional information Voting holders of Claims will need to make an informed decision regarding how to Vote.

The Proponents requested that the Bankruptcy Court hold a hearing on conditional approval of the disclosure-related portions of this Plan ("**Disclosures**") to determine whether this Plan contains "adequate information" under Bankruptcy Code § 1125. The Bankruptcy Court entered an order conditionally approving the Disclosures on May 17, 2024. Bankruptcy Code § 1125(a)(1) defines "adequate information" as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan …." All holders of Claims should read and carefully consider this Plan in its entirety before Voting. In making a decision to accept or reject the Plan, each holder of a Claim must rely on its own assessment of the Plan, including the merits and risks involved.

**1.     Confirmation Hearing**

The hearing at which the Bankruptcy Court will consider confirmation of the Plan and final approval of the adequacy of the Disclosures has been scheduled for **June 21, 2024, at 1:30 p.m. (Arizona Time)** in Courtroom 603, 230 N. 1st Ave, Phoenix, Arizona ("**Confirmation Hearing**").

**2.     Voting Deadline — June 14, 2024**

If you are entitled to Vote to accept or reject the Plan, you must Vote using the enclosed Ballot and return the Ballot as instructed on the Ballot. Not all holders of Claims are eligible to Vote. *See* Article 3 below to determine if you are eligible to Vote. **Your ballot must be received by June 14, 2024, or it will not be counted.**

**3.     Objection Deadline — June 14, 2024**

Objections to the adequacy of the Disclosures or to Confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature of the party's Claim or interest; (iii) state with particularity the basis and nature of any objection; and (iv) in accordance with Bankruptcy Rule 3020(b)(1), be Filed, together with proof of service, no later than June 14, 2024. **The Bankruptcy Court may not consider an objection not timely Filed or meeting the above requirements.**

**4.     Contact for More Information**

If you want additional information about the Plan, you should contact J. Henk Taylor, Warner Angle Hallam Jackson & Formanek, PLC, 255 E. Camelback Road, Suite 800, Phoenix, Arizona 85016, counsel for the Debtor.

**B.     FAQ**

**What is Chapter 11 bankruptcy?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled, court-supervised fashion. Filing a Chapter 11 case creates an "estate" containing all the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a Chapter 11 bankruptcy case, a debtor remains in possession of its assets and may continue to operate its business unless the Bankruptcy Court orders the appointment of a trustee. Here, no trustee has been appointed in the Chapter 11 Case. The Proponents have proposed the Plan in an effort to minimize the overall administrative costs associated with the Chapter 11 Case and maximize value to creditors.

**How do I determine how my Claim is classified?**

To determine the classification of your Claim, you must determine the nature of your Claim. Under the Plan, Claims are classified into Classes. The pertinent articles and sections of the Plan disclose, among other things, the composition of each Class and the treatment that each Class will receive if the Plan is Confirmed.

**How do I determine what I may recover on account of my Claim?**

After you determine the classification of your Claim, you can determine the likelihood and range of potential recoveries with respect to your Claim by referring generally to the discussions of potential Assets and the liquidation analysis contained this Plan.

**What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, Confirmation of the Plan requires that, among other things, at least one Class of impaired Claims Votes to accept the Plan. Acceptance by a Class means that at least two-thirds in the total dollar amount and more than one-half in number of Class members actually Voting in that Class Vote to accept the Plan. Because only holders of claims who actually Vote are counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one half in number of the claims or interests in that class. Besides acceptance of the Plan by each impaired Class, the Bankruptcy Court also must find that the Plan meets a number of statutory tests before it may confirm the Plan. These requirements and statutory tests generally are designed to protect the interests of creditors who do not Vote but who will nonetheless be bound by the Plan's provisions if the Bankruptcy Court confirms the Plan. If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under Bankruptcy Code § 1129(b). To confirm a plan not accepted by all classes, a debtor must demonstrate that the plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired class of claims that has not accepted the Plan. This method of confirming a plan is commonly called "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied as conditions to Confirmation.

**C.     Plan Overview**

The following brief overview is qualified in its entirety by reference to the Plan itself. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

On the Effective Date, a bankruptcy trustee will be appointed to act as a Liquidation Trustee to administer the Plan, wind down the Estate, and litigate potential Causes of Action. As of the Effective Date of the Plan, it is anticipated that the Estate will comprise only two classes of assets: (a) a limited amount of cash to be used to satisfy Administrative Claims; and (b) potential Causes of Action to be litigated by the Liquidation Trustee against third parties that must be investigated, pursued, and liquidated for the benefit of creditors, who will become the beneficiaries of the Liquidation Trust created by the Plan.

The Liquidation Trustee will be responsible for making all payments and distributions under the Plan. Each Executory Contract and Unexpired Lease to which the Debtor is a party that has not been assumed and assigned in connection with the Sale will be deemed rejected as of the Effective Date.

# Article 2 — Background

### A. Description and History of Debtor

The Debtor is an Arizona nonprofit corporation that, until the Sale described below, owned the facility known as Legacy Park, a 320-acre sports and entertainment complex located in Mesa, Arizona. Legacy Park hosts youth, adult, and amateur sports and serves as a venue for sports tournaments and entertainment events. Legacy Park contains indoor and outdoor team athletic facilities and entertainment sports venues and features state-of-the-art performance, training, and competitive spaces for soccer, lacrosse, football, baseball, softball, basketball, volleyball, gymnastics, dance, cheer, ninja warrior, tack and field, pickleball, and indoor soccer. Legacy Park also contains a 17,000-square-foot bar and restaurant and concessions throughout the venue.

The Debtor financed the construction of Legacy Park through loans funded by the proceeds of revenue bonds issued by the Arizona Industrial Development Authority in 2020 and 2021. UMB serves as the trustee for the holders of these bonds. As of the Petition Date, the Debtor owed approximately $301 million of principal and accrued interest under various loan and security documents. UMB, on behalf of the Bondholders, remained the Debtor's principal secured creditor throughout the Chapter 11 case.

The Debtor never owned the real property on which Legacy Park is situated. Rather, the Debtor constructed and operated Legacy Park under a 40-year ground lease (the "**Ground Lease**") with Pacific Proving, LLC as the ground lessor. Accordingly, as of the Petition Date, the Debtor's primary tangible assets were its leasehold interest under the Ground Lease and the improvements, structures, and fixtures constituting Legacy Park.

The Debtor earned revenue at Legacy Park from three sources: usage fees, including admission, ticketing, and parking; sponsorships; and food and beverage sales. The Debtor earned usage fee revenue in two ways. First, "facility use agreements" with sports clubs, entertainment enterprises, and other entities covered fees for staging events such as games and tournaments, concerts, and exhibitions. Second, the Debtor earned revenue from "M&O

Agreements" between Legacy Park's manager and youth sports organizations to manage sports clubs, provide field management services, and implement marketing and promotional plans supporting club events. Those M&O Agreement were the manager's property, but the Debtor received a portion of the revenue from them.

From its opening of Legacy Park, the Debtor contracted with a third-party entity to manage day-to-day operations at Legacy Park. The manager was responsible for managing all guest services, purchasing payroll (all park employees were employees of the manager), repairs, janitorial, ticketing and box office, advertising and sponsorship relationships, food and beverage, booking and pricing for events, and event logistics including parking, security, crowd control, emergency response, and admissions. Legacy Sports USA, LLC—an entity allegedly affiliated with the Debtor—managed Legacy Park under a *Qualified Management Agreement* ("**QMA**") from the park's opening in January 2022 through March 28, 2023, when the Debtor and Legacy Sports mutually agreed to terminate the QMA. As of April 14, 2023, the Debtor had entered into a QMA with Elite Sports Group, LLC, which operated Legacy Park through the closing of the Sale.

## B. Events Leading to Debtor's Chapter 11 Filing

Immediately after breaking ground in September 2020, Legacy Park began suffering challenges relating to supply chain delays, the COVID-19 pandemic, and labor shortages. This resulted in a multi-month delay before Legacy Park was fully operational, resulting in material lost revenue during winter months. Legacy Park ultimately held a "soft" opening on January 2, 2022, to accommodate certain contracts signed in 2021. The park became fully operational in May 2022.

From the outset, the Debtor suffered significant cancelations or postponements of booked events resulting in losses of sports revenue of over $5 million. COVID caused the cancelation of over 30 sports events, with additional cancelations caused by a rise in airline and hotel costs that discouraged travel from out of state. Delays in implementing a ticket system and installing box office structures further frustrated the collection of admission fees. Food and beverage income fell significantly short of expectations, owing to increased costs of food, labor shortages, and overall poor execution of restaurant and concession operations.

Wi-fi and cellular connectivity was spotty and unreliable, resulting in an inability to consistently charge customers for ticketing, parking, and even food transactions. Labor shortages required more expensive third-party providers for landscaping, janitorial, and security.

All these circumstances conspired to create insurmountable financial losses. The Debtor had originally projected $98 million in revenue for 2022. Actual revenue was only $27.7 million. Worse, the Debtor had originally projected a gross margin of $55.5 million, whereas actual gross margin for 2022 (before debt service on the bonds) was a *loss* of $14 million. Those losses continued, causing the Debtor to fail to make full debt service

payments on the bonds beginning in August 2022. By the end of 2022, the Debtor was in arrears of over $10 million in accrued interest payments on the bonds. UMB issued a notice of default on October 27, 2022. The losses also forced the Debtor to delay payment of trade payables, which totaled approximately $7 million by the end of 2022.

Much more significantly, several contractors, suppliers, and materialmen involved in the construction began filing mechanic's liens against Legacy Park, with Okland Construction, the project's general contractor, asserting the largest claim of approximately $24 million. As of the Petition Date, the Debtor estimated that 21 claimants (collectively, the "Materialmen") had filed mechanic's liens totaling, in face amount, some $37 million. Several Materialmen filed lawsuits in Arizona state court seeking to foreclose their mechanic's liens against the Debtor's interest in Legacy Park, as well as Pacific Proving's ownership of land on which Legacy Park sits. Those actions were consolidated not long before they were automatically stayed when the Debtor filed its Chapter 11 petition on the Petition Date.

Additional litigation beset the Debtor before the Petition Date, including an arbitration award and judgment against the Debtor for approximately $1.8 million by Icing Investment Holdings, LLC, a lawsuit seeking over $20 million in damages filed by Insight Investments, LLC, and an arbitration demand by FieldTurf USA, Inc. seeking $5 million for services and materials supplied at the park.

With the crush of litigation, mounting losses preventing the Debtor from making any debt service on the bonds or timely meeting its obligations to trade creditors, the Debtor determined that the only feasible option was to file the Chapter 11 Case and seek to sell Legacy Park as expeditiously as possible.

## C. Significant Events During the Bankruptcy Case

### 1. First Day Motions

In addition to certain customary motions filed by nearly all operating Chapter 11 debtors at the beginning of their cases, the Debtor sought emergency relief by filing on the Petition Date certain motions seeking to preserve the Debtor's business operations in the ordinary course and ensure its access to sufficient working capital during the Chapter 11 case.

Most significantly, the Debtor sought authority to borrow, on a senior-secured, super-priority basis, up to $9 million from the Bondholders represented by UMB as trustee as post-petition debtor-in-possession financing (the "**DIP Loan**"). That motion also sought entry of an order stipulated between the Debtor and UMB that provided for the Debtor's constrained use of UMB's cash collateral in accordance with a budget that was intended at the time to run through the closing date of an anticipated sale of Legacy Park. The Bankruptcy Court approved the DIP Loan and the cash collateral budget on an interim basis with an order entered on May 5, 2023, pending a final hearing after more complete notice

to creditors. Following several objections by various parties, including several Materialmen as well as the United States Trustee, the Bankruptcy Court entered a second interim order on June 7, 2023. After the Committee was appointed and engaged counsel, additional negotiations between the Debtor, UMB, the Committee and other stakeholders resulted in an agreed final order authorizing the DIP Loan entered on June 15, 2023 (the "**Final DIP Order**").

### 2. Retention of Professionals; Appointment of Creditor Committee

The Debtor sought and obtained Bankruptcy Court authority to employ certain legal and financial professionals to aid the Debtor in consummating the Sale and prosecuting the Chapter 11 case. The Debtor employed J. Henk Taylor of the firm Warner Angle Hallam Jackson & Formanek PLC as general bankruptcy counsel, Robert McKirgan and Randy Papetti of the firm Papetti Samuels Weiss McKirgan, LLC as special litigation counsel, and the firm Slania Law PLLC as special bond and transactional counsel.

The Debtor also sought and obtained Bankruptcy Court authority to employ Keith Bierman of the firm MCA Financial as financial advisor, Miller Buckfire & Co. as investment banker to run the process that would result in the Sale, and Epiq Corporate Restructuring, LLC as claims and noticing agent.

On May 15, 2023, the United States Trustee appointed the Committee, comprising FieldTurf USA, Icing Investment, OVG Facilities, LLC, Hurricane Fence, Inc., Earthscapes, Inc., Icon Architectural Group, LLC, and Tri Phx LLC d/b/a Adventure Fitness. Three days later, the Committee sought and obtained authority to employ Jordan Kroop and Bradford Sandler of the firm Pachulski Stang Ziehl & Jones LLP as general bankruptcy counsel and AlixPartners, LLP as financial advisor.

On June 28, 2023, the United States Trustee filed a motion seeking the appointment of a Chapter 11 trustee or, in the alternative, a dismissal of the Chapter 11 Case (the "**Trustee Motion**"), making extensive allegations of wrongdoing against the Debtor's current and former management personnel. The Debtor, UMB, and the Committee strongly objected to the motion. Following several contentious hearings before the Bankruptcy Court, the Bankruptcy Court issued a lengthy ruling on August 9, 2023, denying the Trustee Motion. Two weeks later, the United States Trustee filed an emergency motion to appoint a consumer privacy ombudsman in connection with the prospective sale of the Debtor's assets. Again, the Debtor, the Committee, and UMB opposed the appointment, and hearings on the matter gave the United States Trustee another opportunity to urge her arguments originally made in the Trustee Motion. The Bankruptcy Court ultimately appointed Michael St. James Baxter as the consumer privacy ombudsman in connection with the Bankruptcy Court's consideration of the approval of bidding procedures proposed by the Debtor to apply to a prospective sale of the Debtor's assets (the "**Bid Procedures**"). Mr. Baxter engaged his own law firm, Covington & Burling as counsel, as well as the Burgess Law Group as local counsel.

The United States Trustee objected to the proposed Bid Procedures and again used hearings on the bid procedures to oppose the continued involvement of the Debtor's CEO, Douglas Moss, in the Debtor's operation, rehearsing arguments originally made in connection with the Trustee Motion. To finally resolve the lingering concerns the United States Trustee had about Mr. Moss, the Debtor, with the Committee's and UMB's support, proposed that Mr. Moss would resign and Keith Bierman would assume executive leadership of the Debtor as chief restructuring officer. Although the United States Trustee opposed this proposal, the Bankruptcy Court approved Mr. Bierman's appointment as chief restructuring officer. Mr. Bierman began serving in that capacity in September 2023.

### 3. Schedules and Statements

The Debtor filed its Schedules of Assets and Liabilities ("**SOAL**") and its Statement of Financial Affairs ("**SOFA**") with its Chapter 11 petition on the Petition Date. On July 18, 2023, the Debtor filed amendments to its SOAL and SOFA. Creditors may review those filings, along with all other documents filed in the Chapter 11 Case, at the website maintained by Epiq at dm.epiq11.com/case/lca/dockets.

### 4. Sale of Substantially All the Debtor's Assets

The Debtor's investment banker, Miller Buckfire, worked since before the Petition Date and through the course of the spring and summer of 2023 with many entities expressing at least an initial interest in purchasing substantially all the Debtor's assets. While Miller Buckfire continued its efforts to identify a buyer that could potentially serve as a leading buyer against which other buyers could compete—a "stalking horse" buyer— the Debtor filed, on August 4, 2023, an initial motion to sell substantially all the Debtor's assets and to approve the Bid Procedures, which included deadlines for the submission of qualified purchaser bids, the criteria to be used to determine if a potential bidder was qualified (including, for example, evidence of financial wherewithal to close the transaction), and procedures for identifying a "stalking horse" buyer. Several parties, including the United States Trustee, opposed the approval of the Bid Procedures on various grounds but both UMB and the Committee supported approval, in large measure because both UMB and the Committee had worked with the Debtor to devise the Bid Procedures. After several hearings before the Bankruptcy Court and limited amendments to the Bid Procedures filed by the Debtor, the Bankruptcy Court approved the Bid Procedures by order entered on September 7, 2023. That order, among other things, scheduled a possible auction among more than one proposed buyer to occur on October 3, 2023.

Only one party—AZ Athletic Associates LLC ("**AZ Athletic**")—submitted a qualified bid to purchase all the Debtor's assets by the applicable deadline in accordance with the Bid Procedures. Accordingly, the potential auction was canceled, after which the Bankruptcy Court held a series of hearings in October 2023 concerning the proposed Sale, ultimately resulting in the Bankruptcy Court setting a final hearing to approve the sale of substantially all the Debtor's assets to AZ Athletic under Bankruptcy Code § 363 for $19,725,023 (the "**Sale**") for November 20, 2023. That hearing was held, then continued to

the next day, at which time AZ Athletic signed an asset purchase agreement with the Debtor (the "**APA**"), and considerable negotiations among the Debtor, UMB, Pacific Proving, the Materialmen, and AZ Athletic ensued. Those negotiations resulting in a "global deal" announced to the Bankruptcy Court the next day. At that final hearing, the Bankruptcy Court overruled the remaining objections to the Sale and entered an order approving the Sale on November 22, 2023.

The "global deal" included terms that directed a significant portion of the cash Sale proceeds to the settlement of the Materialmen's liens (which would be released as against both the Debtor's assets and Pacific Proving's real property), another portion of the Sale proceeds to pay approximately $2.5 million toward UMB's secured claim, and another significant portion of the Sale proceeds to ensure payment in full of the administrative expense claims of the professionals representing the Debtor and the Committee, all of which was incorporated into a memorandum of understanding attached to the Bankruptcy Court's order approving the Sale as Schedule 1.

The Sale closed on December 14, 2023. As a result of the Sale, among other things: (a) the Bondholders' pre-bankruptcy claims under the bonds were paid down by approximately $2 million and rendered unsecured following the Sale; (b) the Materialmen's claims against the Estate were deemed satisfied; and (c) the Estate was left with only two substantial classes of assets: (i) cash from the Sale and from pre-closing operations; and (ii) the Causes of Action.

### D. Current Financial Information

#### 1. Assets

The following assets will be transferred to the Liquidation Trust on or before the Effective Date: (a) the Excluded Assets (as defined in the APA); (b) Avoidance Actions; and (c) the Causes of Action.

**Avoidance Actions.** The Liquidation Trustee may be able to pursue Avoidance Actions against recipients of preferential transfers made in the 90 days before the Petition Date under Bankruptcy Code § 547(b). The SOFA indicates indicate that the Debtor made at least $5.8 million in transfers to non-insiders in the 90 days before the Petition Date, certain of which may be recoverable as preferences. The Debtor may also have made transfers to insiders in the one year before the Petition Date, certain of which may be recoverable as preferences.

The Liquidation Trustee may also be able to recover potentially fraudulent transfers the Debtor made within the two years before the Petition Date under Bankruptcy Code § 548 and within the four years before the Petition Date under applicable state law.

**Causes of Action.** In addition to the transfers described above, the Causes of Action comprise additional claims that may exist under federal and state law against former

directors and officers of the Debtor for claims of breach of fiduciary duty, looting, conversion, and fraud, as well as claims against third parties involved in the financing of Legacy Park for violations of federal and state securities law, fraud, breach of contract, business torts, and other malfeasance, all of which claims may be brought by the bankruptcy trustee in the role of Liquidation Trustee. The Causes of Action also include claims for unpaid sponsorship fees under sponsorship agreements relating to advertising at Legacy Park. Much of the investigation of the existence and merits of these Causes of Action has not begun, so the Proponents, on behalf of the Estate and the Liquidation Trust, do not waive or release any claims against any party by failing to identify a claim specifically in this Plan.

The Proponents anticipate that, on the Effective Date there should be unencumbered funds in the Estate of approximately $780,000.

## 2. Liabilities

### a. Administrative Claims

**Debtor's Professionals.** As of the anticipated Confirmation Date, the Debtor's Professionals will have claims of approximately $225,000 for accrued but unpaid fees.

**Committee's Professionals.** As of the anticipated Confirmation Date, the Committee's Professionals will have claims of approximately $50,000 for accrued but unpaid fees.

**Superpriority Claim.** As of the anticipated Confirmation Date, the Bondholders will have a Superpriority Claim of approximately $9,900,000 under the Final DIP Order.

**Other Administrative Expense Claims.** There may be other potential administrative claims subject to objection, reconciliation, or other adjudgment by the Liquidation Trustee.

### b. Priority Claims

**Priority Tax Claims.** Because the Debtor is a tax-exempt nonprofit corporation, the Proponents anticipate that there will be no Priority Tax Claims as of the Confirmation Date.

**Other Priority Claims.** The Proponents do not believe there are any material non-tax Priority Claims against the Debtor. Any such claims would be subject to objection, further reconciliation, or other adjustment by the Liquidation Trustee.

### c. General Unsecured Claims

General Unsecured Claims in Class 4 (including the Bondholders' general unsecured claims) total in excess of $330 million. These Claims are subject to objection, further reconciliation, or other adjustment by the Liquidation Trustee.

### d. Secured Claims

Substantially all the Debtor's assets have been liquidated and the proceeds disbursed. Accordingly, the Proponents believe that, as of the Confirmation Date, there exist no Secured Claims against the Estate. But, cautiously, Proponents have nonetheless created Class 2 in this Plan to contain any Secured Claim the Proponents are unaware of.

# Article 3 — Confirmation Requirements and Procedures

## A. Statutory Confirmation Requirements

The Bankruptcy Court may only confirm the Plan if it determines at and as a result of the Confirmation Hearing that the requirements for Confirmation set forth in Bankruptcy Code § 1129 have been satisfied. The Proponents will demonstrate to the Bankruptcy Court at the Confirmation Hearing that all requirements for Confirmation under Bankruptcy Code § 1129 have been met, which include:

- ✓ The Plan complies with the applicable provisions of the Bankruptcy Code;

- ✓ The Proponents have complied with the applicable provisions of the Bankruptcy Code;

- ✓ The Plan has been proposed in good faith and not by illegal means;

- ✓ At least one Class of Impaired Claims has accepted the Plan, through the accepting Vote of at least two-thirds in amount of Allowed Claims in that Class and more than one-half of creditors by number in that Class actually Voting, without including any Votes by insiders holding Claims in that Class;

- ✓ The Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor other than the liquidation provided for in the Plan;

  - o This requirement is known as the "Feasibility Test."

  - o The Proponents believe the Plan satisfies the Feasibility Test set forth in Bankruptcy Code § 1129(a)(11) because it provides for the satisfaction of all Administrative Claims (except the Superpriority Claim, which UMB agrees does not need to be satisfied in full on the Effective Date) and Priority Claims on the Effective Date from sufficient Cash on hand. Thus, no additional liquidation or financial reorganization of the Debtor will be necessary following Confirmation.

4862-9523-0399.1 51998.002

✓ Each holder of an Impaired Claim either has accepted the Plan or will receive or retain on account of that Claim property of a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code;

    o This requirement is known as the "Best Interests Test."

    o The Best Interest Test requires that any holder of a Claim that does not accept the Plan, either by Voting to reject the Plan or because the holder is deemed to reject the Plan without Voting, receives at least as much under the Plan as the holder would have received under a hypothetical Chapter 7 liquidation of the Estate.

    ▪ To calculate the probable distribution to members of each Impaired Class if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's assets remaining after the Sale if the Chapter 11 Case were converted to Chapter 7 cases under the Bankruptcy Code. Here, this liquidation value is easy to ascertain because the Debtor's assets are limited to Cash, Avoidance Actions, and the Causes of Action. Accordingly, the Proponents assume that its assets have a liquidation value of $784,000.

    ▪ The amount of liquidation value available to unsecured creditors would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the Chapter 7 case, which would include the compensation of a Chapter 7 trustee and its counsel and other professionals, asset disposition expenses, all unpaid expenses incurred by the Debtor (such as compensation of attorneys) allowed in the Chapter 7 case, and litigation costs. Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution on account of General Unsecured Claims from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by those creditors under the Plan, then the Plan is not in the best interests of creditors.

    ▪ The following liquidation analysis assumes the following: (i) unpaid Professional Fee Claims totaling $275,000; (ii) costs associated with marketing and selling any of the Debtor's personal property remaining after the Sale; (iii) Chapter 7 trustee fees and expenses of $123,000, comprising: (A) statutory fees under Bankruptcy Code § 326 of $23,145; and (B) Chapter 7 trustee's professional fees of $100,000 to perform due diligence on the Estate as a party unfamiliar with the Chapter 11 Case or the Debtor and investigate matters already well understood by the Debtor's counsel; and (iv) Allowed General Unsecured Claims, including Rejection Damages Claims for all rejected executory contracts and unexpired leases, in the amount of $312,000,000.

4862-9523-0399.1 51998.002

**Legacy Cares, Inc.**
**Liquidation Analysis**

| | | Plan | | Chapter 7 | | Notes |
|---|---|---|---|---|---|---|
| | | Distribution | % Recovery | Distribution | % Recovery | |
| *Assets* | *Est. Value* | | | | | |
| Available cash on hand | $ 766,193 | $ 766,193 | | $ 766,193 | | |
| Spec Builder Tax Escrowed Funds | 511,000 | 511,000 | | 511,000 | | |
| Refund from IRS | 17,783 | 17,783 | | 17,783 | | |
| Recovery on Avoidance Actions | 600,000 | 600,000 | | - | | |
| Causes of Action | 2,000,000 | 2,000,000 | | - | | |
| **Gross Assets** | | **$ 3,894,977** | | **$ 1,294,977** | | 1 |
| | | | | | | |
| *Administrative Expense Claims* | *Est. Amount* | | | | | |
| Debtor's Professionals | $ 225,000 | $ 225,000 | | $ 225,000 | | |
| Committee's Professionals | 50,000 | 50,000 | | 50,000 | | |
| Spec Builder Tax | 511,000 | 511,000 | | 511,000 | | |
| Other Administrative Expenses | 75,000 | 75,000 | | 75,000 | | |
| Chapter 7 Trustee Fees | 23,145 | - | | 23,145 | | 2 |
| Chapter 7 Trustee Counsel Fees | 100,000 | - | | 100,000 | | |
| Liquidation Trustee Fees | 100,000 | 100,000 | | - | | |
| Liquidation Trustee Counsel Fees | 100,000 | 100,000 | | - | | 3 |
| | | | | | | |
| *Total Administrative Expense Claims* | | *1,061,000* | | *984,145* | | |
| | | | | | | |
| **Net Proceeds After Administrative Expense Cl** | **1,184,145** | **$ 2,833,977** | | **$ 310,831** | | |
| | | | | | | |
| *Unsecured Claims* | *Est. Amount* | | | | | |
| Superpriority Claim | 9,861,044 | 2,833,977 | 28.7% | 310,831 | 3.2% | |
| Prepetition April 2023 Sales Tax | 55,211 | - | 0.0% | - | 0.0% | |
| Gen. Unsecured Claims (Incl. Bondholders | $ 312,024,442 | $ - | 0.0% | $ - | 0.0% | |

**Note:** All amounts are estimates made solely for purposes of this analysis.
No amount on this analysis should be used or relied on for any purpose other than this analysis.

| | |
|---|---|
| 1 | Assumes no recovery on Causes of Action in Chapter 7 liquidation |
| 2 | Assumed fee under § 326 on $861,000 of disbursements, no recovery on Causes of Action |
| 3 | Assume contingency fee for recovery on Causes of Action |

▪ As demonstrated by the liquidation analysis performed using the above assumptions, holders of Allowed General Unsecured Claims will receive no worse a recovery under the Plan than under a hypothetical Chapter 7 liquidation. Accordingly, the Plan satisfies the Best Interests Test with respect to any holder of an Allowed General Unsecured Claim that may Vote.

▪ The Proponents believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Proponents have projected the amount of Allowed Claims based on a review of the SOAL, the Debtor's books and records, and Filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should

not be relied on for any other purpose, including any determination of the value of any Distribution.

✓ The Plan does not discriminate unfairly against, and is fair and equitable with respect to, non-accepting Classes of Claims.

## B. Who May Vote or Object to Confirmation

Any party-in-interest under Bankruptcy Code § 1109 may object to Confirmation of the Plan if the party believes that the requirements for Confirmation are not met.

But many parties in interest are not entitled to Vote. A holder of a Claim may Vote only if it holds a Claim that is both (1) Allowed or allowed for voting purposes and (2) placed in a Class of Impaired Claims that receive a recovery under the Plan.

## C. Who May Not Vote

The following types of creditors are not entitled to Vote:

- Holders of Claims that have been Disallowed;

- Holders of other Claims not Allowed or allowed for voting purposes;

- Holders of Claims that are not Impaired;

- Holders of Claims that do not receive or retain any value under the Plan.

Even if you are not entitled to Vote on the plan, you still have a right to object to Confirmation if the Bankruptcy Court deems you to be a party-in-interest under Bankruptcy Code § 1109.

## D. Votes Necessary to Confirm the Plan

The Bankruptcy Court cannot confirm the Plan unless (1) at least one Impaired Class of creditors has accepted the Plan without counting the Votes of any insiders within that Class and (2) all Impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting Classes, as discussed below.

A Class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half of the Allowed Claims in the Class who actually Vote cast their Votes to accept the Plan; and (2) the holders of at least two-thirds in dollar amount of the Allowed Claims in the Class who actually Vote cast their Votes to accept the Plan.

Even if one or more Impaired Classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if at least one Impaired Class has accepted the Plan and if the nonaccepting Classes are treated in the manner prescribed by Bankruptcy Code § 1129(b).

A Plan that binds nonaccepting classes is commonly referred to as a "cramdown" plan. The Bankruptcy Code allows the Plan to bind nonaccepting Classes of Claims if it does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not Voted to accept the Plan. You should consult your own attorney if a "cramdown" confirmation will affect your Claim, as the variations on this general rule are numerous and complex.

# Article 4 — Definitions

**4.1.** **Scope of Definitions**. All capitalized terms used in this Plan are defined here, elsewhere in the Plan, in the Bankruptcy Code, or in the Bankruptcy Rules. "Including" means "including without limitation." "Or" is not exclusive, such that "A or B" should be read as "A or B, or both." Bankruptcy Rule 9006(a) applies to all periods prescribed in this Plan.

**4.2.** **503(b)(9) Claim.** A Claim under Bankruptcy Code § 503(b)(9) for the value of goods received by the Debtor in the 20 days immediately before the Petition Date and sold to the Debtor in the ordinary course of the Debtor's business.

**4.3.** **Administrative Claim.** A Claim for any expense Allowed under Bankruptcy Code §§ 364(c)(1), 503(b), 503(c), 507(b), 546(c)(2), or 1114(e)(2) and entitled to priority under Bankruptcy Code § 507(a)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the Debtor's businesses; (b) all Fee Claims to the extent Allowed by Final Order under Bankruptcy Code § 330; (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) 503(b)(9) Claims.

**4.4.** **Administrative Claim Bar Date.** The date by which a request for payment of an Administrative Claim must be Filed. The first Business Day 30 days after the Effective Date.

**4.5.** **Administrative Claims Reserve.** The reserve established by the Liquidation Trustee to pay Administrative Claims not entitled to Distributions as of the Effective Date.

**4.6.** **Allowed.** With respect to any Claim: (a) Allowed by Final Order, whether or not following an objection to its allowance, a motion to estimate for purposes of allowance, or a request to subordinate Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court; or (b) Proof of which, request for payment of which, or application for allowance of which was Filed or deemed Filed on or before the Bar Date, the Administrative Claims Bar Date, the Fee Claim Bar Date, or the Rejection Damages Bar Date, as applicable, for filing proofs of claim or requests for payment for Claims of that type against the debtors or other applicable date established by order of the Bankruptcy Court, even if that date is after the Bar Date, the Administrative Claims Bar Date, the Fee Claim Bar Date, or the Rejection Damages Bar

4862-9523-0399.1 51998.002

Date, as applicable; or (c) listed as undisputed, liquidated, and non-contingent in the SOAL and no objection to its allowance, motion to estimate for purposes of allowance, or request to subordinate has been Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

**4.7.**   **APA.** The Asset Purchase Agreement, dated as of November 21, 2023, by and among the Debtor, Elite Sports Group, and Purchaser, as amended, supplemented, amended and restated or otherwise modified from time to time.

**4.8.**   **Avoidance Actions.** All statutory causes of action preserved for the Estates under Bankruptcy Code §§ 510, 542, 544–550, 553, and 724(a) or under similar local, state, federal, or foreign statutes and common law. Failure to specifically identify an Avoidance Action in the Plan does not waive or release that Avoidance Action.

**4.9.**   **AZ Athletic.** The purchaser of substantially all the Debtor's assets in the Sale under the APA.

**4.10.**   **Ballot.** The form distributed to each holder of an impaired Claim entitled to Vote on which the Holder indicates either acceptance or rejection of the Plan.

**4.11.**   **Bankruptcy Code.** Title 11 of the United States Code.

**4.12.**   **Bankruptcy Court.** The United States District Court for the District of Arizona and, to the extent of any reference under 28 U.S.C. § 157, the bankruptcy unit of the District Court under 28 U.S.C. § 151 (that is, the United States Bankruptcy Court for the District of Arizona).

**4.13.**   **Bankruptcy Rules.** Collectively, the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075 and any local bankruptcy rules of the Bankruptcy Court applicable to the Chapter 11 Case.

**4.14.**   **Bar Date.** The date by which any Person asserting a Claim (other than an Administrative Claim, a Fee Claim, or a Rejection Damages Claim) must File a proof of claim or be forever barred from asserting a Claim against the Debtors or their property and from sharing in Distributions. With respect to a Claim of any Person other than a governmental unity, the Bar Date is June 30, 2023.

**4.15.**   **Beneficiary.** A holder of an Allowed Claim entitled to receive a distribution from the Liquidation Trust under the Plan and the Liquidation Trust Agreement.

**4.16.**   **Bondholders.** Collectively, each holder, as of the Voting Record Date, of one or more of: (a) Economic Development Revenue Bonds Tax-Exempt Series 2020A (Legacy Cares, Inc. Project) issued under the *Indenture of Trust* dated as of August 1, 2020, by and between the Arizona Industrial Development Authority and UMB (the "Indenture"); (b) Economic Development Revenue Bonds, Taxable Series 2020B (Legacy Cares, Inc. Project) issued under the Indenture; (c) Economic Development Revenue Bonds, Tax-

Exempt Turbo Redemption Series 2020C (Legacy Cares, Inc. Project) issued under the Indenture; (d) Economic Development Revenue Bonds Tax-Exempt Series 2021A (Legacy Cares, Inc. Project) issued under the First Supplemental Indenture of Trust dated as of June 1, 2021, by and between the Arizona Industrial Development Authority and UMB (the "Supplemental Indenture"); and (e) Economic Development Revenue Bonds Taxable Series 2021B (Legacy Cares, Inc. Project) issued under the Supplemental Indenture.

**4.17. Business Day.** Any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**4.18. Cash.** United States currency, checks drawn on a U.S. bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, negotiable instruments, and wire transfers of immediately-available United States dollars.

**4.19. Causes of Action.** Claims that may exist under federal and state law against former directors and officers of the Debtor including claims of breach of fiduciary duty, looting, conversion, and fraud, as well as claims against third parties involved in the financing of Legacy Park for violations of federal and state securities law, fraud, breach of contract, business torts, and other malfeasance.

**4.20. Chapter 11 Case.** The bankruptcy case commenced on the Petition Date in the Bankruptcy Court by the Debtor under Chapter 11 of the Bankruptcy Code and administered under Case No. 2:23-bk-02832-DPC.

**4.21. Claim.** A claim against a Debtor or its property as defined in Bankruptcy Code § 101(5).

**4.22. Claim Objection Deadline**. The first Business Day 120 days after the Effective Date.

**4.23. Claims and Noticing Trustee.** Epiq, in its capacity as the Debtors' Bankruptcy Court-appointed claims, noticing, and solicitation agent in the Chapter 11 Case.

**4.24. Class.** A category consisting of holders of Claims substantially similar in nature to the Claims of other holders placed that category, as designated in Article 6 of the Plan.

**4.25. Committee.** The Official Committee of Unsecured Creditors appointed in the Chapter 11 Case under Bankruptcy Code § 1102.

**4.26. Confirmation.** The Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Case.

**4.27. Confirmation Date.** The date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

**4.28.    Confirmation Hearing.** The evidentiary hearing at which the Bankruptcy Court considers Confirmation.

**4.29.    Confirmation Order.** The Bankruptcy Court's order confirming the Plan under Bankruptcy Code § 1129 and finally approving the adequacy of the Disclosures under Bankruptcy Code § 1125. The Confirmation Order need not necessarily be a Final Order.

**4.30.    Contingent Claim.** Any Claim for which a proof of claim has been Filed that: (a) was not Filed in a fixed amount, or has not accrued and depends on a future event that has not occurred and may never occur; and (b) has not been Allowed on or before the Confirmation Date.

**4.31.    D&O Policy.** Any directors and officers liability insurance policy or any applicable errors and omissions policy applicable to the Debtor's directors and officers.

**4.32.    Debtor.** Legacy Cares, Inc., an Arizona corporation, the debtor in the Chapter 11 Case.

**4.33.    Disallowed.** With respect to a Claim, any portion of a Claim that: (a) has been disallowed or withdrawn by Final Order; or (b) with respect to a Claim other than an Administrative Claim, a Fee Claim, or a Rejection Claim, that was listed as disputed, unliquidated or contingent in the SOAL and no proof of which was Filed before the Bar Date.

**4.34.    Disputed Claim.** A Claim: (a) listed on the SOAL as disputed, contingent, or unliquidated, whether or not a proof of Claim has been Filed; (b) listed on the SOAL as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in a Filed proof of claim varies from the nature or amount of that Claim as it is listed on the SOAL; (c) not listed on the SOAL; (d) as to which the Debtor or any other party in interest has Filed an objection that has not been withdrawn or overruled by a Final Order; (e) that is a Contingent Claim; or (f) for which a proof of claim or request for payment of Administrative Claim is required to be Filed under the Plan and no such proof of claim or request for payment of Administrative Claim was timely Filed.

**4.35.    Distribution.** Any payment of Cash, property, or other value to a holder of an Allowed Claim under the Plan.

**4.36.    Distribution Date.** A date under the Plan to make Distributions.

**4.37.    Effective Date.** The first Business Day 15 days after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions to the Effective Date set forth in Section 12.2 of the Plan have been satisfied or waived in accordance with the Plan.

**4.38.    Estate.** The Debtor's estate created under Bankruptcy Code § 541.

4862-9523-0399.1 51998.002

**4.39. Excluded Assets.** The assets excluded from the Sale, as more fully described in section 2.2(a) of the APA.

**4.40. Exculpated Parties.** Collectively: (a) the Debtor and its Estate; (b) AZ Athletic; (c) the Committee; and (d) the post-Petition Date officers, directors, attorneys, financial advisors, agents, successors, and assignees of each entity in the preceding clauses (a) through (c), with the exception of Douglas Moss.

**4.41. Fee Claim.** An Administrative Claim for compensation and reimbursement of expenses of a Professional incurred before the Effective Date Filed in accordance with Bankruptcy Code §§ 328, 330, or 503(b)(4), to the extent such compensation and expenses have not been previously paid.

**4.42. Fee Claim Reserve.** The reserve established by the Liquidation Trustee for the payment of Fee Claims not entitled to Distributions as of the Effective Date.

**4.43. Fee Claim Bar Date.** The first Business Day 45 days after the Effective Date.

**4.44. File.** Submit to the Bankruptcy Court (or, in the case of proofs of claim, the Claims and Noticing Trustee) for entry on the docket of the Chapter 11 Case, either through the Bankruptcy Court's ECF system or other permitted method.

**4.45. Final Order.** An order or judgment of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for rehearing has expired, or as to which any right to appeal, petition for certiorari, or rehear has been waived in writing in form and substance satisfactory to the Debtor; and (b) if an appeal, writ of certiorari, or rehearing has been sought, as to which the highest court to which the order was appealed, or certiorari, or rehearing was sought, has determined or denied the appeal, writ of certiorari, or rehearing, and the time to take any further appeal, petition for writ of certiorari, or move for rehearing has expired. The filing of a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules with respect to the order does not prevent the order from being a Final Order.

**4.46. General Unsecured Claim.** Any Claim, including a Rejection Damages Claim but excluding a Secured Claim, an Administrative Claim, a Fee Claim, a Priority Tax Claim, or a Priority Claim.

**4.47. Impaired.** With respect to a Class of Claims, impaired within the meaning of Bankruptcy Code § 1124.

**4.48. Insurance Policies.** All insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of the Debtor or the Debtor's predecessor-in-interest.

**4.49. IRS.** The United States Internal Revenue Service.

**4.50.** **Lien.** A valid, enforceable, and perfected lien, mortgage, security interest, pledge, charge, encumbrance, or any other legally cognizable security device.

**4.51.** **Liquidation Trust.** The grantor trust created under the Plan to be administered by the Liquidation Trustee for the benefit of Holders of Claims and governed by the Liquidation Trust Agreement.

**4.52.** **Liquidation Trustee.** Jeremiah Foster, as the bankruptcy trustee of the Liquidation Trust, with the duties described in the Plan and in the Liquidation Trust Agreement.

**4.53.** **Liquidation Trust Agreement.** The trust agreement for the Liquidation Trust substantially in the form attached as **Exhibit A**.

**4.54.** **Maximum Amount.** With respect to any Claim that is not an Allowed Claim: (a) the amount to which the Debtor or the Liquidation Trustee and the holder of the Claim agree; or (b) any amount the Bankruptcy Court estimates or determines under Bankruptcy Code § 502(c); or (c) absent any agreement, estimation, or determination, the amount set forth in the proof of claim or application for payment Filed by the holder of the Claim, or, if none, the amount set forth in the SOAL for the Claim, or, if none, the amount the Debtor or the Liquidation Trustee estimates in its good faith discretion.

**4.55.** **Petition Date.** May 1, 2023, the date on which the Debtor Filed its chapter 11 petition commencing the Chapter 11 Case.

**4.56.** **Priority Claim.** Any Claim (other than an Administrative Claim, the Superpriority Claim, or a Priority Tax Claim) entitled to priority under Bankruptcy Code § 507(a).

**4.57.** **Priority Claims Reserve.** The reserve established by the Liquidation Trustee for the payment of Priority Claims not entitled to Distribution as of the Effective Date.

**4.58.** **Priority Tax Claim.** Any Claim entitled to priority under Bankruptcy Code § 507(a)(8) including, for purposes of the Plan, any Secured Claim that would otherwise meet the description of an unsecured Claim of a governmental unit but for the Secured status of that Claim.

**4.59.** **Professional.** A Person: (a) employed in the Chapter 11 Case by a Final Order under Bankruptcy Code §§ 327, 328, 363, or 1103 and compensated for services under Bankruptcy Code §§ 328 or 330 by a Final Order; or (b) for whom compensation or reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b)(4).

**4.60.** **Property.** All property of the Estate, other than the Purchased Assets, of any nature owned by the Estate on the Effective Date including the Excluded Assets, the Avoidance Actions, and the Causes of Action.

**4.61.** **Proponents.** Collectively, the Debtor, the Committee, and UMB, the proponents of Confirmation of this Plan.

4862-9523-0399.1 51998.002

**4.62.** **Pro Rata.** A proportionate share, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of that Allowed Claim is the same as the ratio of all consideration distributed on account of all Allowed Claims in that Class to the amount of all Allowed Claims in that Class.

**4.63.** **Purchased Assets.** The assets acquired by AZ Athletic in the Sale under the APA, as more fully described in section 2.1 of the APA.

**4.64.** **Rejection Damages Claim.** A Claim arising from the Debtor's rejection of an executory contract or unexpired lease either during the Chapter 11 Case or under the Plan other than a Claim for unpaid rent or contract payments arising under a rejected executory contract or unexpired lease after the Petition Date and before the effective date of the rejection of that contract or lease.

**4.65.** **Rejection Claims Bar Date.** The first Business Day 30 days after the Confirmation Date.

**4.66.** **Sale.** The sale under the APA and Bankruptcy Code § 363 of substantially all the Debtor's assets to AZ Athletic, which closed on December 14, 2023. The proceeds of the Sale have largely been distributed, but any excess funds from the $1,060,797 distributed to the Estate for administrative expenses or from the $511,000 held in escrow to be paid to the City of Mesa, Arizona are Property to be vested in the Liquidation Trust (i.e., Trust Assets).

**4.67.** **Sale Order.** The *Order (I) Authorizing and Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; (III) Authorizing the Sale Transaction; and (IV) Granting Related Relief,* entered on November 22, 2023.

**4.68.** **Secured Claim.** The portion of a Claim secured by a properly perfected Lien on Property.

**4.69.** **SOAL.** The Debtor's Schedules of Assets and Liabilities Filed under Bankruptcy Code § 521 and Bankruptcy Rule 1007, as they may have been or may be amended or supplemented.

**4.70.** **Superpriority Claim.** The Allowed Claim of the Bondholders in the amount of $9,861,044 for repayment of post-Petition Date financing to the Debtor authorized under the *Final Order re: Use of Cash Collateral and Postpetition Financing on Priming, Superpriority and Secured Basis*.

**4.71.** **Trust Assets.** All Property transferred to the Liquidation Trust under the Plan and the Liquidation Trust Agreement including the Excluded Assets, the Avoidance Actions, and the Causes of Actions.

**4.72. Trust Expenses.** All costs and expenses incurred by the Liquidation Trust reasonably necessary for, and consistent with, the liquidating purpose of the Liquidation Trust including any fees and expenses of the Liquidation Trustee's attorneys, accountants, and financial advisors.

**4.73. Trust Expense Reserve.** The reserve established by the Liquidation Trustee to pay Trust Expenses.

**4.74. UMB.** UMB Bank, N.A. in its capacity as indenture trustee under the *Indenture of Trust* dated August 1, 2020, and the *First Supplemental Indenture of Trust* dated June 1, 2021.

**4.75. Unimpaired.** Not Impaired.

**4.76. Vote.** To timely and properly complete and submit, in accordance with the Bankruptcy Court's order conditionally approving the Disclosures, a Ballot indicating an acceptance or rejection of the Plan.

**4.77. Voting Deadline.** The deadline to Vote established by the Bankruptcy Court's order conditionally approving the Disclosures.

# Article 5 — Unclassified Claims

**5.1. Unclassified Claims.** Under Bankruptcy Code § 1123(a)(1), Administrative Claims, Fee Claims, and Priority Tax Claims are not classified for purposes of Voting on, or receiving Distributions under, the Plan. Holders of Administrative Claims, Fee Claims, and Priority Tax Claims are not entitled to Vote but are treated separately in accordance with Bankruptcy Code §§ 1123(a)(1) and 1129(a)(9)(A).

**5.2. Administrative Claims.**

(a)     **Generally.** Each Allowed Administrative Claim (other than a Fee Claim but including a 503(b)(9) Claim) is paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (i) the Effective Date, or the first feasible date after that; (ii) any date the Bankruptcy Court may fix, or the first feasible date after that; (iii) 30 days after the Claim is Allowed; and (iv) any date on which the holder of the Claim and the Debtor or the Liquidation Trustee agree.

(b)     **Requests for Payment.** All requests for payment of an Administrative Claims (other than a Fee Claim or a claim under Bankruptcy Code § 503(b)(1)(B) or (C) but including a 503(b)(9) Claim) if not already Filed must be served on the Liquidation Trustee and Filed no later than the Administrative Claims Bar Date. Failure to do so forever bars the holder of such an Administrative Claim from asserting its Administrative Claim against the Estate or the Liquidation Trust.

4862-9523-0399.1 51998.002

(c)     **Estimate.** The Proponents believe that the only Administrative Claims are those associated with the Debtor's post-Petition Date operations, substantially all of which have been paid in the ordinary course of business, and the statutory US Trustee fees, a small amount of which will likely remain unpaid as of Confirmation.

**5.3.     Fee Claims**.

(a)     **Generally.** Each Allowed Fee Claim, to the extent not previously paid, is paid in Cash in full on the latest of: (i) the Effective Date or the first feasible date after that; and (ii) 30 days after the Claim is Allowed or the first feasible date after that. All final applications for allowance of all Fee Claims must be served on the Liquidation Trustee and Filed no later than the Fee Claim Bar Date. Failure to do so forever bars the holder of such a Fee Claim from asserting its Fee Claim against the Estate or the Liquidation Trust. Any objection to a Fee Claim must be Filed and served on the requesting party, the Liquidation Trustee, and the US Trustee no later than 14 days after the Fee Claim is Filed, unless the Bankruptcy Court extends that deadline.

(b)     **Estimate.** The Proponents believe that unpaid Fee Claims as of the Effective Date will total approximately, $275,000, comprising fees for Professionals representing both the Debtor and the Committee.

**5.4.     Priority Tax Claims.**

(a)     **Generally.** Except as provided immediately below, all Allowed Priority Tax Claims are paid in full in Cash on the latest of: (i) the Effective Date or the first feasible date after that; and (ii) 30 days after the Claim is Allowed.

(b)     **Secured Tax Claims.** If any Allowed Priority Tax Claim is secured by a Lien on any property of the Estate under applicable non-bankruptcy law, the holder of that Claim retains the Lien it held as of the Petition Date securing the Claim until the Claim is paid in full. On satisfaction of the Secured Tax Claim, the claimholder must release its Lien in accordance with applicable non-bankruptcy law.

(c)     **Penalties.** Any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder of such Claim for actual pecuniary loss is Disallowed.

(d)     **Estimate.** Owing to the Debtor's status as a tax-exempt nonprofit corporation, the Proponents do not believe there exist any Priority Tax Claims.

4862-9523-0399.1 51998.002

# Article 6 — Classification and Treatment of Claims

**6.1.    Classification.** Under Bankruptcy Code §§ 1122 and 1123, Claims are classified for the purposes of Voting and Distributions. A Claim is classified in a particular Class only if that Claim fits within the description of that Class. Except as otherwise specifically provided for in the Plan, the Confirmation Order, or any other Final Order, or unless required by applicable bankruptcy law, the aggregate value of all property received or retained under the Plan on account of an Allowed Claim may never exceed 100% of the underlying Allowed Claim. Bankruptcy Code § 1129(a)(10) is satisfied for the purposes of Confirmation by at least one Impaired Class of Claims accepting the Plan. If no Claim holder within a particular Impaired Class Votes, that Class is deemed to have accepted the Plan.

**6.2.    Treatment.** Each holder of an Allowed Claim receives under the Plan the treatment described below in full and final satisfaction, settlement, and release of, and in exchange for, that Allowed Claim, except if the Liquidation Trustee and the holder of that Allowed Claim agree to different treatment. Unless otherwise indicated, the holder of an Allowed Claim receives its treatment on the later of: (a) the Effective Date or the first feasible date after that; and (b) the date on which the applicable Claim becomes Allowed.

**6.3.    Elimination of Vacant Classes**. Any Class of Claims lacking any holders of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing is considered vacant and deemed eliminated from the Plan for purposes of Voting and determining acceptance or rejection of the Plan by that Class under Bankruptcy Code § 1129(a)(8).

**6.4.    Class 1—Priority Claims**.

(a)    **Classification.** Class 1 contains all Priority Claims. Class 1 is Unimpaired. All holders of Allowed Priority Claims are deemed to accept the Plan under Bankruptcy Code § 1126(f) and do not Vote.

(b)    **Treatment.** Except if the holder of an Allowed Priority Claim agrees otherwise, each holder of an Allowed Priority Claim receives either payment in full in Cash or any other treatment necessary to render that Claim Unimpaired. Unless otherwise provided by an order of the Bankruptcy Court, no fees, interest, or penalties related to a Priority Claim are entitled to payment under the Plan.

(c)    **Estimate.** The Proponents estimates that there exist no unpaid Priority Claims as of Confirmation.

**6.5.    Class 2—Secured Claims.**

(a)    **Classification.** Class 2 contains all Secured Claims. Class 2 is Unimpaired. All holders of Allowed Secured Claims are deemed to accept the Plan under Bankruptcy Code § 1126(f) and do not Vote. The Debtor does not believe there are any Secured Claims.

4862-9523-0399.1 51998.002

(b)     **Treatment.** On the Effective Date or the first feasible date after that, each holder of an Allowed Secured Claim receives, at the Liquidation Trustee's election: (a) payment in full in Cash; (b) the collateral securing the Allowed Secured Claim; or (c) another treatment rendering the Allowed Secured Claim Unimpaired.

(c)     **Estimate.** The Proponents estimates that there exist no Secured Claims as of Confirmation.

**6.6.     Class 3—Superpriority Claim.**

(a)     **Classification and Voting.** Class 3 contains the Superpriority Claim held collectively by the Bondholders, which constitutes an Administrative Claim with priority over all other Administrative Claims. If Class 3 Votes to accept the Plan, the Bondholders are deemed to have agreed for purposes of the Plan to receive a different treatment than required under Bankruptcy Code § 1129(a)(9). Accordingly, Class 3 is Impaired and Votes.

(b)     **Treatment.** On the Effective Date, the Bondolders receive Pro Rata preferred beneficial interests in the Liquidation Trust described in Section 8.2(b) below and the Liquidation Trust Agreement.

(c)     **Estimate.** The Proponents estimate the Superiority Claim to equal approximately $9.9 million at Confirmation.

**6.7.     Class 4—General Unsecured Claims.**

(a)     **Classification and Voting.** Class 4 contains all General Unsecured Claims including all Rejection Damages Claims. Class 4 is Impaired. In light of the relative uncertainty of the Liquidation Trust's recovery on the Causes of Action beyond what would be required to satisfy the Superpriority Claim in full, the Proponents anticipate **solely for purposes of Plan Voting** that the common beneficial interests in the Liquidation Trust will be of no value and that, therefore, holders of General Unsecured Claims will neither receive nor retain any value under the Plan. Accordingly, Class 4 is deemed to reject the Plan without Voting such that holders of General Unsecured Claims will not be solicited to Vote and do not Vote.

(b)     **Treatment.** On the Effective Date, each holder of an Allowed General Unsecured Claim receives Pro Rata common beneficial interest in the Liquidation Trust described in Section 8.2(b) below and the Liquidation Trust Agreement.

(c)     **Estimated Composition and Distributions.** The Proponents believe that Claims constituting Class 4 total approximately $330,000,000. Assuming a recovery on Causes of Action and other Trust Assets that exceeds the Superpriority Claim amount and, therefore, satisfies the Bondholders' preferred beneficial interests in the Liquidation Trust, the Proponents believe that holders of General Unsecured Claims will eventually receive Distributions. But **strictly for purposes of Voting**, the Proponents assume that holders of General Unsecured Claims will neither receive nor retain any value under the Plan.

4862-9523-0399.1 51998.002

# Article 7 — Implementation

**7.1.    Vesting of Assets.** Except as otherwise provided in the Plan, on the Effective Date all property of the Estate, including all Cash remaining after Distributions and payments to be made under the Plan on account of Allowed Administrative Expense Claims and Allowed Fee Claims, vests in the Liquidation Trust.

**7.2.    Abandonment of Assets.** After the Effective Date, the Liquidation Trust may abandon any asset within its control that the Liquidation Trustee determines in the Liquidation Trustee's reasonable discretion to be of insignificant value or burdensome. The Liquidation Trustee need not obtain an order of the Bankruptcy Court to effect any such abandonment.

**7.3.    No Corporate Action Required**. On the Effective Date, automatically and without further action:

(a)    the adoption, execution, delivery, and implementation of all documents and agreements related to or contemplated by the Plan, and all other matters provided for in furtherance of the Plan involving action required of the Debtor are deemed to have occurred, are effective, binding, and enforceable in accordance with their respective terms, and are deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the Debtor's officers or directors;

(b)    all member of the Debtor's board of directors and all the Debtor's officers are deemed to have resigned;

(c)    The Liquidation Trustee is the Debtor's sole officer and director such that all actions taken under the Plan in the Debtor's name of Debtor are taken through the Liquidation Trustee;

(d)    The Debtor is deemed dissolved under Arizona law; the Debtor or the Liquidation Trustee must prepare any required final tax returns and he Confirmation Order must authorize the Liquidation Trustee (in a representative capacity only) to execute any final tax returns and any other documents necessary to accomplish the Debtor's dissolution;

(e)    The Debtor must deliver to the Liquidation Trustee all documents, books, and records in its possession or control (if electronic, in native format) and perform all actions reasonably necessary to facilitate the Plan's implementation;

(f)    The Liquidation Trustee (in a representative capacity only) is authorized to execute on the Debtor's behalf any documents or instruments after the Effective Date reasonably necessary to consummate the Plan.

**7.4.    Winding Up.** Following the Confirmation Date, the Debtor may not engage in any business activities or take any actions except those necessary to implement the Plan and wind up the Debtor's affairs. On and after the Effective Date, the Liquidation Trustee may,

in the Debtor's name and on the Debtor's behalf, take any actions reasonably necessary to implement the Plan without Bankruptcy Court approval and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than any restrictions expressly imposed by the Plan, the Liquidation Trust Agreement, or the Confirmation Order.

**7.5.    Release of Liens**. On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, or other agreement created in connection with the Plan, all mortgages, deeds of trust, Liens, and other security interests against all property of the Estate are released such that all rights, title, and interests of any holder of such mortgages, deeds of trust, Liens, or other security interests vest in Liquidation Trust.

# Article 8 — Liquidation Trust

**8.1.    Liquidation Trust Agreement**. The Liquidation Trust Agreement must be executed by all parties to it on or before the Effective Date, at which time the Liquidation Trust is established and effective without further order of the Bankruptcy Court.

**8.2.    Structure and Legal Status.**

(a)    **Purpose.** The Liquidation Trust established under the Liquidation Trust Agreement is established for the purpose of making Distributions on account of Allowed Claims through liquidation of all Liquidation Trust assets into Cash, net of all Trust Expenses. The Liquidation Trust may not exist in perpetuity or engage in any trade or business other than that reasonably necessary to, and consistent with, this purpose.

(b)    **Beneficial Interests.** The Liquidation Trust contains two classes of beneficial interests: (i) priority beneficial interests issued to the Bondholders on account of the Superpriority Claim; and (ii) common beneficial interests issued to holders of Allowed General Unsecured Claims. All Distributions from the Liquidation Trust to its beneficiaries will be made first to the Bondholders' priority beneficial interests until the Superpriority Claim is paid in full without interest and, after that, Pro Rata to all holders of common beneficial interests.

(c)    **Tax Classification.** The Liquidation Trust is to be classified for federal income tax purposes as a "liquidating trust" within the meaning of § 301.7701-4(d) of the Treasury Regulations. All parties must treat the transfers of property into the Liquidation Trust as if all such property, including all the Trust Assets, had been first transferred to the Beneficiaries and then transferred by the Beneficiaries to the Liquidation Trust. The Beneficiaries must be treated for all purposes of the Internal Revenue Code as the grantors of the Liquidation Trust and the owners of the Liquidation Trust. All income of the Liquidation Trust must be taxed directly to its Beneficiaries (except to the extent the IRS is a Beneficiary). The Liquidation Trustee and the Beneficiaries must value the property transferred to the Liquidation Trust consistently for all federal income tax purposes. The Liquidation Trustee must timely file annual federal income tax returns reflecting all items of income, gain or loss, deductions or credits of the Liquidation Trust as a grantor trust under Treasury Regulations § 1.671-4(a). Consistent with its status as a grantor trust, the

Liquidation Trust is not a taxpayer but the Beneficiaries must pay their allocable portion of any federal income tax liability related to the operation of the Liquidation Trust.

(d) **Termination.** The Liquidation Trust terminates as provided in the Liquidation Trust Agreement. During its existence, the Liquidation Trust may not retain Cash in excess of a reasonable amount necessary to meet Claims and contingent liabilities (including Disputed Claims) or to maintain the value of the Trust Assets and reserves during liquidation.

**8.3. Mandatory Distributions.** The Liquidation Trust must Distribute at least annually to the Beneficiaries, unless the Liquidation Trustee determines that it is not cost effective to do so, all the Liquidation Trust's net income and all the net proceeds from any liquidation of Trust Assets, less any amounts reasonably necessary to maintain the value of the Trust Assets or to meet Claims or contingent liabilities (including Disputed Claims) or reserves. The Liquidation Trustee must use continuing good faith efforts to dispose of the Trust Assets, make timely Distributions, and not unduly prolong the Liquidation Trust's duration.

**8.4. Transfer of Trust Assets into the Liquidation Trust**. On or before the Effective Date, the Debtor must transfer all the Trust Assets to the Liquidation Trust, free and clear of all Claims and Liens except as provided in the Plan, for the Beneficiaries' benefit as detailed in the Liquidation Trust Agreement. Except as provided in the Plan, no asset of the Estate is abandoned, no cause of action is released or compromised, and no defense, setoff, counterclaim, or right of recoupment is waived or compromised as a result of this Plan, Confirmation, or the Plan's treatment of any Claim.

**8.5. The Liquidation Trustee**.

(a) **Authority.** Except as may be provided elsewhere in the Plan, the Liquidation Trustee may take all steps necessary to carry out the Liquidation Trustee's responsibilities under the Plan, including making Distributions of Trust Assets through liquidation and investigating and prosecuting any Avoidance Actions and Causes of Action as a bankruptcy trustee. The Liquidation Trustee possesses all rights, powers, and benefits afforded to a "trustee" under Bankruptcy Code §§ 704 and 1106 with standing to pursue any Avoidance Actions and Cause of Action and to assert any defense that may otherwise be asserted by a "trustee" under the Bankruptcy Code.

(b) **Retention of Professionals.** The Liquidation Trustee may retain professionals (including disbursing and transfer agents and legal counsel) on the on Liquidation Trust's behalf as the Liquidation Trustee deems appropriate and may compensate those professionals from the Trust Assets on customary terms reasonably acceptable to the Liquidation Trustee without the Bankruptcy Court's approval, subject to the Liquidation Trust Agreement. Professionals so retained need not be "disinterested persons" (as defined in the Bankruptcy Code) and may include counsel or financial advisors to the Debtor or the Committee.

4862-9523-0399.1 51998.002

(c)     **Designation and Compensation**. The Liquidation Trustee is appointed as of the Effective Date and serves until resignation or replacement in accordance with the Liquidation Trust Agreement. The Liquidation Trustee's compensation is set forth in the Liquidation Trust Agreement.

(d)     **Resignation, Death, or Removal**. The Liquidation Trustee may resign, be removed, or be replaced only in accordance with the Liquidation Trust Agreement, except as Bankruptcy Court orders otherwise.

**8.6.     Authority to Prosecute Causes of Action**. The Estate assigns and transfers to the Liquidation Trust all right, title, and interest in any Avoidance Actions and Causes of Action belonging to the Estate and all their proceeds, whether from insurance or from any other source, as well as the Debtor's rights to any insurance proceeds (but not its other existing rights as an insured). Under Bankruptcy Code § 1123(b)(3)(B), the Liquidation Trustee has full and exclusive authority as Estate representative, without Bankruptcy Court approval but subject to the Liquidation Trust Agreement, to prosecute Avoidance Actions and the Causes of Action. The Liquidation Trustee may commence or continue, in any appropriate court or tribunal, any suit or other proceeding for the enforcement of all claims and causes of action, and, if the Liquidation Trustee deems it appropriate, to compromise, settle, or abandon such litigation. The Liquidation Trustee retains full discretion to pursue or not to pursue any claims, rights, causes of action, or defenses, as it determines are in the Beneficiaries' best interests, consistent with the purposes of the Liquidation Trust.

**8.7.     Preservation of Claims and Causes of Action**. The Proponents' failure to specifically list any Avoidance Action, Cause of Action, or other claim in the SOAL or in the Plan does not waive or release it. No preclusion doctrine such as collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches apply to any such Avoidance Action, Cause of Action, or other claim on or after Confirmation. Any proceeds of any Avoidance Action, Cause of Action, or other claim is "for the benefit of the Estate" as contemplated in Bankruptcy Code § 550.

**8.8.     Investments**. Subject to the Liquidation Trust Agreement, all Cash held by the Liquidation Trustee must be invested in accordance with Bankruptcy Code § 345 or as otherwise permitted by a Final Order, except that Cash may be held in a federally-insured bank account in an amount exceeding the federal insurance limit.

# Article 9 — Determination of Claims

**9.1.     Objections to Claims**.

(a)     **Authority.** Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, the Liquidation Trustee may object to the allowance, seek the subordination, or seek estimation of any Claim on any ground permitted by the Bankruptcy Code. Nothing in this section affects any party-in-interest's right to object to the allowance, seek the subordination, or seek estimation of any Claim on any ground permitted by the Bankruptcy Code.

(b)　**Deadlines.** All objections to, and all motions to subordinate or estimate, any Claim must be brought by Filing the appropriate pleading before the first Business Day that is 120 days after the Effective Date, but the Bankruptcy Court may approve a later date on a motion Filed (but not necessarily heard) before that date, notice of which may be limited to the Post-Effective Date Limited Notice List described in Section 14.5 below. Unless an order of the Bankruptcy Court specifically provides otherwise, any proof of Claim Filed after the Confirmation Date is automatically Disallowed without any action by the Liquidation Trustee, unless and until the party Filing that Claim obtains an order of the Bankruptcy Court, on notice to the Liquidation Trustee and the Post-Effective Date Limited Notice List, permitting the late Filing of the Claim. If any proof of Claim is permitted by Bankruptcy Court order to be Filed after the Confirmation Date, the Liquidation Trustee has 120 days from the date of that order to object to that Claim, but the Bankruptcy Court may extend that deadline on a motion Filed (but not necessarily heard) before that date, notice of which may be limited to the Post-Effective Date Limited Notice List.

(c)　**Omnibus Objections.** Notwithstanding Bankruptcy Rule 3007(c), any party may File omnibus objections to Claims.

**9.2.　Contingent Claims.** Until a Contingent Claim is either Allowed or Disallowed, the Claim is treated as a Disputed Claim for all purposes under the Plan. Any Contingent Claim for reimbursement or contribution held by a person that may be liable with a Debtor on a Claim is Disallowed as of the Effective Date if: (a) that Claim is Disallowed; (b) the Contingent Claim remains contingent as of the Effective Date; or (c) that person asserts a right of subrogation under Bankruptcy Code § 509.

**9.3.　Offer of Judgment.** The Liquidation Trustee may serve on a holder of a Disputed Claim an offer to allow judgment to be taken on account of the Disputed Claim. Under Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 applies to any such offer of judgment. If the holder of a Disputed Claim is ordered to pay the costs incurred by the Liquidation Trust after the making of the offer, those costs may be set off against the amount of any Distribution to be paid to that holder without any further notice to or approval of the Bankruptcy Court.

# Article 10 — Distributions

**10.1.　Record Date.** As of 5:00 p.m. Arizona Time on the Confirmation Date, the identities of the holders of Claims for all purposes under the Plan, including Distributions, are fixed such that no future changes in the record holders of Claims are valid or will be acknowledged. Neither the Proponents nor the Liquidation Trustee has any obligation to recognize any ownership transfer of any Claim occurring after the Confirmation Date.

**10.2.　No Interest.** Distributions made after the Effective Date are deemed to have been made on the Effective Date such that no interest accrues or is payable with respect to any

Claim or any Distribution related to a Claim. No interest on any Claim accrues or is payable from and after the Petition Date.

**10.3.    Reserve Accounts**.

(a)    **Administrative Claims Reserve.** On or as soon as practicable after the Effective Date, the Liquidation Trustee must establish and maintain the Administrative Claims Reserve, containing Cash sufficient to pay all unpaid Administrative Claims (except the Superpriority Claim) in full in the Maximum Amount. With respect to an unpaid Administrative Claim that is not Allowed as of the Effective Date (except the Superpriority Claim), if, when, and to the extent that Administrative Claim becomes an Allowed Administrative Claim, Cash held in reserve for that Administrative Claim must be Distributed to the holder of the Allowed Administrative Claim consistently with Distributions made to similarly-situated Allowed Administrative Claims. Any balance of the Administrative Claim Reserve remaining after all Administrative Claims have been resolved and paid, then vests in the Liquidating Trust.

(b)    **Fee Claim Reserve.** On or as soon as practicable after the Effective Date, the Liquidation Trustee must establish and maintain the Fee Claim Reserve, containing Cash sufficient to pay all unpaid Fee Claims in full in the Maximum Amount. With respect to an unpaid Fee Claim that is not Allowed as of the Effective Date, if, when, and to the extent that Fee Claim becomes an Allowed Claim, Cash held in reserve for that Fee Claim must be distributed to the Professional consistently with Distributions made to similarly-situated Professionals. Any balance of the Fee Claim Reserve remaining after all Fee Claims have been resolved and paid, then vests in the Liquidating Trust.

(c)    **Priority Claims Reserve.** On or as soon as practicable after the Effective Date, the Liquidation Trustee must establish and maintain the Priority Claims Reserve, containing Cash sufficient to pay all unpaid Priority Claims (including Priority Tax Claims) in full in the Maximum Amount. With respect to an unpaid Priority Claim that is not Allowed as of the Effective Date, if, when, and to the extent that Priority Claim becomes an Allowed Priority Claim, Cash held in reserve for that Priority Claim must be Distributed to the holder of the Allowed Priority Claim consistently with Distributions made to similarly-situated Allowed Priority Claims. Any balance of the Priority Claims Reserve remaining after all Priority Claims have been resolved and paid, then vests in the Liquidating Trust.

(d)    **Trust Expense Reserve.** On or as soon as practicable after the Effective Date, the Liquidation Trustee must establish and maintain the Trust Expense Reserve, containing Cash sufficient to pay all to pay all estimated Trust Expenses. When the Liquidation Trust terminates, the Liquidation Trustee must distribute any balance remaining in the Trust Expense Reserve to the Beneficiaries in accordance with the Liquidation Trust Agreement.

**10.4.    Settlement of Disputed Claims.** Objections to Claims may be litigated to judgment or withdrawn and may be settled with the approval of the Bankruptcy Court, except if such approval is not necessary as provided in this section. After the Effective Date, and subject

to the Plan, the Liquidation Trustee may settle any Disputed Claim where the asserted amount of the Disputed Claim is $100,000 or less, without providing any notice to any party-in-interest or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims asserted in an amount exceeding $100,000 are subject to the Bankruptcy Court's approval under the following procedure: (a) the Liquidation Trustee must give notice of the proposed settlement to the Post-Effective Date Limited Notice List; (b) parties have 21 days to File objections to the proposed settlement; (c) if no objections are timely Filed, the Liquidation Trustee may consummate the settlement without further order of the Bankruptcy Court or may, at the Liquidation Trustee's election, request entry of an order approving the proposed settlement by Filing a proposed order under a counsel certificate of no objection with no further notice to any party; and (d) if objections are timely Filed, the Liquidation Trustee must notice the proposed settlement for hearing on at least five Business Days' notice.

**10.5. Tax Matters.**

(a) **Compliance with Tax Requirements.** The Debtor and the Liquidation Trustee must comply with all tax withholding and reporting requirements imposed by any Governmental Unit with respect to all Distributions, taking all actions appropriate to comply with such requirements. Distributions must comply with any applicable garnishments, domestic support obligations, Liens, and encumbrances.

(b) **Form W-9.** As a condition to receiving any Distribution under the Plan, each holder of an Allowed Claim entitled to a Distribution must, if the Liquidation Trustee requests it, provide an executed IRS Form W-9. Any holder of an Allowed Claim that fails to do so within 30 days of such a request forfeits all rights to all Distributions.

**10.6. Delivery of Distributions.** Unless a holder of an Allowed Claim and the Liquidation Trustee otherwise agree, all Distributions are made by check drawn on a domestic bank or by wire transfer from a domestic bank. Distributions will be made: (a) to the address set forth on the holder's proof of claim, the SOAL, or, in the absence of either, the holder's last known address; or (b) to the address set forth in any written notice of address change delivered to the Liquidation Trustee or its counsel.

**10.7. Undeliverable Distributions.** If any Distribution is returned as undeliverable, no further Distributions to its intended recipient will be made unless and until the Liquidation Trustee is notified of the recipient's then-current address. Claims held by a recipient who fails to notify the Liquidation Trustee of its correct address within 90 days after the Distributions are returned as undeliverable will be expunged, after which all unclaimed property reverts to the Liquidation Trust for Pro Rata Distribution to all other eligible holders of Allowed Claims. The Liquidation Trustee is not required to attempt to locate any holder of an Allowed Claim.

**10.8. De Minimis Distributions.** No Distribution of less than $10 will be made. Any Distribution less than $10 will be held until a date on which the Distribution exceeds $10. At the time of any final Distribution, no Distribution of less than $10 will be made and any

such Distribution will revest in the Liquidation Trust for the sole purpose of making an irrevocable donation to a 501(c)(3)-qualified charity of the Liquidation Trustee's choice. All Distribution amounts are rounded to the nearest whole cent.

**10.9. Setoffs**. Except with respect to Claims satisfied, settled, and released under the Plan or any contract, instrument, release, or other document entered into or delivered in connection with the Plan, the Liquidation Trustee may, under Bankruptcy Code § 553 or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim) any counterclaims and causes of action the Debtor has against the holder of such Claim, but the failure to so set off does not waive or release any such counterclaims or causes of action.

# Article 11 — Executory Contracts

**11.1. Rejection.** Except as otherwise provided in the Plan, all executory contracts and unexpired leases not assumed and assigned in connection with the Sale or already rejected before the Confirmation Date are rejected as of the Confirmation Date. The Confirmation Order constitutes the Bankruptcy Court's approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases under the Plan.

**11.2. Rejection Damages Claims.** All Rejection Damages Claims must be filed by the Rejection Damages Claims Bar Date. Any Rejection Damages Claim not filed by the Rejection Damages Claims Bar Date is forever barred. All Rejection Damages Claims are General Unsecured Claims under the Plan. With respect to any executory contract or unexpired lease rejected before the Confirmation Date, the deadline for filing a Rejection Damages Claim remains the deadline set in the Bankruptcy Court order authorizing that rejection.

**11.3. Indemnification Obligations.** Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan of the Debtor under charter, by-laws, contract, or applicable state law is an executory contract and is rejected as of the Confirmation Date. Except as otherwise provided in the Plan, any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including any officer or director of the Debtor, or any agent, professional, or financial advisor related to any acts or omissions occurring before the Petition Date is rejected under the Plan as of the Confirmation Date. Any Claim resulting from these rejections must be Filed by the Rejection Damages Claims Bar Date and constitutes a General Unsecured Claim. Notwithstanding any of the foregoing, nothing contained in the Plan affects the rights of any Person covered by any applicable D&O Policy with respect to any such policy.

**11.4. Benefit Plans.** All Benefit Plans not already assumed and assigned in connection with the Sale or either rejected or terminated in the ordinary course before the Confirmation Date are rejected as of the Confirmation Date. The Debtor has never been nor will ever be liable for the payment of any retiree benefits, as that term is defined in Bankruptcy Code § 1114.

4862-9523-0399.1 51998.002

**11.5.    Insurance Policies.**

(a)    **Rejection.** All rights of the Debtor under any Insurance Policies under which the Debtor is insured automatically vest in the Liquidation Trust as of the Effective Date. If any such Insurance Policies are deemed executory contracts, then the Plan constitutes a motion to reject those Insurance Policies under Bankruptcy Code § 365. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order constitutes both approval of that rejection under Bankruptcy Code § 365 and a finding by the Bankruptcy Court that such rejection is in the best interests of the Estate. Each applicable Insurer is prohibited and enjoined from denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Case or the Plan, including the treatment or means of liquidation set out within the Plan for any insured Claims or causes of action. Nothing in the Plan impairs the Estate's or the Liquidation Trust's rights with respect to (or affect the coverage under) any Insurance Policy or waives any cause of action the any Entity may hold against any other Entity, including Insurers under any Insurance Policy, nor does anything contained in the Plan waive any Insurer's defenses.

(b)    **Claims Covered by Insurance Policy.**

(i)    The Holder of a Claim covered by an Insurance Policy may pursue that Claim to settlement or final judgment in any court having competent jurisdiction solely to the extent of available insurance proceeds exceeding any applicable deductible or self-insured retention amount as may be determined by the Bankruptcy Court ruling on a motion for relief from the injunction in Section 13.1 below. Claims covered by Insurance Policies may be estimated by the Bankruptcy Court for purposes of determining whether a Claim exceeds an applicable deductible or self-insured retention amount. Any final judgment or settlement may be satisfied solely to the extent of any available Insurance Policy proceeds under provisions of this subsection. If the injunction in Section 13.1 below is lifted with respect to a Claim, the Debtor or the Liquidation Trust may be named in the litigation as a party defendant subject to the provisions of this subsection. Nothing in the Plan releases the Estate from its liability for Claims covered by Insurance Policies, but its liability is limited to the amount of available Insurance Policy proceeds exceeding the applicable deductible or self-insured retention amount. Except as provided in this subsection, as of the Effective Date, all Claims covered by an Insurance Policy are satisfied for all purposes. The holders of Claims covered by an Insurance Policy are entitled solely to the treatment provided in this subsection.

(ii)    If an Insurance Policy applicable to a Claim contains a deductible or self-insured retention amount, when the Bankruptcy Court liquidates and Allows that Claim, the deductible or self-insured retention amount is deemed satisfied and extinguished for all purposes under the applicable Insurance Policy by the allowance of a General Unsecured Claim up to the amount of the applicable deductible or self-insured retention amount that was unexhausted as of the Petition Date. If the injunction in Section 13.1 below is lifted and a holder of an Allowed Claim covered by an Insurance Policy obtains a judgment greater than the applicable deductible or self-insured retention amount, the

amount of any such deductible or self-insured retention amount that was unexhausted as of the Petition Date and is Allowed as a General Unsecured Claim under the Plan constitutes an offset against any such judgment.

(iii)     With respect to any Insurance Policy under which the Debtor and a non-debtor entity are named insureds, nothing in the Plan rejects, terminates, or otherwise affects any non-debtor entities' rights under such Insurance Policy, which remain unimpaired with respect to coverage for covered non-Debtor entities. Any collateral posted with or for the benefit of any Insurer by or for the benefit of any non-debtor entity related to an Insurance Policy, including any letters of credit and cash deposits, continue to collateralize the Insurance Policy solely with respect to covered claims against the applicable non-Debtor entities.

(iv)     The Bankruptcy Court retains exclusive jurisdiction to determine any requests for relief from the injunction in Section 13.1 below and the allowance and estimation of Claims as provided in this subsection and as otherwise consistent with the Plan and the Bankruptcy Code.

# Article 12 — Conditions

**12.1.     Conditions to Confirmation**. The Plan may not be Confirmed unless and until each of the following occurs:

(a)     **Approval of Disclosures.** The Bankruptcy Court enters a Final Order approving the Disclosures in this Plan as an adequate disclosure statement under Bankruptcy Code § 1125.

(b)     **Form of Confirmation Order.** The Bankruptcy Court enters the Confirmation Order in form and substance reasonably acceptable to the Proponents.

(c)     **Substance of Confirmation Order.** The Confirmation Order contains at least the following:

(i)     The provisions of the Confirmation Order are non-severable and mutually dependent;

(ii)     The Plan's assumption or rejection of executory contracts and unexpired leases are approved;

(iii)     All non-Debtor parties to any executory contract or unexpired lease assumed and assigned during the Chapter 11 Case are estopped from asserting any further Claim; and

(iv)     The Bankruptcy Court retains jurisdiction to the fullest extent permissible by applicable law and at least to the extent contemplated by Section 13.3 below.

**12.2. Conditions to Effective Date**. The Effective Date occurs when:

(a)     The Confirmation Date occurs;

(b)     No request for revocation of the Confirmation Order under Bankruptcy Code § 1144 is pending;

(c)     Sufficient Cash exists to make all payments required under the Plan to be made on the Effective Date; and

(d)     All instruments and agreements to be issued, executed, delivered, or Filed under the Plan, including the Liquidation Trust Agreement, are issued, executed, delivered, or Filed and are effective.

**12.3. Waiver of Conditions**. The Proponents may at any time, without notice or authorization of the Bankruptcy Court, waive the condition set forth in Section 12.2(c) above. The Proponents may assert their failure to satisfy or waive that condition regardless of the circumstances causing the failure. The Proponents reserve the right to assert that any appeal from the Confirmation Order is moot after "substantial consummation" of the Plan, as that term is defined in Bankruptcy Code § 1101(2).

**12.4. Notice of Effective Date.** Within three Business Days after the Effective Date occurs, the Liquidation Trustee must File a notice of the occurrence and date of the Effective Date.

# Article 13 — Effects of Confirmation

**13.1. Injunction**.

(a)     **Generally.** Without limiting the maximum effect of Bankruptcy Code § 1141(c), except as otherwise provided in the Plan or the Confirmation Order, from and after the Confirmation Date, all Entities who have ever held or will ever hold any Claims are permanently enjoined from: (i) commencing or continuing in any manner any action or other proceeding against any property sold in the Sale or dealt with by the Plan; (ii) enforcing, attaching, collecting or otherwise recovering in any way any judgment, award, decree or order against property sold in the Sale or dealt with by the Plan; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any property sold in the Sale or dealt with by the Plan; (iv) commencing or continuing any action that does not comply with or is inconsistent with the Plan or the Bankruptcy Code; (v) taking any action to interfere with the implementation or consummation of the Plan.

(b)     **Limited Scope.** Nothing in this Plan: (i) extinguishes, prohibits, or otherwise limits the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan; or (ii) enjoins or otherwise precludes any party-in-interest from enforcing the Plan and the Confirmation Order.

**13.2. Exculpation.** No Exculpated Party has any liability to any holder of a Claim for any act or omission arising on or after the Petition Date through the Effective Date in connection with, related to, or arising out of, the Chapter 11 Case, the Sale, the Plan, the pursuit of Confirmation, the consummation of the Plan, or the administration of the Plan or the property distributed or otherwise dealt with under the Plan except for any act or omission found by a Final Order to constitute a crime, actual fraud, willful misconduct, or gross negligence. In all respects, the Exculpated Parties are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan. The Exculpated Parties have participated in good faith and in compliance with applicable laws pertaining to the solicitation of Votes on, and Distributions under, the Plan and, therefore, are not liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of Ballots or governing Distributions. This provisions of this section add to and do not limit any other release, indemnification, exculpation, and any other applicable law, rule, or regulation protecting Exculpated Parties from liability. The provisions of this section may not be construed to exculpate any Person from its post-Effective Date obligations under the Plan, the Sale, the Liquidation Trust Agreement, or any document, instrument, or agreement executed to implement the Plan.

**13.3. Bankruptcy Court's Retention of Jurisdiction.** Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains as much jurisdiction over the Chapter 11 Case after the Effective Date as legally permissible, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

(b)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

(c)     Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which the Debtor was a party and to hear, determine and, if necessary, liquidate any Claims arising from such rejection;

(d)     Ensure that Distributions are accomplished in accordance with the Plan;

(e)     Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor or the Liquidation Trust that may be pending on the Effective Date or Filed after the Effective Date;

(f)     Enter any necessary or appropriate orders to implement or consummate the Plan or the Sale and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Sale;

4862-9523-0399.1 51998.002

(g)     Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify any contract, instrument, release, or other agreement or document issued, entered into, Filed, or delivered in connection with the Plan;

(h)     Hear and determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, or any contract, instrument, release, or other agreement or document issued, entered into, Filed or delivered in connection with the Plan, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to retrain any entity's interference with consummation or enforcement of the Plan;

(j)     Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(k)     Determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, exculpation, release, or other agreement or document issued, entered into, Filed, or delivered in connection with the Plan or the Confirmation Order including the Liquidation Trust Agreement;

(l)     Adjudicate Disputed Claims;

(m)     Determine matters concerning state, local, and federal taxes under Bankruptcy Code §§ 346, 505, and 1146, including any Disputed Claims for taxes;

(n)     Assist in recovering any asset of the Estate, wherever located;

(o)     Resolve any disputes regarding the Trust Assets; and

(p)     Issue a final decree and enter an order closing the Chapter 11 Case.

# Article 14 — Miscellaneous

**14.1.    Withdrawal or Revocation of the Plan**. The Proponents reserve the right to revoke or withdraw the Plan before the Effective Date. If the Proponents revoke or withdraw the Plan, the Plan is void.

**14.2.    Satisfaction of Claims**. The treatment of and consideration to be received by holders of Allowed Claims under the Plan fully satisfy, settle, and release those Allowed Claims.

**14.3.    Governing Law**. Except if the Bankruptcy Code or other federal law applies to any document entered into in connection with the Plan, the rights and duties of any Person

40

arising under the Plan are governed by, and construed and enforced in accordance with, the internal laws of the State of Arizona without regard for Arizona's choice of law provisions.

**14.4.   Notices.** Any notice required or permitted to be provided under the Plan must be in writing and served by certified return-receipt-requested U.S. mail, hand delivery, overnight courier, or read-receipt-enabled email. Any such notices to the Debtor should be addressed thus:

**Before the Effective Date**

if to Debtor:

    J. Henk Taylor
    Warner Angle Hallman Jackson & Formanek, PLC
    2555 E. Camelback Rd., Suite 800
    Phoenix, AZ 85016
    htaylor@warnerangle.com

if to the Committee:

    Jordan A. Kroop
    Pachulski Stang Ziehl & Jones LLP
    4530 E Shea Blvd., Suite 140
    Phoenix, AZ 85028
    jkroop@pszjlaw.com

**On and After the Effective Date**

    Legacy Cares Liquidation Trust
    c/o Jeremiah Foster
    Resolute Commercial Services
    6750 E Camelback Road, Suite 103
    Scottsdale, AZ 85251
    jfoster@resolutecommercial.com

If personally delivered or sent by overnight courier, notice is deemed delivered on actual receipt. If emailed, notice is deemed delivered on the noticing party's receipt of the read-receipt. If sent by U.S. mail, notice is deemed delivered as of the date of delivery indicated on the receipt issued by the postal service or, if the addressee fails or refuses to accept delivery, as of the date of that failure or refusal. Any party may change its address for the purposes of the Plan by Filing notice of the change.

**14.5.   Post-Effective Date Notice.** As of the Effective Date, only those on the Post-Effective Date Limited Notice List will be given notices of, and a right to object to, certain matters under the Plan. Any Person desiring to be included in the Post-Effective Date Limited Notice List must File a request to be included on the Post-Effective Date Limited Notice List and include its name, contact person, address, telephone number, and e-mail address within 30 days after the Effective Date. On or before 60 days after the Effective Date, the Liquidation Trustee must File the compiled Post-Effective Date Limited Notice List. The U.S. Trustee and UMB must be automatically included on the Post-Effective Date Limited Notice List and need not file a request.

**14.6.   Severability.** If the Bankruptcy Court or any appellate court finds the Plan or any provision of the Plan to be invalid or unenforceable, the Bankruptcy Court, at the Debtor's request, may retain the power to alter and interpret the Plan or any such provision to make

it valid or enforceable to the maximum extent feasible, consistent with the original purpose of the provision held to be invalid or unenforceable, and such provision then becomes applicable as altered or interpreted. The Confirmation Order constitutes a judicial determination and provides that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing sentence, is valid and enforceable.

**14.7.  Headings**. The headings used in the Plan are inserted for convenience only and neither constitutes a portion of the Plan nor in any manner affect the Plan's provisions.

**14.8.  Substantial Consummation.** Once the Effective Date has occurred and any payments under the Plan to any holder of a Claim have commenced, the Plan is substantially consummated within the meaning of Bankruptcy Code §§ 1101 and 1127(b).

**14.9.  Final Decree.** The Debtor may seek and obtain a final decree from the Bankruptcy Court as soon as feasible after any payments under the Plan have commenced. Notice of application for a final decree need be given only to those parties that, after the Effective Date, specifically request such notice in writing.

# Article 15 — Additional Disclosures

**15.1.  Voting Procedures and Requirements.** The Proponents are providing copies of this Plan and Ballots to all known holders of Impaired Claims entitled to Vote. Only Class 3 is Impaired and expected for Voting purposes to receive a Distribution, so only Class 3 Votes. (Classes 1 and 2 are Unimpaired and are deemed to accept the Plan without Voting. Class 4 is treated for Voting purposes as Impaired but neither receiving nor retaining any value under the Plan.) **Ballots will be accepted by the Claims and Noticing Agent as instructed on the Ballot.**

**15.2.  Alternatives to the Plan.** The Proponents believe that the Plan affords holders of Claims the greatest possible recovery under the circumstances and, therefore, is in their best interests. But if the Plan is not Confirmed, the theoretical alternatives include:

     (a)    **Continuation of the Chapter 11 Case.** The Debtor has insufficient funds and no ready source of additional financing to maintain business operations beyond the proposed Confirmation Date. Nothing is accomplished by continuing the Chapter 11 Case other than the needless incurrence of additional Administrative Claims, which would all but preclude recoveries for holders of Allowed Claims.

     (b)    **Alternative Plan.** It is theoretically possible to formulate an alternative to the Plan, but any differences between this Plan and such an alternative plan that could still be legally confirmable would be largely cosmetic and would come only after additional administrative expenses had been incurred, reducing or even eliminating recoveries to holders of Allowed Claims.

     (c)    **Liquidation Under Chapter 7.** If the Plan is not confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. As demonstrated

by the liquidation analysis included in this Plan above, recoveries to holders of Allowed Claims under a Chapter 7 liquidation would be materially lower than recoveries under the Plan. Such a liquidation would be disadvantageous to holders of Allowed Claims compared with the Plan.

(d) **Dismissal.** The Chapter 11 Case could be dismissed if the Plan were not confirmed. Among other things, dismissal would result in the termination of the automatic stay, permitting individual creditors to assert state law collection rights against the Debtor at the likely disadvantage to other less aggressive or speedy, yet similarly-situated, creditors. Given a chaotic race to assets that could result from a dismissal of the Chapter 11 Case, the likelihood that all holders of Allowed Claims would receive a ratable, fair distribution would be exceedingly low.

**15.3. Risk Factors.** All holders of Claims in Class 3 should read the following risk factors carefully, as well as all the information contained in this Plan, before deciding whether and how to Vote. The following risk factors should not be regarded as the only risks associated with the Plan and its implementation.

(a) **Non-Confirmation of the Plan.** Although the Proponents believe that the Plan satisfies all legal and factual requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that modification would not adversely affect holders of Allowed Claims, or that modification would not necessitate another solicitation of Votes.

(b) **Estimate Inaccuracies.** It is possible that one or more of the estimated dollar amounts set forth above or one or more of the factual assumptions used in the analyses above will prove materially incorrect. If so, estimated recoveries for holders of Allowed Claims could differ materially from those described in this Plan. Financial information contained in this Plan has not been audited. In preparing this Plan, the Proponents relied on financial data derived from the Debtor's books and records. Although the Proponents used reasonable business judgment to ensure the accuracy of the financial information provided in this Plan, and while the Proponents believe such financial information fairly reflects the Debtor's financial condition, the Proponents cannot warrant or represent that the financial information contained in this Plan is without inaccuracies.

(c) **Conditions.** The Plan contains certain conditions to the Effective Date. It is possible that circumstances arise that make those conditions impossible to satisfy and improvident to waive. If that occurs, the Plan could be Confirmed but may not become effective.

(d) **Causes of Action.** Given the size of the Superpriority Claim, the source of recovery for holders of Claims in Class 4 is likely to come solely from recovery on the Causes of Action. Although the Proponents believe that the Causes of Action are both meritorious and likely to generate significant recoveries, it is possible that the Proponents' assessment of the merit and value of the Causes of Action are inaccurate. It is also possible

that the Liquidation Trust will be required to engage the services of litigation counsel to pursue the Causes of Action on a contingency-fee basis and that the Liquidation Trustee may have difficulty engaging qualified counsel on that basis.

**15.4.    Disclosure Disclaimers.**

(a)    The information contained in this Plan is for purposes of soliciting Votes and may not be relied on for any other purpose.

(b)    This Plan was not filed with the SEC under federal or state securities laws. Neither the SEC nor any state regulatory authority has passed on the accuracy or adequacy of this Plan, or the exhibits or the statements contained in it, and any representation to the contrary is unlawful.

(c)    This Plan may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative or variations of such terminology or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, distribution projections, or other information contained in this Plan are estimates only, and the timing and amount of actual Distributions to holders of Allowed Claims may be affected by many unpredictable factors. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

(d)    This Plan is not legal, business, or tax advice to you. Each holder of a Claim should consult the holder's own legal counsel and accountant with regard to any legal, tax, and other matters concerning the holder's Claim.

(e)    The information and statements contained in this Plan constitutes neither an admission of any fact or liability by any entity (including the Debtor) nor evidence of the tax or other legal effects of the Plan on the Debtor, holders of Allowed Claims, or any other party in interest.

(f)    The Proponents have relied on information provided by the Debtor in connection with the preparation of this Plan. Although the Proponents have performed certain limited due diligence in connection with the preparation of this Plan, they have not independently verified the information contained in this Plan.

(g)    The Proponents make the statements contained in this Plan only as of the date at the end of this document, and the delivery of this Plan after that date does not imply that there has not been a change in the information set forth in this Plan since that date. While the Proponents used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan, the Proponents nonetheless cannot, and do not, confirm

4862-9523-0399.1 51998.002

the current accuracy of all statements appearing in this Plan. Further, although the Proponents may subsequently update the information in this Plan, the Proponents have no duty to do so unless the Bankruptcy Court so orders.

(h)     No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code other than those contained in this Plan. You should not rely on any representations or inducements made to secure your Vote other than those contained in this Plan.

# Article 16 — Federal Income Tax Consequences of the Plan

**16.1.   General Tax Considerations.**

(a)     The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan, is for general information purposes only, and should not be relied on for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of federal income taxation that may be relevant to a particular holder of a claim subject to special treatment under federal income tax laws (such as foreign taxpayers, broker dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans and other tax exempt investors), and does not discuss any aspects of state, local, or foreign tax laws. Furthermore, this summary does not address all of the federal income tax consequences that may be relevant to a holder of a Claim, such as the potential application of the alternative minimum tax.

(b)     This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), existing and proposed treasury regulations promulgated under the IRC, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses set forth below with respect to the federal income tax consequences of the plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the plan.

(c)     No ruling has been requested or obtained from the Internal Revenue Service (the "**IRS**") and no opinion of counsel has been sought or obtained with respect to any tax aspects of the Plan. No representations or assurances are being made to the holders of Claims with respect to the federal income tax consequences described below.

(d)     Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based on the individual circumstances pertaining to a particular holder of a claim or interest. Each holder of a claim or interest is strongly urged to consult with its own tax advisors regarding the federal, state, local, and other tax consequences of the Plan.

(e)  **Internal Revenue Service Circular 230 Disclosure:** To ensure compliance with requirements imposed by the IRS, any tax advice contained in this Plan (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the IRC. Tax advice contained in this Plan (including any attachments) is not written to support the promotion, marketing, or promotion of the transactions or matters addressed by the Plan. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

**16.2.  Certain Federal Income Tax Consequences to the Debtor.** Generally, a discharge or cancellation of a debt obligation by the Debtor for an amount less than the debt's adjusted issue price (in most cases, the amount the Debtors received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("**COD**") income, which must be included in the Debtor's income. But COD income is not includable in gross income if it occurs in a case of bankruptcy or to the extent of the Debtor's insolvency immediately before the COD income is recognized. The Debtor's COD income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor. COD income that is excluded from gross income will reduce certain attributes of the taxpayer, including net operating losses, capital loss carryovers, the tax basis of assets, and foreign tax credit carryforwards, in a specified order of priority beginning with net operating losses, unless a taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. In general, any reduction in tax attributes does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of any asset basis reduction, the first day of the taxable year following the tax year in which COD income occurs. **The preceding discussion generally does not apply to the Debtor, which is a 501(c)(3)-qualified, tax-exempt organization and is not liable for federal income tax.**

**16.3.  Certain Federal Income Tax Consequences to Holders of Claims.** The following discusses certain tax consequences of the transactions contemplated by the Plan to Holders that are "United States holders," as defined below. The tax consequences of the transactions contemplated by the Plan to holders (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for tax purposes; (2) the manner in which a holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for tax purposes. Holders, therefore, should consult their own tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan. For purposes of the following discussion, a "United States holder" is a holder that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States

federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

(a) **Gain or Loss Generally.** Each holder of a Claim may be permitted to recognize a loss or may be required to recognize gain on its distributions under the Plan. Generally, the loss or gain to be recognized by the holder of an Allowed Claim will equal the positive difference in the case of a loss (and negative difference in the case of a gain) between (1) the adjusted tax basis such holder has in its Claim (excluding any adjusted tax basis attributable to accrued but unpaid interest), and (2) the fair market value of the beneficial interest distributed (or deemed distributed) to the holder of the Claim (excluding any Cash or other property received or deemed received attributable to accrued interest). Depending on the manner in which the Claim arose, applicability of the market discount rules and other factors, such loss or gain may be capital or ordinary in nature. Due to limitations in the IRC, a holder of an Allowed Claim that recognizes a capital loss relating to its Claim may not be able to use such capital loss in the taxable year it arises or ever. Although many holders of Claims will not be required to recognize gain or income as a result of the property distributions (including Cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist that will require a holder of a Claim to do so. For example, if a Claim relates to a transaction under which the holder is required to recognize gain on payment (for example, an installment sale), the holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan. Moreover, if (1) a holder of a Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Claim, and (2) the fair market value of the property (including Cash) it receives or is deemed to receive for its Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Claim, such holder will be required to recognize gain or income. Similarly, a holder of a Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such holder's adjusted tax basis in the Claim. There are several other reasons why a holder of a Claim may be required to recognize gain or income as a result of the actual or deemed distributions made to it under the Plan. Therefore, each holder of a Claim should consult its own tax advisor to determine the tax consequences of the receipt of or deemed receipt of property (including Cash) under the Plan.

(b) **Accrued but Untaxed Interest.** To the extent that any amount received under the Plan by a holder is attributable to accrued but untaxed interest, such amount should be taxable to the holder as ordinary interest income, if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, a holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the holder's gross income but was not paid in full by the Debtors. The extent to which amounts received by a holder will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed

Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. But the IRS could take the position that the consideration received by a holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(c) **Market Discount.** Holders who exchange Claims for Cash or other property may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims. In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, on original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. But a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a holder has not previously included market discount in its taxable income, gain recognized by a holder on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a holder that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the holder's period of ownership.

(d) **Original Issue Discount.** The original issue discount ("**OID**") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each holder must consult its own tax advisor.

(e) **Holders of Disputed Claims.** Distributions deemed issued to a holder of a Claim on consummation of the Plan will not include any distribution held in reserve for holders of Disputed Claims. As a result, in determining the amount of loss or gain recognized by a holder of a Claim on consummation of the Plan, the holder will not be

4862-9523-0399.1 51998.002

treated as receiving any property attributable to the assets that are held by or for the benefit of holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the holders of a Claim will be treated as receiving additional consideration in respect of their Claim at that time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a holder of a Claim on consummation of the Plan should be determined by disregarding the Disputed Claims and treating any distribution held in reserve for holders of Disputed Claims as proportionately distributed to the holders of Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Claims should consult with their tax advisors as to the proper amount of consideration deemed received on consummation of the Plan. Holders of Disputed Claims will not be treated as receiving any consideration in respect of their Claims on consummation of the Plan. On the allowance of a Disputed Claim, the holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of Cash distributed to the holder at such time plus the fair market value of any property distributed to such holder. On the disallowance of a Disputed Claim, the distribution attributable to such Disputed Claim will be canceled and the Cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, holders will likely be treated as having received additional consideration in satisfaction of their Claims equal to their proportional shares of (i) the Cash released from the reserve, less (ii) the fair market value of the cancelled distributions. If the Disputed Claim becomes disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to holders' Claim on consummation of the Plan and would possess the same character (i.e., capital or ordinary) as the gain or loss recognized on consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on disallowance of the Disputed Claim will be treated as gain with the same character (i.e., capital or ordinary) as the gain or loss recognized on consummation of the Plan. Holders of a Claim would increase the tax bases in their distribution by the additional amounts deemed received on the disallowance of a Disputed Claim. Similarly, in the event that undeliverable Distributions are redistributed to other claimants entitled to Distribution, such recipients will likely be subject to comparable tax treatment as discussed in this paragraph.

(f)     **Reinstatement of Claims.** Holders of Claims generally should not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a substantial modification of the Claim.

(g)     **Bad Debt and Worthless Securities Deduction.** A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section

4862-9523-0399.1 51998.002

165(g) of the IRC. The rules governing the character timing and amount of bad debt and/or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

(h) **Information Reporting and Backup Withholding.** Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made under the Plan unless that holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

(i) **Importance of Obtaining Professional Tax Assistance.** *The foregoing discussion is intended only as a summary of certain income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a claim holder's particular circumstances. Accordingly, claim holders are urged to consult their tax advisors about the United States federal, state, local, and applicable foreign income and other tax consequences of the Plan.*

**16.4. Reservation of Rights.** This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtor reserves the right to further modify or supplement this Article 16 and the other tax-related sections of the Plan before the date by which objections to Confirmation of the Plan must be filed and served.

**<span style="color:red">The Proponents believe that Confirmation is in the best interests of all holders of Claims.</span>**

4862-9523-0399.1 51998.002

May 17, 2024

Respectfully submitted,

Legacy Cares, Inc., Debtor

By: _/s/ Keith Bierman_
      Keith Bierman
      Chief Restructuring Officer

Official Committee of Unsecured Creditors

By: _/s/ Marie-France Nantel_
      Marie-France Nantel
      Chair

UMB Bank, N.A., as bond trustee

By: _/s/ Michael G. Slade_
      Michael G. Slade
      Senior Vice President

1              **EXHIBIT A**

2          **Liquidation Trust Agreement**

# LIQUIDATION TRUST AGREEMENT AND DECLARATION OF TRUST

This Liquidation Trust Agreement and Declaration of Trust (this "**Agreement**"), dated as of July 1, 2024, is made by Legacy Cares, Inc. ("**Debtor**") and Jeremiah Foster ("**Trustee**"). The Debtor and the Trustee are, together, the "**Parties**" and each is a "**Party**."

## RECITALS

1. On May 1, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Arizona ("**Bankruptcy Court**"), commencing Case No. 2:23-bk-02832-DPC (the "**Chapter 11 Case**"). On May 15, 2023, the U.S. Trustee appointed the Official Committee of Unsecured Creditors ("**Committee**").

2. On May 1, 2024, the Debtor, the Committee, and UMB Bank, N.A. as bond trustee (collectively, "**Proponents**") filed the *Combined Disclosure Statement and Plan of Liquidation* ("**Plan**"), which the Bankruptcy Court confirmed under Bankruptcy Code § 1129 by order dated June 21, 2024 ("**Confirmation Order**"). The Plan becomes effective on the Effective Date.

3. The Plan provides for the establishment of the Liquidation Trust ("**Trust**") on the Effective Date for (a) the benefit of holders of Allowed General Unsecured Claims and the Bondholders on account of their Superpriority Claim, (b) the purpose of enabling the Liquidation Trustee as a bankruptcy trustee to litigate Causes of Action, and (c) liquidating the Trust Assets, reconciling Disputed General Unsecured Claims, and distributing the proceeds of the Trust Assets to the Beneficiaries under the Plan and this Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent necessary and consistent with the liquidating purpose of the Trust. The Trust is intended to qualify as a liquidating trust under Treasury Regulation § 301.7701-4(d).

4. For all United States federal income tax purposes, the transfer of the Trust Assets to the Trust for the Beneficiaries' benefit, including any amounts or other assets subsequently transferred to the Trust (but only when actually transferred) constitutes (a) a transfer of the Trust Assets (subject to any obligations relating to them) to the Beneficiaries followed by (b) the transfer by the Beneficiaries of the Trust Assets to the Trust in exchange for the Beneficiaries' beneficial interests in the Trust. Accordingly, the Beneficiaries must be treated for United States federal income tax purposes (and for applicable United States state and local income tax purposes) as the grantors and owners of their respective shares of the Trust Assets.

5. The Trust is intended under Bankruptcy Code § 1145 to be exempt from the requirements of the Securities Exchange Act of 1933, as amended, the Investment Company Act of 1940, as amended, and any applicable state and local laws requiring registration of securities.

Under the Plan and the Confirmation Order, and in consideration of the Parties' agreements contained in the Plan and this Agreement and other received consideration, the Parties agree thus:

# DECLARATION OF TRUST

The Debtor and the Trustee enter into this Agreement to effect the distribution of the Trust Assets to the Beneficiaries under the Plan;

Under the Plan and Section 2.3.2 below, on the Effective Date, all Trust Assets automatically transfer to and vest in the Trust free and clear of all Claims, Liens, Interests, encumbrances, and contractually imposed restrictions except as otherwise provided in the Plan;

For the Trustee and its successors in trust TO HAVE AND TO HOLD; and

The Trust Assets are to be held by the Trust and applied on behalf of the Trust by the Trustee (such Trustee to be a "United States person" within the meaning of Internal Revenue Code § 7701(a)(30)) on the terms and conditions set forth in this Agreement and the Plan, for the Beneficiaries' sole benefit and for no other party.

## Article I — DEFINITIONS AND CONSTRUCTION

1.1     **Definitions.** All terms used but not defined in this Agreement retain the meanings given to them in the Plan.

1.2     **Conflict Among Plan Documents.** The Confirmation Order controls with respect to any inconsistency between the Confirmation Order and this Agreement. This Agreement controls with respect to any inconsistency between the Plan and this Agreement.

1.3     **Rules of Construction.** "Including" means "including without limitation." "Or" is not exclusive, such that "A or B" should be read as "A or B, or both."

## Article II — ESTABLISHMENT OF TRUST

2.1     **Effectiveness of Agreement; Name of Trust.** The Debtor and the Trustee, under the Plan and the Bankruptcy Code, create the Trust effective on the Effective Date. The Trust is called the "Legacy Cares Liquidation Trust."

2.2     **Purpose of Trust.** The Trust is established for the primary purpose of collecting, holding, administering, distributing, and liquidating the Trust Assets for the Beneficiaries' benefit under this Agreement and the Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Trust's liquidating purpose (the "**Purpose**").

2.3     **Transfer of Trust Assets.**

2.3.1     **Transfer.** Under the Plan and on the Beneficiaries' behalf to establish the Trust, the Debtor irrevocably transfers its rights to litigation the Causes of Action, its rights to proceeds of any insurance policy, and its title to and interests in all other Trust Assets to the Trust as of the Effective Date in trust for the Beneficiaries' benefit to be litigated and administered as specified in this Agreement and the Plan. On the Effective Date, the Debtor must execute and deliver any documents (in recordable form when necessary or appropriate) and take any action the

Trustee reasonably deems necessary or appropriate to vest title to and possession of the Trust Assets in the Trust. The Trustee has no duty to arrange for any such transfer or to ensure the transfer's compliance with the Plan and the Confirmation Order. The Trustee may conclusively rely on the legality and validity of all transfers.

2.3.2 **Title to Trust Assets.** The Trust takes all title to and interest in the Trust Assets free and clear of all Liens, Claims, encumbrances, Interests, contractually imposed restrictions, and other interests, except as specifically provided in the Plan. The Trust may, among other things, to obtain possession or control of, liquidate, and collect all Trust Assets in the possession or control of third parties, pursue, settle, or sell the Avoidance Actions and the Causes of Action, and exercise any rights of setoff and recoupment and defenses of the Debtor or the Estate may have had immediately before the Effective Date. Without limiting the generality of the foregoing, the Trust may invoke Bankruptcy Code § 542 to pursue turnover of Trust Assets. On the Effective Date, the Trust is substituted for the Debtor for all purposes with respect to the Trust Assets. To the extent any law or regulation not superseded by the Bankruptcy Code prohibits the transfer of ownership of any Trust Asset to the Trust, the Trust's interest in those Trust Assets constitutes a Lien on the Trust Assets, in trust for the sole use and purposes set forth in this Agreement, with this Agreement serving as a security agreement granting the Lien without need to filing financing statements, mortgages, or deeds of trust. By executing this Agreement, the Trustee accepts all Trust Assets to be held in trust for the Beneficiaries subject to this Agreement and the Plan.

2.4 **Capacity of Trust.** Notwithstanding any state or federal law or anything in this Agreement to the contrary, the Trust itself has the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts. The Trust may alone be the named movant, respondent, party plaintiff or party defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against the Trust, and may settle and compromise all matters in its own name.

2.5 **Cooperation of the Debtor.** The Debtor must, for the duration of its existence, continue to use commercially reasonable efforts to cooperate with the Trust and the Trustee and their professionals in effecting the transition of the administration of the Trust Assets from the Debtor to the Trust, including to identify (a) any evidence and information the Trustee reasonably requests in connection with the Trust's investigation, prosecution, other pursuit, or defense of the Avoidance Actions and Causes of Action and objections to Disputed Claims and (b) former employees and Professionals of the Debtor (by providing all reasonably available contact information) with knowledge regarding the Avoidance Actions, the Causes of Action, or Disputed Claims. The Debtor must arrange for the Trustee to receive an updated claims register of General Unsecured Claims within 30 days after the Effective Date.

2.6 **No Retention of Excess Cash.** Notwithstanding anything in this Agreement to the contrary, the Trust may not retain cash or cash equivalents in excess of a reasonable amount needed to satisfy Claims, expenses, and contingent liabilities or to maintain the value of the Trust Assets during liquidation other than reserves established under the Plan or this Agreement. The Trust must distribute all amounts not required to be retained for those purposes and not otherwise required to be distributed to the Beneficiaries as promptly as reasonably practicable.

2.7     **Acceptance by Trustee.** The Trustee accepts its appointment as Trustee.

### Article III — ADMINISTRATION

3.1     **Trustee's Rights and Powers.** Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the Effective Date, the Trustee may control and exercise authority over the Trust Assets, over the acquisition, management, and disposition of the Trust Assets, and over the management and conduct of the affairs of the Trust in accordance with the Plan and this Agreement. In administering the Trust Assets, the Trustee must, as expeditiously as commercially reasonable, liquidate and convert to Cash the Trust Assets, make timely Distributions in accordance with this Agreement and the Plan, and exercise reasonable business judgment to avoid unduly prolonging the Trust's duration. The Trustee must always act consistently with, and not contrary to, the Purpose.

3.2     **Power to Contract.** To further the Purpose, and except as otherwise specifically restricted in the Plan, the Confirmation Order, or this Agreement, the Trustee may cause the Trust to enter into any covenants or agreements binding the Trust and to execute, acknowledge, and deliver any instruments necessary or deemed by the Trustee to be consistent with and advisable in furthering the Purpose.

3.3     **Advice of Counsel.** Nothing in this Agreement prevents the Trustee from taking or refraining to take any action on behalf of the Trust that, based on the advice of counsel or other professionals, the Trustee determines it is obligated to take or to refrain from taking in the performance of any duty that the Trustee may owe the Beneficiaries under the Plan, the Confirmation Order, or this Agreement.

3.4     **Specific Powers.** Without limiting the generality of Section 3.1 above and in addition to the powers granted in the Plan, the Trustee has the power to take the following actions on the Trust's and any reasonably related actions that the Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the Purpose:

3.4.1     Hold legal title to the Trust Assets and any rights of Debtor or the Beneficiaries in or arising from the Trust Assets;

3.4.2     Receive, maintain, conserve, supervise, prosecute, collect, settle, manage, adjust, invest, protect, enforce, and, where appropriate, abandon the Trust Assets, including causing the Trust to invest any moneys held as Trust Assets in accordance with Section 3.8 below;

3.4.3     Open and maintain bank accounts in the Trust's name;

3.4.4     Cause the Trust to enter into and perform under any agreement or execute any document required by or consistent with the Plan, the Confirmation Order, or this Agreement;

3.4.5     Collect and liquidate all Trust Assets;

3.4.6     Protect and enforce the rights to the Trust Assets (including the Avoidance Claims and the litigation of Causes of Action by the Liquidation Trustee acting as a bankruptcy trustee) by any method the Trustee deems appropriate, including by judicial proceedings;

3.4.7    Investigate any Trust Assets including the Avoidance Actions and Causes of Action, review, reconcile, compromise, settle, or object to Claims, and cause the Trust to seek the examination of any Person under applicable rules of procedure, including Federal Rule of Bankruptcy Procedure 2004;

3.4.8    Cause the Trust to employ and reasonably compensate professionals, agents, independent contractors, and third parties as necessary to fulfill the Trustee's obligations under this Agreement;

3.4.9    Cause the Trust to pay all of its lawful expenses, debts, taxes, and other liabilities, and make all other payments relating to the Trust Assets, solely out of the Trust Assets;

3.4.10  Review, reconcile, prosecute, enforce, collect, compromise, settle, abandon, or elect not to pursue all Disputed General Unsecured Claims, Avoidance Actions, and Causes of Action;

3.4.11  Calculate, authorize, and make all Distributions to the Beneficiaries as provided for in the Plan and this Agreement;

3.4.12  Establish, adjust, and maintain the Administrative Claims Reserve, the Fee Claim Reserve, the Priority Claim Reserve, and the Trust Expense Reserve;

3.4.13  Withhold from any Distribution the maximum amount needed to pay any tax, garnishment, or other charge that the Trustee has determined, based on the advice of its professionals, must be withheld under applicable laws of the United States or of any state or state political subdivision;

3.4.14  Review and, where appropriate, allow or object to General Unsecured Claims, and supervise and administer the Trust's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed General Unsecured Claims;

3.4.15  Beginning with the official Claims register maintained in the Chapter 11 Case, create and maintain a register evidencing the Beneficiaries' interests in the Trust;

3.4.16  File tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Trust, and file tax returns for the Trust as a grantor trust under Internal Revenue Code § 671 and Treasury Regulation § 1.671-4 under the Plan and Article VII below, and pay any taxes payable by the Trust (except that nothing in this Agreement or the Plan requires the Trustee or vests the Trustee with authority to file any tax returns for the Debtor);

3.4.17  Abandon or donate to a charitable organization that qualifies for tax-exempt status under Internal Revenue Code § 501(c)(3) any Trust Assets the Trustee determines to be too impractical to distribute to the Beneficiaries or of inconsequential value to the Trust and the Beneficiaries;

3.4.18  Send to the Beneficiaries for purposes of income tax reporting, in accordance with applicable tax laws, annual statements stating each Beneficiary's interest in the Trust and its share of the Trust's income, gain, loss, deduction, or credit;

3.4.19 Seek a determination of tax liability or refund of the Trust under Bankruptcy Code § 505;

3.4.20 Purchase and carry all insurance policies the Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs from Trust Assets;

3.4.21 Undertake all administrative functions of the Trust, including overseeing the winding down and termination of the Trust; and

3.4.22 Take all other actions not inconsistent with the Plan the Trustee deems necessary or desirable to administer the Trust.

3.5 **Avoidance Actions and Causes of Action.** The Trust has the exclusive power to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue any Avoidance Action or any Cause of Action. The Trust is the Estate's sole representative under Bankruptcy Code § 1123(b)(3) with respect to the Avoidance Actions and the Causes of Action.

3.6 **Administering Claims.** After the Effective Date, the Trust is responsible for administering and paying Distributions to the holders of Allowed Claims, including Administrative Claims and General Unsecured Claims. The Trust has the exclusive right to object to the allowance of any such Claim on any ground, to file, withdraw, or litigate to judgment those objections, to settle or compromise any Disputed Claim, to assert all defenses owned by the Estate, and to assert all of the Estate's rights under Bankruptcy Code § 558 and to seek estimation of any Claims under Bankruptcy Code § 502(c). Objections to Claims may be litigated to judgment or withdrawn and may be settled with the approval of the Bankruptcy Court, except if such approval is not necessary as provided in this section. The Trustee may settle any Disputed Claim where the asserted amount of the Disputed Claim is $100,000 or less, without providing any notice to any party-in-interest or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims asserted in an amount exceeding $100,000 are subject to the Bankruptcy Court's approval under the following procedure: (a) the Trustee must give notice of the proposed settlement to the Post-Effective Date Limited Notice List; (b) parties have 21 days to File objections to the proposed settlement; (c) if no objections are timely Filed, the Trustee may consummate the settlement without further order of the Bankruptcy Court or may, at the Trustee's election, request entry of an order approving the proposed settlement by Filing a proposed order under a counsel certificate of no objection with no further notice to any party; and (d) if objections are timely Filed, the Trustee must notice the proposed settlement for hearing on at least five Business Days' notice.

3.7 **Agents and Professionals.** The Trustee may, but is not required to, consult with and employ attorneys, financial advisors, accountants, appraisers, and other professionals (including the Trustee's own firm or affiliates) the Trustee believes have qualifications necessary to assist in the administration of the Trust, including professionals previously employed by the Debtor or the Committee. The Trustee may pay the reasonable fees of such agents and professionals from the Trust Assets in the ordinary course of business without application to, or approval by, the Bankruptcy Court.

3.8     **Safekeeping and Investment of Trust Assets.** All moneys and other Trust Assets received by the Trustee, until distributed under this Agreement or the Plan, must be held in trust for the Beneficiaries' benefit in one or more accounts in the Trustee's discretion. Neither the Trust nor the Trustee has any liability for interest or producing income on any moneys held for distribution except interest actually received by the Trust, which must be distributed as provided in the Plan or this Agreement. The Trustee may only invest Trust Assets in investments that a "liquidating trust," within the meaning of Treasury Regulation § 3.01.7701-4(d), may be permitted to hold. Bankruptcy Code § 345 does not apply to any investments of Trust Assets.

3.9     **Maintenance and Disposition of Records.** The Trustee must maintain accurate records of the administration of the Trust Assets, including receipts and disbursements and other activity of the Trust. The Trust may, but has no obligation to, engage a claims agent (including the Debtor's claims agent) to continue maintaining and updating the Claims register maintained in the Chapter 11 Case throughout the administration of the Trust. The books and records maintained by the Trustee and any records of the Debtor transferred to the Trust may be disposed of by the Trustee when the Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Trust and the termination Trust, whichever is later.

3.10    **No Bond Required.** Notwithstanding any applicable law to the contrary, the Trustee is exempt from giving any bond or other security in any jurisdiction and serves without bond.

3.11    **Fiduciary and Other Duties.** Notwithstanding anything in the Plan or this Agreement to the contrary, the Trustee must always act in the Beneficiaries' best interests and in furtherance of the Purpose. The Trustee owes the fiduciary duties to the Beneficiaries consistent with the fiduciary duties that a member of an official committee appointed under Bankruptcy Code § 1102 has to its constituents and must exercise all its responsibilities accordingly. Except for obligations this Agreement expressly imposes on the Trustee, any duties imposed on the Trustee under law or in equity to the Beneficiaries or to any other person party to this Agreement are waived to the fullest extent permitted by applicable law. This Agreement does not waive the implied contractual covenant of good faith and fair dealing.

## Article IV — Distributions and Reserves

4.1     **Distribution and Reserve of Trust Assets.** All Distributions are subject to the reserves required under the Plan or otherwise deemed necessary by the Trustee.

4.1.1   **Distributions.** The Trustee may make Distributions only in accordance with the Plan, the Confirmation Order, and this Agreement to the Beneficiaries. The Trustee must cause the Trust to make Distributions at least annually except that the Trustee may retain sufficient Trust Assets in applicable reserves set forth below. The Trustee need not maintain any of the Trust's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Trust but must treat all such reserved funds as being held in a segregated manner in the Trust's books and records.

4.1.2 **Trust Expense Reserve.** As soon as practicable after the Effective Date, and before any Distributions are made, the Trustee must, in its reasonable discretion, establish, supplement, and maintain the Trust Expense Reserve containing Cash sufficient to pay all to pay all expenses expected to be reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets pending their liquidation during the term of the Trust or that are determined to be necessary to pay or be reserved for in the Trustee's reasonable discretion. When the Liquidation Trust terminates, the Liquidation Trustee must distribute any balance remaining in the Trust Expense Reserve to the Beneficiaries in accordance with this Agreement.

4.1.3 **Disputed Claims Reserve.** The Trust may also maintain as necessary a reserve with respect to Disputed General Unsecured Claims in the Maximum Amount such that the Trustee may withhold any Distribution pending the Trust's determination of whether to object to any General Unsecured Claim. Any such withheld Distribution becomes part of a Disputed Claims Reserve be distributed to the appropriate Holder of an Allowed General Unsecured Claim no later than the first Distribution Date after a decision is made not to object to the Claim or the Claim becomes Allowed.

4.1.4 **Distributions Net of Reserves and Costs.** Distributions must be made net of reserves and the actual and reasonable costs of making Distributions. The Trustee may sell or otherwise dispose of Trust Assets to pay such costs.

4.1.5 **Right to Rely on Professionals.** In determining the amount of any Distribution or reserves, the Trustee may rely on the advice and opinion of the Trust's financial advisors, accountants, or other professionals.

4.2 **Priority of Distributions.** The common beneficial interests held by holders of Allowed General Unsecured Claims identified in Section 5.1.2 below are fully subordinated to, and not entitled to Distributions before Distributions equaling the amount of the Superpriority Claim are made to, the Bondholders as the holders of the preferred beneficial interests identified in Section 5.1.1 below. The Trustee must cause the Trust to Distribute any proceeds of Trust Assets available for Distribution to Beneficiaries first to the Bondholders as the holders of the preferred beneficial interests until the Bondholders have received Distributions equaling the amount of the Superpriority Claim and, only then, second to all holders of common beneficial interests Pro Rata.

4.3 **IRS Forms.** As a condition to receiving any Distribution under the Plan, each holder of an Allowed Claim entitled to a Distribution must, if the Trustee requests it, provide an executed IRS Form W-9 or other similar documentation. Any holder of an Allowed Claim that fails to do so within 30 days of the Trustee's request forfeits all rights to all Distributions.

4.4 **Forfeited, Unclaimed, and Undeliverable Distributions.** Forfeited Distributions become Trust Assets to be redistributed to Beneficiaries under this Agreement. The Trustee must hold all unclaimed Distributions and Distributions returned as undeliverable in an "**Unclaimed Property Reserve**" for 90 days and may be released before the 90-day period expires if the intended recipient of the Distribution presents to the Trustee reasonable proof of entitlement to the Distribution. After the 90 days expires, all unclaimed property reverts to the Trust for redistribution to Beneficiaries under this Agreement and the beneficial interest of the non-claiming Beneficiary is cancelled and discharged such that the Beneficiary forfeits any future right to any Distribution

from the Trust. The Liquidation Trustee is not required to attempt to locate any holder of an Allowed Claim.

4.5     **Inapplicability of Escheat or Unclaimed Property Laws.** Unclaimed property held by the Trust is not subject to the laws of the United States, or any state, provincial, or local governmental units pertaining to escheat or abandoned or unclaimed property.

4.6     **Request for Reissuance.** Unless a Beneficiary and the Trustee otherwise agree, all Distributions are made by check drawn on a domestic bank or by wire transfer from a domestic bank. Distributions will be made: (a) to the address set forth on the Beneficiary's proof of claim, the SOAL, or, in the absence of either, the Beneficiary's last known address; or (b) to the address set forth in any written notice of address change delivered to the Trustee or its counsel. Distribution checks are void if not negotiated within 90 days after issuance. Funds reflected on Distribution checks not cashed within 90 days are unclaimed property to be held in the Unclaimed Property Reserve. Requests for reissuance of any check must be made in writing directly to the Trustee by the original payee. A Beneficiary bears all the risk that, and must indemnify and hold the Trust and the Trustee harmless against any loss that may arise if, the Trustee does not reissue a check promptly after receiving a request for reissuance.

4.7     **Conflicting Claims.** If any conflicting claims or demands are made or asserted with respect to a Beneficiary's interest in the Trust, or if there is a disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made, the Trustee may, in its sole discretion, refuse to comply with any such conflicting claims or demands.

    4.7.1   The Trustee may elect to cause the Trust to make no Distribution with respect to the conflicting claim or demand and refer such conflicting claim or demands to the Bankruptcy Court, which retains jurisdiction under the Plan and the Confirmation Order to resolve such conflicting claims or demands. Neither the Trust nor the Trustee may be liable to any party for the Trustee's refusal to comply with any such conflicting claims or demands, nor may the Trust or Trustee be liable for interest on any funds so withheld.

    4.7.2   The Trustee may refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or (b) all differences have been resolved by a valid written agreement among all such parties that satisfies the Trustee and provides a complete release of the Trust and Trustee. Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem the holder of the disputed beneficial interest to be the Beneficiary identified as the owner of that interest in the Trust's books and records for all purposes.

4.8     **Priority of Expenses of Trust.** The Trust must pay or reserve for all necessary expenses before making any Distributions. All Beneficiaries' entitlement to Distributions are subject and subordinated to all such expenses.

## Article V — Beneficiaries

5.1    **Classes of Beneficial Interests.** The Trust has two classes of beneficial interest:

5.1.1    **Preferred Beneficial Interest.** On account of its Superpriority Claim allowed under the Plan, the Bondholders hold Pro Rata a beneficial interests entitled to preferential Distributions as described in Section 4.2 above. The Bondholders are the only holders of such Preferred Beneficial Interests.

5.1.2    **Common Beneficial Interest.** All holders of Allowed General Unsecured Claims under the Plan hold a common beneficial interest entitled to Distributions as described in Section 4.2 above only after the Preferred Beneficial Interests receives Distributions in full satisfaction of the Superpriority Claim.

5.2    **Interest Beneficial Only.** The ownership of a beneficial interest in the Trust does not entitle any Beneficiary or the Debtor to any title in or to the Trust Assets or to any right to call for a partition or division of such assets.

5.3    **Evidence of Beneficial Interest.** Ownership of a beneficial interest in the Trust is not evidenced by any certificate, security, receipt, or any other form and is solely recorded and maintained on the Trust's books and records.

5.4    **No Right to Accounting.** Except as expressly provided in this Agreement, neither a Beneficiary nor its successors, assignees, creditors, or any other Person claiming a right through a Beneficiary (a "**Derivative**") has any right to demand or receive an accounting from the Trustee and the Trustee is not obligated to provide any accounting to any Beneficiary or Derivative. Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition of making any advance, payment, or Distribution out of proceeds of Trust Assets.

5.5    **No Standing.** Except as expressly provided in this Agreement, neither a Beneficiary nor a Derivative has standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person with respect to the Trust Assets. This section does not prevent a Beneficiary from seeking any appropriate or necessary relief from the Bankruptcy Court.

5.6    **Requirement of Undertaking.** The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or not taken in its capacity as Trustee, the filing by any party to the suit an undertaking to pay the costs of the suit, including reasonable attorney fees, against any other party to the suit. The provisions of this section no not apply to any suit brought by the Trustee.

5.7    **Limitation on Transferability.** Beneficial interests in the Trust are non-transferable and non-assignable during the term of this Agreement except by operation of applicable law. An assignment by operation of applicable law is not effective unless and until appropriate notification and proof of the assignment is submitted to the Trustee. Until such

submission, the Trustee may continue to cause the Trust to pay to the assigning Beneficiary all amounts to or for the benefit of the assigning Beneficiary. The Trustee may rely on the submission without verification or further investigation.

5.8    **Exemption from Registration.** The beneficial interests in the Trust may be deemed "securities" under applicable law. But beneficial interests have not been defined as "securities" under the Plan because (a) the Proponents intend that beneficial interest not be deemed securities and (b) if the beneficial interests are deemed to be "securities," the exemption from registration under Bankruptcy Code § 1145 is intended to apply to such securities. No party to this Agreement may contend otherwise.

5.9    **Limited Liability.** No provision of this Agreement, the Plan, or the Confirmation Order, and no mere enumeration of the rights or privileges of any Beneficiary gives rise to any liability of a Beneficiary solely in its capacity as such, whether such liability is asserted by the Debtor, creditors, successors, representatives, employees, or equity interest holders of any Debtor, or by any other person. Beneficiaries are deemed to receive the Trust Assets in accordance with this Agreement, the Plan, and the Confirmation Order in exchange for their Allowed Claims as set forth in the Plan without any further obligation or liability but subject to this Agreement.

## Article VI — Limits on Liability

6.1    **Dealings With Trustee.** In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee may rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Trust Assets. No Person dealing with the Trustee may inquire into the validity or expediency or propriety of any transaction by the Trustee or any agent of the Trustee.

6.2    **Limitation of Trustee Liability.** In exercising its rights granted in this Agreement, the Trustee must exercise its best judgment in accordance with its fiduciary duties to properly manage the Trust's affairs and safeguard the interests of all Beneficiaries. Despite anything in this Agreement to the contrary, neither the Trustee nor any of its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, or agents, and any of their successors and assigns, incurs any liability by reason of any error of law or fact or of anything done or not done in connection with this Agreement, whether in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct found by a Final Order of the Bankruptcy Court to be the direct and primary cause of loss, liability, damage, or expense suffered by the Trust. The Trustee may not be liable for indirect, punitive, special, incidental, or consequential damages (including lost profits) regardless of the form of action. In addition to the foregoing, the Trustee is entitled to the benefits of the limitation of liability and exculpation provisions in the Plan and the Confirmation Order.

6.3    **No Liability for Acts of Other Persons.** No Person identified in Section 6.2 above may be liable for any act or omission of any other such Person.

6.4    **No Liability for Acts of Predecessors.** No successor Trustee may be liable for the acts or omissions of any Trustee in office before the date on which such successor becomes the Trustee unless a successor Trustee assumes liability expressly and in writing.

6.5     **No Liability for Good Faith Error of Judgment.** The Trustee may not be liable for any error of judgment made in good faith, unless the Bankruptcy Court determines by Final Order that the Trustee was grossly negligent.

6.6     **Reliance by Trustee on Documents and Advice of Counsel.** Except as otherwise provided in this Agreement, the Trustee may rely, and is protected in acting, on any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other document believed by the Trustee to be genuine and to have been signed or presented by the proper party. The Trustee also may engage and consult with legal counsel and other agents and advisors and may not be liable for any action taken or not taken in good faith reliance on the advice of such counsel, agents, or advisors to the extent permitted by applicable law.

6.7     **No Liability For Acts Approved by Bankruptcy Court.** The Trustee may seek an order at any time from the Bankruptcy Court concerning the Trust's administration. The Trustee may not be liable for any act expressly taken or not taken in accordance with, and not inconsistent with, any Bankruptcy Court order. No such acts taken or not taken constitute fraud, gross negligence, or willful misconduct.

6.8     **No Personal Obligation for Trust Liabilities.** Persons dealing with the Trustee have recourse only to the Trust Assets to satisfy any liability the Trustee incurs to any such Person in carrying out this Agreement. The Trustee has no personal, individual obligation to satisfy any such liability.

6.9     **Indemnification.** The Trust, solely from the Trust Assets, must indemnify, defend, and hold harmless the Trustee and each of its accountants, agents, assignee, attorneys, consultants, directors, employees, executors, financial advisors, managers, members, officers, partners, predecessors, principals, professionals, the employees of the Trust, and their respective principals agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, affiliates, employers, and successors and principals (each, an "**Indemnified Party**") against any loss, liability, claim, damage, judgment, fine, penalty, demand, settlement, or expense occurring after the Effective Date (including reasonable attorney fees and expenses the Indemnified Party may incur in connection with invoking the indemnification in this section ("**Indemnity**")) for any act taken or not taken on the Trustee's behalf in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or this Agreement, if the Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Trust and the Beneficiaries. The Trust may not be liable to indemnify any Indemnified Party for any act or omission arising out of the Indemnified Party's gross negligence, fraud, or willful misconduct as determined by a Final Order of the Bankruptcy Court. An Indemnified Party may obtain advances from the Trust to cover reasonable expenses of defending itself in any action brought against it as a result of the Indemnified Party's actual or alleged acts taken or not taken in its capacity as such, except for any actions taken or not taken out of willful misconduct, fraud, or gross negligence. An Indemnified Party receiving such an advance must repay the advanced amounts to the Trust immediately on the entry of a final, non-appealable judgment or order finding that the Indemnified Party was not entitled to Indemnity. All Indemnity liabilities constitute Trust expenses that must be paid solely out of available Trust Assets after reserving for all actual and anticipated Trust expenses and liabilities. The Trustee is

not personally liable for the payment of any Trust liability and no Person may look to the Trustee or an Indemnified Party personally for the payment of any Trust liability.

6.10    **Survival of Provisions.** The provisions of this Article VI survive the Trustee's death, dissolution, liquidation, incapacity, resignation, replacement, or removal or, as it relates to an Indemnified Party, the termination of the Trust or this Agreement, and inure to the benefit of the Trustee's and the Indemnified Parties' successors and assignees.

## Article VII — Tax Matters

7.1    **Tax Treatment of Trust.** For all United States federal income tax purposes, the Debtor, the Beneficiaries, the Trustee, and the Trust must treat: (a) the Trust as a "liquidating trust" within the meaning of Treasury Regulation § 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124; (b) the transfer of the Trust Assets to the Trust as a transfer of the Trust Assets (subject to any obligations relating to the Trust Assets) by the Debtor to the Beneficiaries in satisfaction of their Allowed Claims followed by a transfer of the Trust Assets by the Beneficiaries to the Trust in exchange for their beneficial interests in the Trust; and (c) the Beneficiaries as the grantors and owners of the Trust.

7.2    **Annual Reporting and Filing Requirements.** The Trustee must file any applicable federal, state, local, and foreign tax returns for the Trust as a grantor trust under Treasury Regulation § 1.671-4(a) if required by applicable law.

7.3    **Tax Treatment of Reserves.**

7.3.1    The Trustee may, in the Trustee's sole discretion, determine the best way to treat and report any reserves authorized by the Plan or this Agreement for United States tax purposes including: (a) filing a tax election to treat the reserve as a DOF or other separate entity within the meaning of Treasury Regulation § 1.468B-9 rather than to tax the reserve as a part of the Trust (and, if permitted by applicable law, report consistently with the foregoing for United States federal, state, and local income tax purposes); or (b) electing to report as a separate trust or sub-trust or other entity.

7.3.2    If the Trustee elects to report a reserve as a DOF or other separate entity: (a) the Trust must comply with all federal and state tax reporting and compliance requirements of the DOF or other separate entity, including filing a separate federal tax return for the DOF or other separate entity and paying solely from Trust Assets any federal and state income tax due; and (b) all parties (including the Debtor, the Trust, the Trustee, and the Beneficiaries) must report for United States federal, state, and local income tax purposes consistently with the foregoing.

7.3.3    If any Cash in a reserve is insufficient to pay the portion of any taxes attributable to the taxable income arising from the assets allocable to, or retained on account of the Claims reserved for, the Trustee may, in its discretion: (a) sell any non-Cash assets relating to such Claims to pay such taxes; or (b) reimburse the Trust for the payment of such taxes from any subsequent Cash amounts allocable to, or retained on account of such Claims.

7.4    **Valuation of Trust Assets.** After the Effective Date, but not later than the due date for timely filing of the Trust's first United States federal income tax return (taking into account

applicable tax filing extensions), the Trustee must determine the fair market value of the Trust Assets as of the Effective Date, based on the Trustee's good faith determination, and establish appropriate means to apprise the Beneficiaries in writing of that valuation from time to time as relevant for tax reporting purposes. All parties (including the Debtor, the Trust, the Trustee, and the Beneficiaries) must use the valuation consistently for all applicable United States federal, state, and local income tax purposes. If the Trustee determines that the Trust may be required to withhold from Distributions, the Trustee must endeavor to promptly notify the relevant Beneficiary.

7.5     **Allocations.** Allocations of Trust taxable income among the Beneficiaries must be determined by referring to how an amount of Cash representing such taxable income would be Distributed (were such Cash permitted to be Distributed at that time) if, immediately before that deemed Distribution, the Trust had Distributed all its assets (valued at their tax book value) to the Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust. Taxable loss of the Trust must be allocated by reference to how an economic loss would be borne immediately after a hypothetical liquidating Distribution of the remaining Trust Assets. The tax book value of the Trust Assets for purposes of this section must equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

## Article VIII — TRUSTEE

8.1     **Initial Trustee.** The Trustee has been selected by the Proponents and is appointed as of the Effective Date to serve as Trustee subject to the requirement that the Trustee (including any successor trustee) be a "United States person" within the meaning of IRC § 7701(a)(30). The Trustee (including any successor trustee) may not take any action or make any strategic decisions from a physical location outside of the United States nor carry on business through a branch, agency, or permanent establishment outside of the United States, except that nothing in this Agreement precludes the Trust from retaining and compensating agents and advisors outside of the United States.

8.2     **Duties.** The Trustee has all rights and duties given to the Trustee under this Agreement, the Plan, or the Confirmation Order as well as all rights and duties reasonably related and appurtenant to those so given. The Trustee is not required to obtain any approvals for any action if the Trustee, in good faith reasonably determines (with or without the advice of legal counsel) that the action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement.

8.3     **Term of Service.** The Trustee serves until the earliest of: (a) completion of the Trust's administration, including the winding up of the Trust; (b) termination and dissolution of the Trust in accordance with this Agreement; and (c) the Trustee's resignation, death, dissolution, incapacity, liquidation, or removal. If the Trustee's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Trustee must be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced.

8.4     **Removal.** Only a group of Beneficiaries representing at least 50.1% in value of all beneficial interests ("**Beneficial Quorum**"), on notice and hearing before the Bankruptcy Court, may seek removal of the Trustee for "**Cause**," which is defined as the taking or not taking of any act constituting gross incompetence, gross misconduct, fraud, or criminality. The Bankruptcy Court retains jurisdiction to hear and finally determine any matter arising out of this section. On removal, the removed Trustee must file a complete accounting of monies and assets received, Disbursed, and held during the Trustee's term and must deliver to any successor Trustee all Trust books and records and unlimited access to all Trust data in whatever form.

8.5     **Resignation.** The Trustee may resign at any time on written notice to the U.S. Trustee and Bankruptcy Court. The resignation is effective on the later of (a) the date specified in the notice of resignation and (b) 30 days after the date such notice is filed with the Bankruptcy Court. On resigning, the resigning Trustee must file a complete accounting of monies and assets received, Disbursed, and held during the Trustee's term and must deliver to any successor Trustee all Trust books and records and unlimited access to all Trust data in whatever form.

8.6     **Successor Trustee.** On the resignation, death, dissolution, incapacity, liquidation, or removal of a Trustee, the Trustee or any Beneficiary may file a motion in the Bankruptcy Court to appoint a successor trustee. If no such party seeks the appointment of a successor Trustee, the Bankruptcy Court may do so on its own motion. Any successor Trustee so appointed (a) must consent to and accept appointment as successor Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of appointment as successor Trustee, and (b) has no liability for any act taken or not taken by any predecessor Trustee.

8.6.1     **Interim Appointment.** Any Beneficiary may file a motion in the Bankruptcy Court to appoint an emergency interim Trustee pending the resolution of a motion to appoint a permanent successor Trustee. The interim successor Trustee must meet all qualifications under the this Agreement for any Trustee and must conform all acts to the requirements and restrictions set forth in this Agreement. The interim successor Trustee may receive compensation as set by the Bankruptcy Court. No such interim appointment may last longer than 30 days.

8.6.2     **Powers and Duties.** The successor Trustee must meet all qualifications under the this Agreement for any Trustee and must conform all acts to the requirements and restrictions set forth in this Agreement. A successor Trustee has all the rights, privileges, powers, and duties of the predecessor Trustee under this Agreement, the Plan, and the Confirmation Order.

8.7     **Trust Continuance.** The resignation, death, dissolution, incapacity, liquidation, or removal of the Trustee does not terminate the Trust, revoke any existing agency created under this Agreement, or invalidate any action already taken by any Trustee.

8.8     **Compensation; Costs of Administration.** The Trustee must receive fair and reasonable compensation for its services. All compensation constitutes a charge solely against and solely paid out of the Trust Assets. All costs the Trustee or professionals employed by the Trustee in administering the Trust (or in any manner connected, incidental, or related to administering the Trust) must be paid by the Trust solely from the Trust Assets before any Distribution to any Beneficiaries.

8.9    **Supplemental Trustee.** If the Trustee has a conflict or any of the Trust Assets are situated in any state or other jurisdiction in which the Trustee is not qualified to act as trustee, the Trustee must nominate and appoint a Person duly qualified to act as Trustee (the "**Supplemental Trustee**") with respect to such conflict, or in such state or jurisdiction, and require from each such Supplemental Trustee security the Trustee designates in its discretion. If the Trustee is unwilling or unable to appoint a disinterested Person to act as Supplemental Trustee to handle any such matter, the Bankruptcy Court, on notice and hearing, may do so. The Trustee or the Bankruptcy Court, as applicable, may confer on the Supplemental Trustee any right, power, privilege, and duty of the Trustee under this Agreement except as limited by the laws of the applicable state or other jurisdiction. The Trustee must require the Supplemental Trustee to be answerable to the Trustee for all monies, assets, and other property that may be received in connection with the administration of all property. The Trustee or the Bankruptcy Court, as applicable, may remove a Supplemental Trustee, with or without cause, and appoint a successor Supplemental Trustee at any time by executing a written instrument declaring the Supplemental Trustee removed from office and specifying the effective date and time of removal.

## Article IX — DURATION OF TRUST

9.1    **Duration.** The Trust and this Agreement remain in effect until the Trust is terminated under this Agreement.

9.2    **Termination on Final Distribution.** When the Trust has paid all costs incurred in connection with administering the Trust and has Distributed all Trust Assets in accordance with this Agreement, the Trust automatically terminates and dissolves and the Trustee is discharged from any further responsibility in connection with the Trust except as may be required to effect the Trust's termination under applicable law.

9.3    **Termination after Five Years Unless Extended.** If not been already terminated and dissolved under Section 9.2 above, no later than five years from the Effective Date, unless the Trust term has been extended under Section 9.5 below, the Trustee must Distribute all Trust Assets to the Beneficiaries (after satisfying all Trust costs), at which time Trust immediately and automatically dissolves and terminates and the Trustee is immediately and automatically discharged under Section 9.6 below.

9.4    **No Termination by Beneficiaries.** The Trust may not be terminated or dissolved at any time by a Beneficiary or group of Beneficiaries.

9.5    **Continuance of Trust.** At any time between 48 and 57 months from the Effective Date (the "**Extension Request Window**"), the Trustee may move the Bankruptcy Court for an order, after notice and a hearing, extending the duration of the Trust for any period between six and 18 months (an "**Extension Motion**") beyond the date that is five years from the Effective Date. After that, any subsequent request for a further extension of the Trust's duration must be sought by an Extension Motion brought no later than three months before the end of the previously-extended duration. Any Extension Motion timely filed automatically extends the Trust's duration until the date on which the Bankruptcy Court enters an order granting or denying the Extension Motion.

9.6    **Discharge of Trustee.** After the termination of the Trust and solely for the purpose of liquidating and winding up the Trust's affairs, the Trustee may continue to act as Trustee until its responsibilities have been fully performed. Except as otherwise specifically provided in this Agreement, when all Distributions of Trust Assets, including all reserves, have been made and all Trust expenses paid, the Trustee and the Trust's professionals and agents are immediately and automatically discharged from all duties under this Agreement. The Trustee may seek an order of the Bankruptcy Court confirming that discharge and releasing the Trustee and its employees, professionals, and agents from all liability related to the Trust.

### Article X — MISCELLANEOUS

10.1    **Cumulative Rights and Remedies.** The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

10.2    **Notices.** Notices of motions to the Bankruptcy Court made under this Agreement may be limited to the Post-Effective Date Limited Notice List. All notices required to be given to Beneficiaries may be given by ordinary mail or email at the addresses appearing in the Trustee's records. Any notice or other communication to the Trustee must be in writing sent by registered or certified United States mail (return receipt requested), overnight delivery requiring receipt signature, hand delivery, or email if receipt is confirmed addressed thus:

Legacy Cares Liquidation Trust              Counsel Name
c/o Jeremiah Foster                         Counsel Firm
Resolute Commercial Services    —and—       Street Address
6750 E Camelback Road, Suite 103            City, State ZIP
Scottsdale, AZ 85251                        email address
jfoster@resolutecommercial.com

10.3    **Governing Law.** This Agreement is governed by, and must be construed in accordance with, the laws Arizona irrespective of conflict of laws principles.

10.4    **Execution.** All funds in the Trust must be deemed to be held *in custodia legis* until the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person may execute on, garnish, or attach any Trust Assets in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court. Distributions and Payments are governed solely by the Plan, the Confirmation Order, and this Agreement.

10.5    **Amendment.** This Agreement may be amended only by order of the Bankruptcy Court. No amendment may be inconsistent with the Plan or the Confirmation Order.

10.6    **No Waiver.** No failure or delay in exercising any right or remedy under this Agreement waives any such right or remedy.

10.7    **No Association; No Third Party Rights.** No relationship created in this Agreement may be construed as an association, partnership, or joint venture of any kind. Nothing in this Agreement is intended to vest or does vest any rights in any third parties.

10.8 **Severability.** If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against regulatory or public policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement remain unaffected, unimpaired, and valid.

10.9 **Further Assurances.** Without limiting the generality of Section 2.5 above, the Parties must execute and deliver any documents or notices and to take any further actions reasonably required from time to time to carry out this Agreement's intent and purposes and consummate the transactions this Agreement contemplates.

EXECUTED as of July 1, 2024

Legacy Cares, Inc.

By: _____

Keith Bierman
Chief Restructuring Officer

Jeremiah Foster, solely in the capacity as Trustee under this Agreement

_____