Philip J. Giles, State Bar #30340
**ALLEN, JONES & GILES, PLC**
1850 N. Central Avenue, Suite 1025
Phoenix, Arizona 85004
Office: (602) 256-6000
Fax: (602) 252-4712
Email: pgiles@bkfirmaz.com

Attorneys for Kearney Electric, Inc.

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| In Re: | Chapter 11 |
|---|---|
| LEGACY CARES, INC, an Arizona non-profit corporation. | Case No. 2:23-bk-02832-DPC |
| Debtor. | **MOTION FOR SUMMARY JUDGMENT** |
| | Hearing Date: July 29, 2024<br>Time: 1:30 PM<br>Ctrm: 603 |

Pursuant to Fed. R. Civ. P. 56, made applicable by Fed. R. Bankr. P. 7056, Kearney Electric, Inc. ("<u>Kearney</u>"), by and through undersigned counsel, hereby moves for summary judgment in favor of Kearney and against Okland Construction Company, Inc. ("<u>Okland</u>") with respect to the "Dispute," as described herein. This Motion is supported by the following Memorandum of Points and Authorities, and the Statement of Facts, Declarations of Michael Kearney and Greg Cahill, and Request for Judicial Notice, which are filed contemporaneously herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.  INTRODUCTION**

This Motion seeks to resolve a dispute that should never have come about. While the bankruptcy case and the underlying mechanic lien litigation were somewhat complex, the sole remaining dispute between Kearney and Okland is not. It is quite

{00484395}
Case 2:23-bk-02832-DPC    Doc 782    Filed 06/14/24    Entered 06/14/24 15:31:35    Desc
Main Document    Page 1 of 12

simple: based on the global settlement of all of the asserted lien claims (and the payment of those claims by the project owner and landowner), Kearney is owed $428,573 and Okland, without justification, refuses to pay.

In short, all of the mechanic lienholders in this case agreed to a global settlement by which approximately $19 MM was paid from the sale proceeds to resolve 100% of the $25+ MM in asserted lien claims and which specifically provided that each lien claimant would be paid 75.14% of their principal claim without verification or challenge. In exchange for this payment, the mechanic lienholders would dismiss their claims and release their liens against the landowner, Pacific Proving, LLC ("Pacific"), and the tenant/project owner/debtor, Legacy Cares, Inc. ("Legacy"), as well as various claims the mechanic lienholders asserted against each other.

Kearney's lien at issue,[1] asserted independently as well as part of Okland's lien, was for the principal sum of $3,169,965. As such, Kearney agreed to and expected payment of $2,381,911 (75.14%) to resolve that claim. At no point prior to the settlement did Okland, Pacific, or Legacy (or anyone) contest or challenge the amount of Kearney's lien claim. In fact, the settlement was based on the stated amount of Kearney's lien. However, while full payment was made to Okland, it has only offered to pay Kearney $1,953,338 (61.62%), of the anticipated payment, which Kearney rightly refused. Kearney advised Legacy and Pacific of the "dispute" with Okland, and reiterated its agreement to settle at the agreed to percentage.

Kearney and Okland ultimately agreed, as an accommodation, to resolve the dispute at a later date but allow the proposed sale to move forward including the settlement. To facilitate the global resolution of the dispute, Kearney and Okland agreed that the undisputed amount of $1,953,338 would be paid to Kearney and that a $500,000

---

[1] Kearney had three liens – two arising from direct contracts it had with Legacy Cares (total principal of $2,155,990) and the third as a subcontractor to Okland (total principal of $3,169,965). Kearney accepted settlement of the two direct lien claims at the same rate (75.14%) and was paid $1,620,010 directly as part of the settlement in satisfaction of the two direct liens.

"holdback" would be held in trust while the parties attempt to resolve the balance of Kearney's claim—$428,573. Kearney and Okland were unable to resolve the dispute at mediation, and Kearney therefore brings this Motion seeking a final adjudication of the same. For the reasons stated herein, Kearney is entitled to the $428,573 based on the deal it reached with Pacific and Legacy, and Kearney requests the Court order Okland to immediately turn these funds over to Kearney.

B. STATEMENT OF FACTS

    a. GENERAL BACKGROUND

Legacy is a nonprofit organization that operated Legacy Park, formerly known as Bell Bank Park (the "Sports Park"). Statement of Facts ("SOF") ¶ 1. The Sports Park is a 320-acre sports and entertainment complex located in Mesa, Arizona, which hosts youth, adult and amateur sports, and serves as a venue for sports and entertainment events. SOF ¶ 2. The land upon which the Sports Park sits is owned by Pacific. SOF ¶ 3. Legacy leased the land from Pacific pursuant to that certain *Ground Lease Between Pacific Proving, LLC as "Landlord" and Legacy Cares, Inc. as "Tenant" for the "Premises"* ("Ground Lease") that enabled Legacy to improve upon and use Pacific's land to operate the Sports Park. SOF ¶ 4.

Kearney was one of the many contractors hired by Legacy that aided in the construction of the Sports Park. SOF ¶ 5. Kearney's role was to install electric utilities throughout the Sport Park. *Id.* Kearney provided services to Legacy directly, and through Okland. SOF ¶ 6. The relationship between Kearney and Okland in connection with the development of the Sports Park is documented through those certain *Okland Construction Company, Inc. Master Subcontract Agreement* dated August 22, 2019 and the *Okland Construction Company, Inc. Work Order Pursuant to Master Subcontract Agreement* dated May 3, 2021. SOF ¶ 7.

By the end of Kearney's involvement with the construction of the Sports Park and

including all change orders required throughout the project, Kearney had not been paid in full for services rendered and was owed at least $2,155,990 on account of the services Kearney provide directly to Legacy, and $3,169,965 on account of the services Kearney provided to Legacy as a subcontractor under Okland. SOF ¶ 8. Because of nonpayment and to protect its interests, Kearney recorded three mechanic liens with the Maricopa County Recorder. SOF ¶ 9. Kearney's liens are against both Legacy and Pacific. *Id.*

Also due to nonpayment of Kearney's and other mechanic lienholders' claims, Kearney, among others, initiated lien foreclosure actions before the Maricopa County Superior Court, which were eventually consolidated into Case No. CV2022-013494 (the "Lien Foreclosure Litigation"). SOF ¶ 10. To stop the Lien Foreclosure Litigation, on May 1, 2023, Legacy filed a voluntary chapter 11 petition with the U.S. Bankruptcy Court for the District of Arizona, case no. 2:23-bk-02832-DPC. SOF ¶ 11.

Legacy, in its bankruptcy schedules ("Schedules") filed under penalty of perjury, identified Kearney as holding three secured claims against it totaling $5,681,026.22. SOF ¶ 12. The Schedules also identify Okland as holding a claim in the amount of $24,073,511.99. SOF ¶ 13. On June 29, 2023, Kearney filed its Secured Proof of Claim listing a total claim of $5,350,104.25 on account of both of its liens, which represented the principal amount due and owing to Kearney of $5,325,954.25 plus attorney fees and costs incurred prior to the bankruptcy filing. SOF ¶ 14. Okland also filed a secured Proof of Claim listing a total claim of $25,254,538.51. SOF ¶ 15. During the pending bankruptcy case, Legacy removed the Lien Foreclosure Litigation to the bankruptcy court, thereby initiating adversary proceeding no. 2:23-ap-00089-DPC. SOF ¶ 16.

b. THE "DEAL"

On or about October 19, 2023, Legacy received a $17 MM purchase offer from Burke Operating Partners for the Sports Park as a going concern, subject to resolution of

the Lien Foreclosure Litigation and, more specifically, resolution of all mechanic liens against Legacy and Pacific. SOF ¶ 17. Kearney, through counsel, negotiated with Legacy's and Pacific's counsel regarding what Kearney would accept to settle the mechanic lien dispute and release its liens for a sale of the Sports Park to proceed. SOF ¶ 18. Kearney's final position was that it needed to receive at least $4 MM or 75% of the principal value of Kearney's lien claims for Kearney to agree to release its liens for the sale to go through. *Id.*

On October 23, 2023 at 11:40 AM (Arizona time), Pacific's counsel emailed all mechanic lien claimants advising the purchase offer from Burke Operating Partners has increased and "$19mm will be paid to satisfy 100% of the [mechanic lienholder] claims—whether under Okland or direct [mechanic lienholder] claims. This amounts to 75.14% of the principal amount of **all** lien claims." SOF ¶ 19. (**emphasis** added). Kearney accepted the offer, as stated in Pacific's counsel's email dated October 23, 2023. *Id.* And based on the agreement reached with Pacific, Kearney agreed to release its liens against Legacy and Pacific in exchange for a total distribution of $4,001,922.59, broken out as follows:

| Kearney's expectation | | Lien Value | 75.14% distribution | % Return |
|---|---|---|---|---|
| | Under Okland | 3,169,965.00 | $2,381,911.70 | 75.14% |
| | Direct | 2,155,990.00 | $1,620,010.89 | 75.14% |
| | Total | 5,325,955.00 | **$4,001,922.59** | 75.14% |

SOF ¶ 20.

On October 23, 2023 at 8:13 PM, Okland's counsel forwarded to Kearney's counsel an email purporting to offer Kearney $1,953,338 to settle its lien and claim under Okland. SOF ¶ 21. Based on Okland's proposed settlement, the total distribution to Kearney would be $3,573,348.89 or 67.09% of its lien amount, which is $428,573.70 less than what Kearney had agreed to with Pacific, as outlined below:

///

Case 2:23-bk-02832-DPC    Doc 782    Filed 06/14/24    Entered 06/14/24 15:31:35    Desc
Main Document    Page 5 of 12
{00484395}

|  |  | Lien Value | 67% distribution |  |
|---|---|---|---|---|
| Okland's proposal | Under Okland | 2,600,000.00 | $1,953,338.00 | 61.62% |
|  | Direct | 2,155,990.00 | $1,620,010.89 | 75.14% |
|  | Total | 4,755,990.00 | $3,573,348.89 | 67.09% |

SOF ¶ 21.

On October 23, 2023 at 9:20 PM, Kearney's counsel advised Okland's counsel that Okland's proposed settlement amount is based on Okland's incorrect calculation of Kearney's claim, and it does not mirror the deal reached with Pacific and Legacy which resulted in a 75.14% return to Kearney on account of its liens. SOF ¶ 22. Kearney's counsel again wrote to Okland reiterating Kearney's position that it will not accept less than the 75.14% return on principal of the liens as offered by Pacific and Legacy and accepted by Kearney. SOF ¶ 23. Kearney's counsel subsequently notified Pacific's counsel of the newly raised issue by Okland and that Kearney stands willing to settle its lien against Pacific's land for the offer stated by Mr. Abraham, which Kearney accepted. SOF ¶ 24.

On October 24, 2023 at 1:00 PM, the bankruptcy court held a continued hearing on Legacy's *Motion for Sale of Property et al.* [ECF No. 335]. SOF ¶ 24. At the hearing, Pacific's counsel represented to the bankrupt court: (*i*) with respect to the resolution of the mechanic lienholder dispute, there will be available a pot of $19,142,000 that will be available for distribution for holders of mechanic liens; and (*ii*) the anticipated distribution from the pot to the mechanic lienholders of $19,142,000 is approximately 75.14%. SOF ¶ 26. Legacy's counsel also represented to the bankruptcy court that under the terms of the deal, approximately $19,142,000 from the sale proceeds will be allocated to the mechanic lienholders to provide them with an approximate 75% distribution on principal. SOF ¶ 27.

On or about November 20, 2021, Kearney, among others including Legacy,

Pacific, and Okland, executed a *Memorandum of Understanding* ("MOU") which outlined the key terms of the proposed sale of the Sports Park to Burke Operating Partners (and its designee). SOF ¶ 28. The MOU provides $19,142,000 will be paid to the mechanic lienholders, including Kearney, and the distribution to mechanic lienholders is as per Table 3 to the MOU. *Id.* Per Table 3 to the MOU, Legacy accounted for a payment to Kearney on account of its direct lien in the amount of $2,155,990 and its lien under the Okland umbrella, which is in the amount of $3,169,965. *Id.*

On November 22, 2024, the bankruptcy court entered the *Order (I) Authorizing and Approving the Sale et al.* ("Sale Order"), which authorized the sale of the Sports Park pursuant to 11 U.S.C. § 363, addressed the global settlement between the mechanic lienholders, Pacific, Legacy, and others, incorporated the MOU, and provided for a "Holdback" of $500,000. SOF ¶ 29. For the Holdback, Okland and Kearney agreed $500,000 of the distribution to Okland will be held in an account until resolution of the dispute ("Dispute") between Okland and Kearney. SOF ¶ 30.

On or about December 14, 2023 closing occurred for the sale of the Sports Park. SOF ¶ 31. Kearney received $1,620,071 on account of and in full satisfaction of its direct lien, and $1,953,338 on account of its lien under Okland, which has not been fully satisfied in accordance with the agreement reached between Kearney, Legacy, and Pacific. *Id.*

**C. ARGUMENT**

    a. LEGAL STANDARD

Under Fed. R. Civ. P. 56, made applicable by F. R. Bankr. P. 7056, summary judgment should be granted where the pleadings and the supporting documents, viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(e), Fed. R. Civ. P., showing there is a genuine issue for trial. *Id.* at 256. "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. *Villiarimo v. Aloha Island Air Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). "Thus, the relevant inquiry in a summary adjudication motion is threefold: is there a genuine issue, is that issue about a material fact, and is the moving party entitled to judgment as a matter of law." *State of Cal. v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

### b. A DEAL IS A DEAL.

Kearney reached a deal with Pacific and Legacy which allowed the sale of the Sports Park to go through in exchange for a set payment in satisfaction of Kearney's liens. While there were many facets to the resulting sale, the deal is quite simple. Legacy received a purchase offer from Burke Operating Partners to purchase the Sports Park for $19,142,000, subject to resolution of the mechanic lienholders' claims, including Kearney. Because this amount alone was insufficient, and with Pacific wanting to have the liens recorded against its land released as part of the sale, Pacific chipped in $6,042,000 to the sale consideration in order for the sale to go through.

Pacific did not decide to chip in $6,042,000 on a whim. Pacific separately negotiated with each of the mechanic lienholders—including Kearney—to understand what they were willing to accept for payment on account of their respective claim and lien, knowing that the mechanic lienholders would never be paid in full.

When it came to Kearney's three liens, Kearney was clear with Pacific and Legacy that it would be willing to accept less than full payment of the face value of its mechanic liens, but under no circumstances would it accept less than $4 MM. Kearney's direct and indirect (i.e., through Okland) liens totaled $5,325,955. No party blinked, nor did Pacific or Legacy challenge Kearney's lien amounts.

Eventually, between Kearney's offer and the agreements Pacific and Legacy made with other mechanic lienholders, Pacific agreed to contribute $6,042,000 to the purchase price which, among other things, enabled the mechanic lienholders to receive a 75.14% distribution on the principal amount of their liens. Pacific's representatives confirmed this both in writing and at the October 24 hearing; Legacy's representatives also confirmed this at the October 24 hearing; and the Court approved the sale of Legacy pursuant to the terms presented to it, including the global settlement between the mechanic lienholders, Legacy, and Pacific. Thus, pursuant to the terms of the deal, Kearney was to receive a distribution of sale proceeds equivalent to 75.14% of the face value of its liens or $4,001,922.59. There is nothing more to it, and the Court should order Okland to remit $428,573.00 from the Holdback to Kearney since it rightfully belongs to Kearney.

   c. OKLAND HAS NO RIGHT TO INTERFERE WITH KEARNEY'S AGREEMENT

Okland has no right to interfere with the agreement reached between Kearney, on the one side, and Legacy and Pacific, on the other. For starters, Kearney recorded its own liens on account of the services provided to Legacy, and therefore is the only party entitled to negotiate settlement of those liens. Under no circumstances was Kearney reliant upon any lien or any action taken by Okland when negotiating settlement.

Secondly, by Pacific, the **landowner**, and Legacy, the **project owner**, agreeing to a settlement that paid Kearney 75.14% of the principal amount of the liens, they have effectively and unequivocally approved Kearney's claim amounts, the work performed

by Kearney, and the value provided by Kearney. (**emphasis** added). In other words, Okland's belated challenge to any change orders issued by Kearney during the project is irrelevant and of no consequence. Okland does not have standing to interject and argue that the amounts due to Kearney and paid by Pacific and Legacy should be reduced on the account of change orders submitted over four years ago when Pacific (the landowner) and Legacy (the project owner) have approved paying a percentage of the entirety of the principal claim due to Kearney inclusive of all change orders. Accordingly, Okland has no right to interfere with Kearney's agreement with Pacific and Legacy.

### d. TO THE EXTENT OKLAND ARGUES IT CAN REFUSE PAYMENT TO KEARNEY ON ACCOUNT OF A *PAY WHEN PAID* CLAUSE, IT CANNOT.

To the extent Okland argues that it can refuse to pay Kearney the entire amount owed because of a "pay-when-paid" clause, Okland's argument is dead on arrival. The Master Subcontract Agreement at Paragraph 31 provides a pay-when-paid clause which states, in relevant part:

> . . . All payments to Subcontractor under this Subcontract shall be made by Contractor solely and exclusively out of funds Contractor receives from Owner. Subcontractor acknowledges that it shares, to the extent of payments to be made to it, in the risk that Owner may fail to make one of more payments to Contractor for all or a portion of its Work. . .

*See* SOF ¶ 6, Kearney Declaration, Exhibit 2.

The import of this type of clause in a construction contract is not surprising. A general contractor does not want to be responsible to a subcontractor for work performed on behalf of an owner in an amount greater than the owner actually pays the general contractor. That is, if a subcontractor bills $100,000 for work performed and the owner pays the general contractor $80,000 for that work, the subcontractor, rather than the general contractor, contractually bears the risk of non-payment (or lesser payment) by the owner and agrees to accept the $80,000. Such clauses, if properly drafted, are

enforceable as a matter of settled Arizona law. *L. Harvey Concrete, Inc. v. Agro Const. & Supply Co.*, 189 Ariz. 178, 939 P.2d 811 (App. 1997).

The situation before this Cout, however, is absolutely not a pay-when-paid situation. Here, the record is clear, Legacy and Pacific paid $2,381,911.70 (75.14%) to resolve Kearney's $3,169,965 lien claim, an amount which Kearney agreed to accept. However, Okland has refused to pay Kearney that amount. There has been no non-payment by the Owner. Okland cannot use this provision as a basis for it to unilaterally refuse to pay Kearney the full $2,381,911.70 Legacy and Pacific paid, and Kearney agreed to accept, as payment in full for Kearney's lien claim.

In fact, Arizona's Prompt Payment Act requires Okland to pay Kearney the amount it received from the Legacy and Pacific for Kearney's work, as follows:

> If a subcontractor or material supplier has performed in accordance with the provisions of a construction contract, **the contractor shall pay to its subcontractors** or material suppliers and each subcontractor shall pay to its subcontractors or material suppliers, **within seven days of receipt by the contractor or subcontractor of each progress payment, retention release or final payment, the full amount received for such subcontractor's work** and materials supplied based on work completed or materials supplied under the subcontract

A.R.S. § 32-1183(b) (**emphasis** added). Both the Master Subcontract Agreement and Arizona law require Okland to pay Kearney the remaining amount due it - $428,573.

## D. CONCLUSION

For the reasons discussed herein, Kearney respectfully requests that the Court grant summary judgment as follows:

A. Finding in favor of Kearney with respect to the Dispute;

B. Ordering Okland to remit to Kearney $428,573 from the Holdback;

C. Awarding Kearney its reasonable attorneys' fees and costs pursuant to A.R.S. §§12-341 and 12-341.01; and

D. Granting any further relief as the Court may deem just and equitable.

DATED: June 14, 2024.

**ALLEN, JONES & GILES, PLC**

/s/ *PJG #30340*
Philip J. Giles
1850 N. Central Ave. Suite 1025
Phoenix, Arizona 85004
Attorneys for Kearney Electric, Inc.